# EXHIBIT A

| | |
|---|---|
| STATE OF MINNESOTA | DISTRICT COURT |
| COUNTY OF HENNEPIN | FOURTH JUDICIAL DISTRICT |

| | |
|---|---|
| Kevin Williams and Pat Williams, | Court File No. 27-cv-08-29778 |
| Plaintiffs, | **SECOND AMENDED COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| National Football League, | |
| Defendants. | |

Kevin Williams and Pat Williams ("Plaintiffs"), by their attorneys, Crowell & Moring LLP and Fulbright & Jaworski L.L.P., as and for their Second Amended Complaint in the above-referenced action, state and allege as follows:

## NATURE OF THE ACTION

1. This is an action seeking damages for the harm suffered as a result of the National Football League's ("NFL") violations of the unambiguous and unyielding requirements of both the Minnesota Drug and Alcohol Testing in the Workplace Act ("DATWA") and the Minnesota Consumable Products Act ("CPA") and equitable relief enjoining the NFL's willful violations of the public policy underlying those statutory protections created for employees in the State of Minnesota. Plaintiffs also seek injunctive relief and other equitable relief as provided for by statute as well as compensatory damages, and attorneys' fees.

## THE PARTIES

2. Plaintiff Kevin Williams is a 6-year veteran of the NFL, a husband and father of two children, and a pillar of his community of Minneapolis, Minnesota, where he resides.

1

3.  Plaintiff Pat Williams is a 12-year veteran of the NFL, a husband and father of three children, and a pillar of his community of Monroe, Louisiana, where he resides in the off-season, as well as of Minneapolis, Minnesota, where he resides during the NFL season.

4.  Defendant NFL is an unincorporated association owned by its members. The NFL approves players' contracts, controls players' workplace conditions, and sets forth, *inter alia,* guidelines for the administration of the NFL Policy on Anabolic Steroids and Related Substances (the "Program")

## **FACTUAL BACKGROUND**

5.  The Program purports to advance three primary goals with regard to the use of anabolic/androgenic steroids, stimulants, growth hormones and related substances: (1) assuring the fairness and integrity of athletic competition; (2) combating adverse health effects of using prohibited substances; and (3) educating young people about steroids.

6.  The Program bans Bumetanide, a controlled substance found (and undisclosed, to all but the Defendant in this case) in StarCaps, a weight-loss aid regularly available at all times relevant to the instant action in stores and online. StarCaps was a legal consumable product that, in the absence of Bumetanide, is not a banned product in the Program.

7.  The NFL has wantonly ignored the first two basic tenets of the Program and, as a result, Plaintiffs have suffered irreparable injury to their reputations and livelihood, and are threatened with continuing and future injury if the Defendant is not enjoined from taking the threatened actions described below. Moreover, as a result of Defendant's actions in this matter, it has also compromised the third tenet of the Program.

8.  Furthermore, the NFL has failed to take even the most basic steps to ensure that the testing to which players are subjected under the Program meets the statutory requirements of

Minnesota State law. Consequently, nearly every aspect of the testing the NFL performed on the samples submitted by Plaintiffs, and its subsequent notification of the results, was in direct violation of the privacy and procedural rights and protections afforded to Plaintiffs under Minnesota law.

9. The NFL, on December 2, 2008, suspended and otherwise disciplined, and are continuing to discipline, at least two of its players, Plaintiffs Kevin Williams and Pat Williams, despite its acknowledgment that neither tested positive for anabolic steroids, knowingly ingested any substance banned by the Program, masked or attempted to mask their ingestion of any substance, nor ever tested positive for anabolic steroids during their long and productive years in the NFL despite frequent and random drug testing.

10. The NFL has unfairly and wrongfully compromised Plaintiffs' reputations, their place in the community and the compensation towards which they have spent years building, as well as their privacy rights, based upon a series of circumstances that included an unexplained and irrational cover-up by top NFL executives that was likely to jeopardize Plaintiffs' health and welfare and certain to entrap and otherwise compromise NFL players, with no regard to the protections afforded Plaintiffs under Minnesota law.

**Defendant NFL Discovers the Existence of an Undisclosed**
**Controlled Substance in a Product Widely Used by NFL Players**

11. As early as 2006, the "Independent Administrator" in charge of the Program, John Lombardo, M.D., learned that: (1) several NFL players were using a product called StarCaps as a weight-loss aid; (2) StarCaps was advertised as having only "natural ingredients"; (3) StarCaps in fact contained a controlled substance, Bumetanide; and (4) detection of Bumetanide in a player being tested under the Program would yield a positive result for a banned substance, thereby subjecting the player to suspension.

12. By sometime in late 2006, the NFL had confirmed that: (1) StarCaps contained Bumetanide; (2) Bumetanide presented a potentially "acute" medical threat to any person unwittingly ingesting the substance; and (3) the issue was sufficiently dangerous that the NFL encouraged a more thorough scientific review of the situation, which confirmed the presence of Bumetanide in StarCaps and resulted in a top NFL lawyer, Adolpho Birch, undertaking the responsibility to warn the Food & Drug Administration ("FDA") of the presence of Bumetanide in StarCaps while overtly discouraging a scientist involved in the scientific review from making the disclosure.

13. Notwithstanding the above, the NFL did not (1) warn NFL players or teams of the presence of Bumetanide in StarCaps; or (2) alert the FDA of the presence of Bumetanide in StarCaps despite Mr. Birch undertaking the responsibility to do so.

14. More concerned about the commercial aspect of the NFL than the health and safety of the players and the integrity of the Program, the NFL, in December 2006, circulated a memorandum barring NFL personnel from endorsing products manufactured by Balanced Health Products, the manufacturer of StarCaps, but did not warn players – or anyone else – that StarCaps contained Bumetanide, nor did the NFL release a specific advisory, as it does from time to time, warning players not to use StarCaps.

15. Tellingly, the memorandum used to distribute this information about endorsements was sent to NFL Presidents, General Managers and head athletic trainers but *not* to players. Indeed, even in a December 19, 2006 letter informing the NFLPA of the endorsement ban, the NFL continued to hide the fact that StarCaps contained Bumetanide, simply telling the NFLPA to distribute the letter through "normal channels" – meaning it would not get circulated directly to players – and failing to say anything about StarCaps containing Bumetanide.

16. Importantly, StarCaps was never placed on the NFL's list of substances or products banned under the Program, even as an "example" of a prohibited product, as the NFL frequently has done with other products.

17. Moreover, as the NFL and Mr. Birch well knew, the Program's "Hotline" telephone service, supposedly designed as an outlet for information for players, was providing erroneous information about StarCaps, informing players on at least two occasions that StarCaps was not banned under the Program and providing general warnings equally applicable to the use of vitamins as it was to the use of a potentially lethal product.

**Defendant Fails to Afford the Williamses the
Rights and Protections Required by Minnesota Law**

18. Neither Plaintiff has ever taken anabolic steroids. Neither Plaintiff has ever masked or otherwise diluted a urine sample taken as part of the administration of the Program or otherwise in order to disguise the use of any substance. It is undisputed that neither of the Williamses has ever violated the Program despite undergoing years of testing.

19. Notwithstanding, on July 26, 2008, both of the Williamses tested positive for having Bumetanide in their system.

20. Neither had any trace of an anabolic steroid or any sign of diluting their urine samples or masking any substance.

21. Despite that conclusion, both Williamses were referred for discipline under the Program.

22. Two months after the test, Mr. Birch informed Kevin Williams, on September 26, 2008, and Pat Williams, on October 3, 2008, that they would each be suspended for four games.

23. Following a hearing, the NFL - four months after the "positive" tests - suspended each of the Williamses on December 2, 2008, for four games. The NFL rationalized the decision by stating that it was enforcing a strict liability policy – which is fiction.

24. In fact, the "strict liability" policy was more fiction than fact, having been ignored in both practice and principal by the NFL for at least a period of 2005 through the end of 2007, during which time the NFL did not discipline perhaps as many as almost one dozen players who had testified positive for Bumetanide, apparently always as a result of the use of StarCaps.

25. Neither Plaintiff would have used StarCaps had the NFL disclosed to players that the product contained a banned substance or that its label and advertising was erroneous. NFL officials have stated that, without Bumetanide, the use of StarCaps would not violate the Program.

26. Both Plaintiffs suffer from medical conditions that could have been exacerbated by the ingestion of Bumetanide and, indeed, could have presented acute health risk.

27. Despite confidentiality requirements set forth in Minnesota statutory law, as well as in the Program, just hours after the NFL proposed the four-game suspension in late September and early October, and before Plaintiffs could even provide notice that they were challenging the proposed sanction (and apparently before Plaintiffs had even learned of the proposed suspension), news of the NFL's suspension was broadcast throughout the country.

28. Indeed, despite the clear statutory mandate of confidentiality, and having been provided with leads about the source of the leaks, the NFL has conducted no investigation of the violation.

29. Defendants had a duty to inform Plaintiffs, at the time they received notice of the positive test result, that they had a "right to explain the positive test," including identifying "any

over-the-counter or prescription medication that the individual is currently taking or has recently taken and any other information relevant to the reliability of, or explanation for, a positive test result." Minn. Stat. § 181.953(6).

30. Not only did the NFL fail to provide proper notice of this right, but Defendants have made it abundantly clear that even the most innocent explanation would be irrelevant.

31. Defendants immediately imposed discipline upon Plaintiffs by placing them on "reasonable cause testing" in the absence of a second confirmatory test which Minnesota law requires. Reasonable cause testing permits Defendants to test a player for drugs twice every month for one year. Subjecting an employee to that level of constant scrutiny for that period of time can only fairly be described as discipline.

32. Defendants rejected Kevin Williams' specific request to appeal Defendant's imposition of reasonable cause testing.

33. At every turn, Defendants failed to provide Plaintiffs with timely statutory notice.

34. The fact that Plaintiffs were tested pursuant to an annual exam triggered the requirement that they receive two weeks written notice in advance of any testing.

35. Defendants admit to providing Plaintiffs with no notice.

36. In addition, Defendants failed to ensure that they were timely notified by the laboratory of the positive confirmatory result and, in turn, failed to provide timely notice to Plaintiffs of the results of the positive confirmatory result (in this case the 'B' test). In each of the Williamses' cases, Defendants missed the three-day deadline prescribed by statute at least four times over.

37. Pat Williams' 'B' test was conducted on September 9, 2008, and there was no notification from the laboratory of the results until September 29, 2008.

38. Similarly, Kevin Williams' 'B' test was conducted on September 9, 2008, and there was no notification from the laboratory of the results until September 22, 2008.

39. Additionally, Defendants were required by Minn. Stat. § 181.953(7) to notify Plaintiffs within three days of the positive confirmatory test. Plaintiffs were not notified for *months* of the positive confirmatory test. Plaintiffs were initially tested on July 26, 2008, but did not receive notice of the positive confirmatory test until September 26, 2008 and October 3, 2008.

40. Minnesota Statute § 181.953(9) mandates that an employee be provided with the right to confirm a 'B' test result – meaning a right to a third test. Plaintiffs specifically requested a third test. Defendants denied Plaintiffs' request for the particular test requested or for any third test.

41. Defendant also failed to give Plaintiffs notice of their right to conduct a third test as required by Minn. Stat. § 181.953(7).

42. Defendant have acknowledged that the UCLA Olympic Analytical Laboratory, which conducted the testing of Plaintiffs' samples, was not certified, accredited or licensed by the National Institute on Drug Abuse, the College of American Pathologists or the New York State Department of Health, as required by Minn. Stat. § 181.953(1).

**Defendant Continues to Subject the Williamses to Discipline in Violation of Minnesota Law Despite Assurances to This Court that No Disciplinary Action Would be Taken**

43. Since participating in the Pro-Bowl last season, in or around February 2009, the Plaintiffs have been subjected to increased drug testing and intrusion in their day-to-day functioning under the auspices of "random" drug testing by the NFL which clearly are not random at all.

8

44. Defendant has subjected Plaintiffs to repeated, heightened and increasingly intrusive drug testing as though they are violators of the Program. The Plaintiffs are being treated as though they have been suspended, despite assurances from Defendant that they are not suspended or subject to discipline.

45. Since February 2009, despite an injunction preventing the NFL from disciplining the Plaintiffs pursuant to the December 2, 2008 decision, the NFL has subjected Plaintiffs to drug testing approximately two to three times per month. Before February 2009, and before Defendant began treating the Plaintiffs as though they are violators of the Program, they were tested approximately three times per year. Plaintiffs are currently being tested far more frequently than they were prior to February 2009.

46. The NFL's heightened and repeated drug testing does not afford Plaintiffs 24 hours' notice of any test.

47. Plaintiffs have never been advised of the results of these tests.

48. Plaintiffs are routinely called and told to report for testing the same day, often as the specimen collector is en route to test them. Plaintiffs have no choice but to subject themselves to the test despite the lack of notice. If they were to refuse, Defendants would be deemed to have had a positive result and consequently they would be treated as though they are in violation of the Program.

49. Plaintiff Kevin Williams has been forced to subject himself to a test while on a fishing trip in Arkansas. He was contacted while fishing and told that the specimen collector was en route. Because of the unavailability of a suitable clean testing site, Mr. Williams was forced to submit to testing at a roadside McDonalds. Mr. Williams was not afforded the opportunity to refuse such testing.

50. Plaintiffs are routinely left messages regarding being available for testing. If either fails to respond to the messages within 24 hours, irrespective of their availability or circumstance, they will be deemed to have tested positive for drug use and will be deemed to have violated the Program.

51. The drug tests Plaintiffs have been subjected to since February 2009 are not random. Both Plaintiffs are routinely tested on the same day despite the Program's requirements that tests will be administered *only if* a player is selected randomly by computer program.

52. The privacy and confidentiality guaranteed Plaintiffs under the Program and required by Minnesota State law have been repeatedly and overtly breached. Each Plaintiff is routinely asked by the specimen collector where the other is so that testing of the other can be administered on the same day.

53. Plaintiffs are being treated as though they are violators of the Program. This treatment has interfered with Plaintiffs' day-to-day activities and serves unfairly to label Plaintiffs as violators of the Program - which they are not - to their teammates, coaches, family, friends and community.

54. Defendants are unfairly retaliating against Plaintiffs because of these proceedings and the claims they have asserted against Defendant.

## NEED FOR EXIGENT INJUNCTIVE RELIEF

55. The NFL's treatment and testing of the Williamses under the Program was in direct contravention of the requirements set forth in both DATWA and the CPA.

56. The NFL has failed to ensure that the Williamses were afforded the minimum protections afforded under DATWA and the CPA and by Minnesota public policy as incorporated in, and reflected by, these statutory protections for the due process and privacy

10

rights of all employees in the State of Minnesota. As a result, the Williamses reputations have been smeared, their careers have been irreparably tarnished, and their standing in the community has been diminished.

57. Without injunctive relief, the NFL will enforce the December 2, 2008 suspension of each player that is illegal under Minnesota law and the Williamses will suffer irreparable harm as a result.

## COUNT I
### (Injunctive Relief)

58. Paragraphs 1 through 57 are incorporated herein and made a part of this claim.

59. Plaintiffs have demonstrated a likelihood of ultimate success on the merits based on the allegations set forth herein.

60. Plaintiffs will suffer irreparable injury if the injunctive relief sought is withheld or lifted.

61. The sanctions that would be imposed on Plaintiffs by the NFL's December 2, 2008 decision, which was to take effect immediately, would cause Plaintiffs substantial irreparable injury that could not be fully remedied with monetary compensation. The NFL's decision to bar Plaintiffs from participating in four NFL games, from practicing, attending team and individual meetings, training at the Minnesota Vikings' practice facility, spending time at the Minnesota Vikings' practice facility, communicating with teammates or members of the coaching staff, attending team functions, attending Minnesota Vikings' games even as a spectator and from collecting their salaries would cause Plaintiffs not only to lose their weekly wages but also to miss a significant part of one of the seasons that comprises their short

professional careers. This would impact Plaintiffs' sports records and impact their eventual ability to be inducted into the Professional Football Hall of Fame.

62. Suspension under the Program would preclude Plaintiffs from being included in the NFL Pro Bowl team, an all-star football team that is a prestigious honor. The opportunity to "make-up" the time lost is not an option. Plaintiffs would simply never have the ability to participate in these lost games and practices again. Moreover, being selected for the NFL Pro Bowl has significant implications for compensation that could not be recuperated.

63. Plaintiffs' contracts also contain bonus clauses that would necessarily be affected by punishment wielded by the Defendant. The monetary losses cannot be accurately calculated for purposes of an injunction because of the snowball effect the NFL's suspension would have on the reputations, earning potential, and NFL standing of Plaintiffs. The games, including the Pro Bowl, once forgone can never be recovered.

64. The NFL's actions severely compromise Plaintiffs' reputations and standing in their community, among their fellow athletes, and in the public.

65. The NFL's own press release, as well as the hundreds of spin-off reports by the mass media, makes clear that Plaintiffs were suspended for violating the NFL's "anti-doping policy" without any substantive provision to assure that it is clear and undisputed that Plaintiffs did not use steroids or otherwise try to ingest banned substances. Plaintiffs' reputations are irreparably being smeared.

66. The balance of the equities tips in favor of Plaintiffs rather than the Defendant.

67. Plaintiffs are the only parties who have and will continue to suffer from the NFL's proposed suspension.

68. The NFL has falsely attempted to rationalize its administration of the Program – to this Court, to the United States District Court, to Congress, to players, and to the media, -- as being premised upon a "strict liability" policy. That rationalization is more fiction than fact, having been ignored – without notice or disclosure to the Plaintiffs or their union or to anyone else -- in both practice and principal by the NFL for at least a period of 2005 through the end of 2007, during which time the NFL did not discipline perhaps as many as almost one dozen players who had testified positive for Bumetanide, apparently always as a result of the use of StarCaps.

69. The relief herein sought would cause minimal hardship to the NFL because it receives no benefit from the suspension. Moreover, even if the NFL were to prevail on the merits in this action, which it will not, it can always move forward and institute the suspension at the resolution of this case. The relief herein sought only seeks to maintain the *status quo*, and provide Plaintiffs with the opportunity to defend their good names and expose the bad acts of the NFL.

## COUNT II
### (Violation of Minnesota Drug and Alcohol Testing in the Workplace Act)

70. Paragraphs 1 through 69 are incorporated herein and made a part of this claim.

71. Plaintiffs have enumerated rights and remedies pursuant to DATWA.

72. For purposes of DATWA, Plaintiffs are employees of the NFL.

73. For purposes of DATWA, NFL is an "employer."

74. Defendants have violated Plaintiffs' rights and the substantive procedural protections set forth in DATWA in at least the following ways:

   a. Failing to consider in good faith the innocent explanation provided by Plaintiffs for the finding of Bumetanide in their system, as required by Minn. Stat. § 181.953(6);

13

b. Failing to notify Plaintiffs of their right to explain the positive result, as required by Minn. Stat. § 181.953(6);

c. Failing to adhere to Minn. Stat. § 181.953(10)(a), which prohibits the imposition of any discipline upon an unconfirmed initial positive test result;

d. Failing to provide Plaintiffs with two weeks written notice in advance of the drug test taken as part of an annual routine physical examination, as required by Minn. Stat. § 181.951(3);

e. Failing to ensure that the laboratory provided written test results within three days of the confirmatory test, as required by Minn. Stat. § 181.953(3);

f. Failing to provide Plaintiffs with notice of the result of the confirmatory test results within three days, as required by Minn. Stat. § 181.953(7);

g. Failing to notify Plaintiffs that they were entitled to a third test of their samples at their own expense, as required by Minn. Stat. § 181.953(7);

h. Failing to allow a third test of Plaintiffs' sample, as required by Minn. Stat. § 181.953(9);

i. Failing to use a properly licensed, accredited or certified laboratory, as required by Minn. Stat. § 181.953(1);

j. Failing to assure the confidentiality requirements set forth in Minn. Stat. § 181.954(2); and

k. Failing to refrain from retaliating against the Williamses for commencing and continuing this action. Minn. Stat. § 181.956(5).

75. Defendant's violations of DATWA were knowing and reckless.

76. The NFL is unfairly retaliating against Plainitffs because of these proceedings and their claims against Defendant, in violation of DATWA. Minn. Stat. § 181.953(5).

77. As a result, Plaintiffs have suffered compensatory damages in excess of $10,000,000, in an exact amount to be determined at trial, reputation damage in an exact amount to be determined at trial, and attorneys' fees in this matter.

## COUNT III
### (Violation of Minn. Stat. § 181.938)

78. Paragraphs 1 through 77 are incorporated herein and made a part of this claim.

14

79. For purposes of Minn. Stat. § 181.938, also known as the CPA, Plaintiffs are employees of the NFL.

80. Plaintiffs consumed StarCaps, which they justifiably believed to be, and which was sold and advertised as, a lawful consumable product.

81. Plaintiffs took StarCaps at night and not while at work.

82. The NFL disciplined Plaintiffs.

83. The disciplinary action taken against Plaintiffs by the NFL was a direct result of their ingestion of StarCaps.

84. As a result of the Defendant's violation of the CPA, Plaintiffs have suffered significant damage to their reputations and careers, including endorsement and appearance opportunities comprising compensatory damages in excess of $10,000,000, in an exact amount to be determined at trial. Plaintiffs have also incurred significant attorneys' fees in an effort to enforce the rights and protections afforded under Minn. Stat. § 181.938.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully pray the Court to grant them judgment for the following relief:

1. Compensatory damages;

2. Attorneys' fees;

3. Injunctive relief;

4. Other equitable relief as provided for by statute; and

5. Such other relief as the Court deems just and proper.

Dated: June 5, 2009

*/s/ Peter R. Ginsberg by RBK*
Peter R. Ginsberg
*Admitted Pro Hac Vice*
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, New York 10022
Telephone: (212) 895-4200
Facsimile: (212) 895-4201

*/s/ Ronn Kreps*
Ronn Kreps, #151142
Andre Hanson, #0258234
FULBRIGHT & JAWORSKI L.L.P.
2100 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402-2112
Telephone: (612) 321-2810
Facsimile: (612) 612-321-2288

*Attorneys for Plaintiffs Pat Williams and Kevin Williams*