# EXHIBIT C

Dockets.Justia.com

STATE OF MINNESOTA                FILED                DISTRICT COURT

COUNTY OF HENNEPIN         2010 FEB 18  AM 8:00  FOURTH JUDICIAL DISTRICT

BY _____ DEPUTY

HENN CO. DISTRICT
COURT ADMINISTRATOR                         Judge Gary Larson

Kevin Williams, Pat Williams,

                              Court File No. 27-CV-08-29778

                Plaintiffs,

v.                            **ORDER AND MEMORANDUM OF LAW**
                              **GRANTING IN PART AND DENYING IN**
                              **PART PLAINTIFFS' MOTION FOR**
The National Football League, John    **SUMMARY JUDGMENT AND**
Lombardo, M.D., Brian Finkle, and Adolpho  **GRANTING IN PART AND DENYING IN**
Birch,                        **PART DEFENDANTS' MOTION FOR**
                              **SUMMARY JUDGMENT**
                Defendants.


The above-entitled matter came on for a hearing before the Honorable Gary Larson,

Judge of Hennepin County District Court, on January 14, 2010.  Peter Ginsberg, Esq., and

Steven Rau, Esq., appeared on behalf of Plaintiffs, Kevin and Pat Williams.  Joseph Schmitt,

Esq., Daniel Nash, Esq., and Marla Axelrod, Esq., appeared on behalf of Defendants, the

National Football League, John Lombardo, M.D., Brian Finkle, M.D., and Adolpho Birch.

Based upon all files, records, and proceedings herein, together with the arguments of counsel,


                    **IT IS HEREBY ORDERED:**


1

1.    Plaintiffs' Motion for Summary Judgment is granted in part and denied in part.

2.    Defendants' Motion for Summary Judgment is granted in part and denied in part.

3.    Plaintiffs' request for an injunction is reserved for trial.

4.    A Pre-trial settlement conference is scheduled for March 1, 2010, at 8:00 a.m., in
      Courtroom 1655, Hennepin County Courthouse.

5.    A trial is scheduled for March 8, 2010 at 9:00 a.m., in Courtroom 1655, Hennepin County
      Courthouse.

6.    The attached memorandum is incorporated herein.

                                              BY THE COURT:

Dated:  February 18, 2010

                                              Gary Larson
                                              Judge of District Court
                                              C-1655 Government Center
                                              Minneapolis, MN 55487
                                              (612) 348-6102

2

**MEMORANDUM**

## I.     FACTS

Kevin and Pat Williams ("Plaintiffs") are both players on the Minnesota Vikings football

team ("Vikings") and members of the National Football League Players Association ("NFLPA").

The National Football League ("NFL") is an unincorporated association of NFL member clubs.

The Vikings are one of the NFL's member clubs.  Under Plaintiffs' contracts, the Vikings agree

to pay Plaintiffs a yearly salary for performance of their services and all other promises.  The

NFL Management Council is the exclusive collective bargaining representative of the NFL

member clubs.  The NFLPA and NFL Management Council are parties to a comprehensive

collective bargaining agreement ("CBA") that governs the terms and conditions of employment

for all NFL players and established the NFL Policy on Anabolic Steroids and Related Substances

(the "Policy").

### A.     The Policy.

The Policy bans a variety of prohibited substances, including steroids and diuretics which

can mask the detection of banned substances.  The Policy's stated goals are to: (1) assure the

fairness and integrity of athletic competition; (2) combat the adverse health effects of using

prohibited substances; and (3) educate young people about steroids.  The Policy requires strict

liability.  "Players are responsible for what is in their bodies, and a positive test result will not be

excused because a player was unaware that he was taking a Prohibited Substance." (Def. Ex. 2.)

The Policy specifically states that, "a positive test result will not be excused because a player

was unaware that he was taking a Prohibited Substance." (*Id.*)

John Lombardo, M.D., ("Dr. Lombardo"), is the Policy's Administrator.  The NFL and

the NFLPA jointly selected Lombardo to administer the Policy.  Dr. Lombardo reports directly to

Adolpho Birch ("Birch") the NFL's Vice President of Law and Labor Policy, and answers to, is paid by, and directs information about the Policy to the NFL.

Dr. Lombardo has sole discretion to determine the testing method that players are subjected to, select which players are tested each week, decide when tests are administered, analyze test results, and certify violations for disciplinary or administrative action. Dr. Lombardo is also responsible for consulting with players and club physicians, overseeing the development of educational materials, and participating in steroid research. Bryan Finkle, M.D., ("Dr. Finkle"), is the Policy's Consulting Forensic Toxicologist. The NFL and the NFLPA jointly appointed Dr. Finkle, but his position is contingent upon continued approval from the NFL.

Under the Policy, players are notified that they will be tested for prohibited substances pursuant to an annual physical at least once a year at training camp or whenever the player reports thereafter. Players are also tested throughout the pre-season, regular season, post-season, and off-season. The Policy details the procedures for collecting samples, protecting the chain of custody, handling materials, reviewing test results, etc. Each sample is split into an "A" and "B" bottle and labeled with a number, rather than a player's name. Samples are shipped to either the UCLA Olympic Analytical Laboratory ("UCLA Lab") or the Sports Medicine Research and Testing Laboratory in Utah ("Utah Lab"). These two labs are the only in the United States that are certified and accredited by the World Anti-doping Agency ("WADA").

The lab performs an initial test on the "A" sample, followed by a confirmatory test of the "A" sample. If both tests are positive for a prohibited substance, the lab notifies Dr. Lombardo, who matches the sample number with the player, gives the player written notification of the positive test, and requests that the player call him to discuss the results. The player may then

4

explain to Dr. Lombardo any medical circumstances surrounding the positive result. Based on the explanation, Dr. Lombardo has the discretion to grant the player a "therapeutic use exemption" from discipline. If a therapeutic use exemption is granted, no one else, including the NFL and NFLPA, is notified of the positive "A" sample result. (Def. Ex. 2.)

If the player is not granted a therapeutic exemption, a second confirmatory test is performed on the "B" sample. The player may have an independent toxicologist observe the confirmatory test of the "B" sample. The "B" test results are given to Dr. Lombardo who reviews the case with Dr. Finkle to ensure that the Policy requirements were met. The results are then reported to the Player and the NFL, who informs the player's team.

Under the Policy, any player who tests positive for a prohibited substance is "subject to ongoing reasonable cause testing at a frequency determined by [Dr. Lombardo]." (*Id.* at 5.) Discipline is not imposed until a confirmatory test is conducted on the player's "B" sample. The discipline for first-time violators is suspension "without pay for a minimum of four regular and/or postseason games." (*Id.* at 8.)

The Policy establishes an arbitration process for players to appeal discipline imposed as a result of a Policy violation. Within 20 days of a player's notice of appeal, a hearing before "the Commissioner or his designee" must be scheduled "absent mutual agreement or extenuating circumstances." (*Id.* at 11, 20.) Before the hearing, the NFL provides the player and the NFLPA with a packet of information regarding the testing process and results. After reviewing the information, the player must provide the NFL with a written statement explaining the grounds for his appeal. The parties exchange evidence and a witness list prior to the appeal hearing. The player may be accompanied by counsel and provide expert witness testimony. The NFLPA may attend and participate in the hearing as well. The NFL must establish a prima facie violation of

the Policy. Once the record is complete, the hearing office issues a written decision. The decision is binding on all parties.

### B.   StarCaps.

StarCaps[1] is a weight loss aid, which is sold in stores such as GNC and over the internet. StarCaps is a legal consumable product that, in the absence of Bumetanide, is not banned under the Policy. Bumetanide is a prohibited substance under the Policy because it can mask the use of steroids. Bumetanide is not listed as an ingredient in StarCaps. Bumetanide is a prescription diuretic, and risks of consuming Bumetanide include heat stroke, brain swelling, cardiac arrest, and other life threatening conditions.

The NFL and Dr. Lombardo knew, in 2006, that at least some StarCaps capsules contained Bumetanide. Indeed, when several players tested positive for Bumetanide after taking StarCaps in 2006, Dr. Lombardo and the NFL asked Aegis Sciences Corporation, an independent laboratory, to analyze StarCaps. These players were placed on reasonable cause testing rather than suspended for four games. Mr. Crouch, a toxicologist at Aegis, found Bumetanide in StarCaps and informed Birch and Dr. Lombardo of the results. In November 2006, Mr. Crouch volunteered to notify the FDA that StarCaps contained Bumetanide. Dr. Lombardo agreed that the FDA should be notified. Birch, however, claimed responsibility for warning the FDA. Birch never did so. The Aegis laboratory published the test results in the November/December 2007 Journal of Analytical Toxicology.

Birch did not inform the NFLPA that StarCaps contained Bumetanide, but did inform it that players were prohibited from providing endorsements for Balanced Health Products, the distributor of StarCaps. Birch also sent a memorandum to each team's president, general

---

[1] StarCaps was recalled on December 8, 2008, due to Bumetanide's potential for causing dangerous health effects.

manager, and head athletic trainer stating that players were not to endorse Balanced Health Products.

On previous occasions, the NFL Management Council has sent notices to general managers, trainers, players, and coaches, alerting them of products posing health risks to players. In November 2005, the NFL composed three memorandums that a dietary supplement known as 6-Oxo contained an anabolic steroid and aromatase inhibitor that are banned by the Policy. The NFL directed that the notice be posted in locker rooms and disseminated to players. On another occasion, the NFL identified products Modafinil and Synephrine, warning players that that they were being marketed under the brand names Bitter Orange or Citrus Aurantium and that the products contained substances banned under the Policy. The NFL chose not to send out similar notices about StarCaps.

### C.     This incident.

Both Plaintiffs annually received a copy of the Policy during training camp. Both Plaintiffs contracts stated that they would earn a $400,000 bonus for meeting their assigned weight targets. Plaintiffs contractually agreed not to engage in any last minute weight-reducing tactics, including the use of diuretics, to meet those targets.

On July 26, 2008, at the start of the Vikings training camp, both Plaintiffs were tested for prohibited substances. Their "A" bottles were sent to the UCLA Lab, which performed initial and confirmatory tests. Both tests were positive for the presence of Bumetanide. Dr. Lombardo sent Plaintiffs written notification of the test results and explained that Plaintiffs would be subjected to ongoing reasonable cause testing. Dr. Lombardo also advised Plaintiffs that they were entitled to have a qualified toxicologist observe their "B" bottle tests, and asked them to call him immediately to discuss the "A" bottle results.

In response to Dr. Lombardo's letter, Kevin Williams, through his agent, called and spoke with Dr. Lombardo and arranged for an independent toxicologist, Dennis Crouch, to observe the "B" bottle test. Pat Williams did not contact Dr. Lombardo. Kevin Williams'' "B" sample tested positive for Bumetanide on September 9, 2008, and the results were reviewed and verified by Dr. Lombardo and Dr. Finkle on September 22, 2008. Pat Williams' "B" sample tested positive for Bumetanide on September 10, 2008, and the results were reviewed and verified by Dr. Lombardo and Dr. Finkle on September 29, 2008. On September 26, 2008, Kevin Williams was notified that he was suspended for four games. On October 3, 2008, Pat Williams was notified that he was suspended for four games. Both players appealed their suspensions to arbitration.

On August 27, 2008, almost a month before Plaintiffs were even informed of their confirmatory test results, news of their suspensions was leaked to the media and broadcast throughout the country.

### D.     Plaintiffs' arbitration appeal.

Plaintiffs appealed their suspensions to the NFL's chief legal officer, Jeffrey Pash. ("Pash"). Plaintiffs were represented by counsel, and representatives from the NFLPA and the Vikings appeared on their behalf. Plaintiffs admitted that they used StarCaps the night before their scheduled weigh-ins so that they could meet their weight targets. Plaintiffs further testified that Bumetanide was not listed on the StarCaps label. Plaintiffs kept their use of StarCaps a secret from their managers, agents, and team. They cited clinical weight problems as an excuse for the violation, and argued that they were protected by the Americans with Disabilities Act.

Plaintiffs' counsel also argued that their Policy violations should be excused because the Policy created a fiduciary duty that required the NFL to specifically warn players that StarCaps

contain Bumetanide. Plaintiffs also claimed that they did not use StarCaps to mask steroid use and demanded a different type of test to prove that there was no trace of steroids in their test samples. The NFL denied the alternative test request. Following the hearing, Plaintiffs' counsel submitted a letter brief setting forth their arguments under the Policy and New York state fiduciary law.

On December 2, 2008, Pash upheld Plaintiffs' four-game suspensions. Pash noted that "none of the players challenged the laboratory analysis, the chain-of-custody, or any other aspect of the test." (Def. Ex. 15 at 7.) The arbitrator rejected Plaintiffs' fiduciary duty arguments because the Policy "does not articulate or impose an obligation to issue specific warnings about specific products." (*Id.*)

### E.   Procedural history.

On December 3, 2008, the day after their appeals to the NFL were denied, Plaintiffs filed suit in this Court alleging common-law causes of action and seeking injunctive relief. This Court issued a temporary restraining order ("TRO") blocking Plaintiffs' suspensions. The next day, the NFLPA, on behalf of Plaintiffs and three other players, brought suit in federal court. The NFL removed Plaintiffs' state lawsuit to federal court. The Honorable Paul Magnuson, Judge of the United States District Court for the District of Minnesota, granted the NFLPA's motion for a preliminary injunction and declined to overturn the TRO entered in state court, thus allowing Plaintiffs to continue playing until the end of the NFL's season. *Nat'l Football League Players Ass'n v. Nat'l Football League*, 598 F.Supp.2d 971 (D. Minn. 2008).

Defendants never answered the initial complaint. Rather, Defendants filed a notice of their intent to file a motion to dismiss, which was subsequently denied on January 27, 2009. On January 2, 2009, Plaintiffs filed an amended complaint ("First Amended Complaint"), which

added causes of action for violations of Minnesota Drug and Alcohol Testing in the Workplace Act ("DATWA"), Minn. Stat. § 181.950-57, and the Consumable Products Act ("CPA"), Minn. Stat. § 181.938. Defendants never answered the First Amended Complaint, and again filed a notice of their intention to file a motion to dismiss on January 28, 2009. On April 14, 2009, Plaintiffs dismissed Dr. Finkle as a party to this action. All parties moved for summary judgment. On May 22, 2009, Judge Magnuson dismissed Plaintiffs' common law claims on the ground of preemption, and remanded Plaintiffs' DATWA and CPA claims back to this Court. *Nat'l Football League Players Ass'n v. Nat'l Football League*, Civ. No. 08-6254, 2009 WL 1457007 (D. Minn. May 22, 2009).

Following remand to this Court, Plaintiffs filed a Motion for a Temporary Injunction on June 5, 2009. Plaintiffs then filed a "Second Amended Complaint" on June 11, 2009. Plaintiffs' Second Amended Complaint alleges that the NFL violated Plaintiffs' rights under DATWA by (1) denying their right to explain the positive test result; (2) failing to give due consideration to Plaintiffs' explanation of their unknowing ingestion of Bumetanide; (3) failing to use properly certified laboratories; (4) failing to provide Plaintiffs timely and proper notice; and (5) failing to protect Plaintiffs' rights to confidentiality. Plaintiffs further assert that the NFL violated their rights under the CPA, which prohibits the imposition of discipline for an employee's consumption of lawful consumable products when that consumption occurs off the employer's premises during non-working hours.

Both parties appealed portions of Judge Magnuson's May 22, 2009 Order to the Eighth Circuit Court of Appeals. The Eighth Circuit affirmed Judge Magnuson's Order in its entirety. On December 14, 2009, the Eighth Circuit denied Defendants' request for rehearing and rehearing en banc.

Both parties moved this Court for Summary Judgment. The Court heard arguments on

January 14, 2010. This decision follows.

## II.    LEGAL ANALYSIS

### A.    Standard of review.

Rule 56.03 of the Minnesota Rules of Civil Procedure establishes the standard for

summary judgment:

> Judgment shall be rendered forthwith if the pleadings, depositions,
> answers to interrogatories, and admissions on file, together with the
> affidavits, if any, show that there is no genuine issue as to any material
> fact and that either party is entitled to a judgment as a matter of law.

Minn. R. Civ. P. 56.03. In a summary judgment motion, the facts are viewed in a light

most favorable to the non-moving party. *Offerdahl v. Univ. of Minn. Hosp. & Clinics*, 426

N.W.2d 425, 427 (Minn. 1988). The moving party bears the burden of showing that the material

facts in the case are undisputed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Mems v.

City of St. Paul, Dep't of Fire & Safety Serv.*, 224 F.3d 735, 738 (8th Cir. 2000).

Material facts are those tending to establish the existence of any element essential to a

party's case, and on which the party will bear the burden of proof at trial, inasmuch as the

complete failure of proof concerning any essential element of the non-moving party's case

renders all other fact issues immaterial. *See Celotex*, 477 U.S. at 322-23; *Carlisle v. City of

Minneapolis*, 437 N.W.2d 712, 715 (Minn. Ct. App. 1989). If the evidence is merely colorable,

or is not sufficiently probative, summary judgment may be granted. *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 249-50 (1986). The moving party cannot rely upon mere general statements

of fact, hearsay, speculation or conjecture. *Id.*

The non-moving party must present specific facts showing there is a genuine issue for

trial. *DLH, Inc. v. Russ*, 566 N.W.2d 60, 70 (Minn. 1997). "The mere existence of a scintilla of

evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Inferences from circumstantial evidence must be drawn against the party seeking summary judgment. *Forsblad v. Jepson*, 195 N.W.2d 429, 430 (Minn. 1972); *see also Schroeder v. St. Louis County*, 708 N.W.2d 497, 507 (Minn. 2006); *Louwagie v. Witco Chemical Corp.*, 379 N.W.2d 63, 66 (Minn. Ct. App. 1985). To defeat a motion for summary judgment, the nonmoving party must submit "significant probative evidence . . . [it] must do more than simply show that there is some metaphysical doubt as to material facts." *Carlisle*, 437 N.W.2d at 715.

Both Plaintiffs and Defendants assert that there are no issues of material fact precluding their motions for summary judgment.

**B.    The record is currently insufficient for the Court to legally determine whether the NFL is Plaintiffs' employer.**

*1.  Professional sports are covered by DATWA.*

DATWA specifically contemplates that professional sports organizations and leagues are covered by its provisions. In 2005, DATWA was amended to provide an exception for random drug testing of professional athletes pursuant to the terms of a CBA. Minn. Stat. § 181.951(4) permits an employer to require random drug testing only if the employee is (1) employed in safety-sensitive positions, or (2) "employed as professional athlete[] if the professional athlete is subject to a collective bargaining agreement permitting random testing but only to the extent consistent with the collective bargaining agreement."

Defendants claim that the statute should be interpreted to exclude professional athletes from DATWA altogether. Defendants point to the statement of Representative Larry Hosch, one of the amendment's sponsors. "The last thing we'd want is for this [Major League Baseball drug testing] policy to be implemented, and hypothetically, let's say a player tested positive. If they

look through state policy, they'd find they couldn't test them. That's really what this bill is doing, just taking away that possibility." (Def. Ex. 23.)

"The touchstone for statutory interpretation is the plain meaning of a statute's language." *ILHC of Eagan, LLC v. County of Dakota*, 693 N.W.2d 412, 419 (Minn. 2005). When the words of a statute "are clear, explicit, unambiguous, and free from obscurity, courts are bound to expound the language according to the common sense and ordinary meaning of the words." *State ex rel. Gardner v. Holm*, 62 N.W.2d 52, 55 (Minn. 1954) (quoting *Minn. & Pac. R.R. Co. v. Sibley*, 2 Minn. 13, 20 (1858)). The plain, obvious, and rational meaning of a statute should always be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute intellect would discover. *Lynch v. Alworth-Stephens Co.*, 294 F. 190 (8th Cir. 1923), *aff'd by*, 267 U.S. 364 (1925). In the absence of any ambiguity in this language, courts will not delve into discerning legislative intent. *See, e.g., Educ. Minn.-Osseo v. Ind. Sch. Dist.*, 742 N.W.2d 199, 201 (Minn. Ct. App. 2007) (refusing to engage in statutory interpretation because the plain meaning of a statute controls).

In this case, the plain language of the statute is clear. Minn. Stat. § 181.951(4) permits an employer to require random drug testing of professional athletes "if [the] professional athlete[] is subject to a collective bargaining agreement permitting random testing but only to the extent consistent with the collective bargaining agreement." DATWA did not exclude drug testing for professional athletes. The Minnesota Legislature could have made such an exception if it had so chosen. For example, the Legislature did decide to exclude certain federal employees and federal job applicants from the strictures of DATWA. Minn. Stat. § 181.957. Because the Legislature did not exempt professional athletes from DATWA, the Court will not read such an exclusion into the statute. Professional sports organizations, employing players in Minnesota,

must conform their activities to the procedural and substantive protections and safeguards set forth in DATWA.

Moreover, the drug tests that started this entire dispute were not random drug tests, as addressed by Minn. Stat. § 181.951(4). The test results at issue in this case were obtained from a drug test pursuant to Plaintiffs' annual physical exams. The legislative history in this case is likewise not instructive. Plaintiffs, as professional athletes, are not excluded from DATWA's protections.

### 2. It is unclear whether the Minnesota Vikings or the NFL is Plaintiffs' employer for purposes of DATWA.

It is unclear whether the NFL, the Minnesota Vikings, or both are Plaintiffs' employer. DATWA governs only "employer drug testing of employees." *Kise v. Product Design & Eng'g*, 453 N.W.2d 561, 563 (Minn. Ct. App. 1990). DATWA defines an employer as "a person or entity located or doing business in this state and having one or more employees, and includes the state and all political or other governmental subdivisions of the state." Minn. Stat. 181.950, subd. 7. An employee is "a person, independent contractor, or person working for an independent contractor who performs services for compensation, in whatever form, from an employer." *Id.*, subd. 6.

Plaintiffs are indisputably employees. DATWA anticipated employee drug testing conducted pursuant to a CBA. DATWA "shall not be construed to limit the parties to a collective-bargaining agreement from bargaining and agreeing with respect to a drug and alcohol testing policy that meets or exceeds, and does not otherwise conflict with, the minimum standards and requirements for employee protection provided in those sections." Minn. Stat. § 181.955(1). Plaintiffs' drug testing was conducted pursuant to the NFL's Policy, a collective

bargaining agreement between the NFL and the NFLPA. The Court must decide whether Plaintiffs are the employees of the NFL, the Vikings, or both.

                *a.*       *Simply being an employer in Minnesota is not enough to make the NFL Plaintiffs' employer for DATWA purposes.*

Plaintiffs argue that the NFL is subject to DATWA in this case because it has employees in the State of Minnesota. Plaintiffs assert that the NFL is an employer under DATWA because it does business within the State and, at a minimum, employs referees, security personnel, and other League officials in the state. Plaintiffs state that the NFL has direct control over player compensation by setting salary caps and approving player contracts, as well as controlling players' work conditions, schedules, rules, regulations, and the structure of compensation.

Plaintiffs argue that DATWA does not limit its applicability to the corporate entity that directly compensates an employee. Rather, Plaintiffs allege that DATWA applies to testing of all employees and job applicants irrespective of whether the employer is the corporate entity that directly compensates the employee being tested. Plaintiffs, however, do not cite any legal support for this hypothesis. Merely being an employer in the State of Minnesota, does not make the NFL Plaintiffs' employer under DATWA. The NFL must have some employment relationship with Plaintiffs in order to incur the obligations that DATWA imposes on employer drug testing programs.

                *b.*       *The NFL is not Plaintiffs' direct or sole employer, to the exclusion of the Vikings.*

Plaintiffs claim that the NFL conceded that it employs them. In support of this argument, Plaintiffs cite to a reference in Defendants' brief to the Eight Circuit Court of appeals. In their brief, Defendants stated that "[t]he district court preliminarily enjoined two arbitration awards that, pursuant to a collectively bargained process, suspended five football player-employees who

had tested positive for a banned substance." (Kiehl Aff. Ex. J.) This statement by Defendants is

the only evidence that substantiates Plaintiffs' claims that the NFL is their direct employer.

Defendants adamantly deny that they employ Plaintiffs.

Plaintiffs entered into employment contracts with the Minnesota Vikings. The NFL

Player Contract provides that the contract is between the Player and Club, as a member of the

National Football League. Plaintiffs' contracts state that the "Club employs Player as a skilled

football player. Player accepts such employment. He agrees to give his best efforts and loyalty

to the Club . . .." (Def. Ex. CA002; CA026.) The contracts also provide that the Vikings will

pay Plaintiffs a yearly salary in return "[f]or performance of [their] services." (Id.) Additionally,

the preamble to the CBA provides that NFL players are "employed by a member club of the

National Football League." The Players' contracts are separate documents from the CBA.

Plaintiffs argue that the NFL is, in fact, Plaintiffs' employer, even though it may not be

the corporate entity that entered into Plaintiffs' contracts. Plaintiffs argue that the NFL, rather

than the Vikings, has the sole authority and discretion to test for drugs, analyze samples, and

discipline players. The Vikings have no input into the drug testing procedures and protocols

used by the NFL. Nor can the Vikings prevent, modify, or alter the discipline decided upon and

imposed by the NFL on players.

Defendants cite to four federal cases which reference the issue of identifying the

employer of an NFL player. First, in *Brown v. Nat'l Football League*, a former NFL player

brought a personal injury action in state court against the NFL, seeking damages for a career-

ending eye injury he sustained during a game when a referee threw a penalty flag that struck the

player in the eye. 219 F.Supp.2d 372, 375 (S.D.N.Y. 2002). The district court observed that,

"the NFL is neither Brown's employer nor a party to the CBA. At the time of his injury, Brown

worked not for the NFL, but for the Cleveland Browns Football Company, a Delaware limited partnership and an entirely separate entity which happens to be a member of the NFL." *Id.* at 383. The owners of NFL teams "own franchises in the NFL and employ the union members as football players." *Id.* The court noted that the referee accused of negligence was an employee of the NFL and "neither a co-employee of Brown nor a member of the same bargaining unit nor a party to the CBA." *Id.*

Second, in *Clarett v. Nat'l Football League*, the Second Circuit stated that, "[b]ecause the NFL players have unionized and have selected the NFLPA as its exclusive bargaining representative, labor law prohibits Clarett from negotiating directly the terms and conditions of his employment with any NFL club[.]" 369 F.3d 124, 138 (2d Cir. 2004). The Second Circuit explained that "[i]n the context of collective bargaining, however, federal labor policy permits the NFL teams to act collectively as a multi-employer bargaining unit in structuring the rules of play and setting the criteria for player employment. Such concerted action is encouraged as a matter of labor policy and tolerated as a matter of antitrust law." *Clarett*, 369 F.3d at 141.

A third case, *White v. Nat'l Football League*, involved a "settlement agreement [that] purports to end a six-year dispute between the NFL member teams and their player-employees." 41 F.3d 402, 406 (8th Cir. 1994), *abrogated on other grounds by, Amchem Prods. v. Windsor*, 521 U.S. 591 (1997). Finally, in *Chuy v. Philadelphia Eagles Football Club*, the court was presented with an appeal involving "several interesting questions growing out of the employment by the Philadelphia Eagles Football Club of a former professional player, Don Chuy." 595 F.2d 1265, 1269 (3d Cir. 1979).

Although the Court finds these references persuasive, these previous cases did not address the same type of question in this case: must the NFL conform to state labor laws as the

players' employer. Based on the undisputed facts of the case and previous federal cases, the
Court finds that the NFL is not Plaintiffs' direct or sole employer, to the exclusion of the
Vikings. This finding does not dispose of the question, however, and the Court must consider
whether the NFL and Vikings are engaged in a type of joint employment, whether the NFL acts
as the Vikings alter ego, or whether the Vikings and the NFL are dual employers.

> c.      *The Vikings are not the NFL's alter ego for employment purposes.*

Plaintiffs argue that the Vikings act as the NFL's alter ego for employer purposes in order
to evade liability under DATWA. An alter ego claim is a doctrine which fastens liability. *In re
RCS Engineered Prod. Co.*, 102 F.3d 223, 226 (6th Cir. 1996); *accord Victoria Elevator Co. v.
Meriden Grain Co.*, 283 N.W.2d 509, 512 (Minn. 1979) (stating that courts have relied on alter
ego as a "theory to impose liability"). In labor and employment law, the alter ego doctrine treats
two nominally separate business entities as if they were a single, continuous employer, and is
applied to prevent "an Employer from gaining an unearned advantage in his labor activities
simply by altering his corporate form . . .." *Alkire v. NLRB*, 716 F.2d 1014, 1018 (4th Cir. 1983).
Generally, one entity cannot be held liable for the wrongdoing of another without a showing of
improper conduct, fraud, or bad faith. *Assoc. of Mill & Elevator Mut. Ins. Co. v. Barzen Int'l*,
553 N.W.2d 446, 449 (Minn. Ct. App. 1996), *rev. denied*, (Minn. Nov. 20, 1996).

Courts look to "the reality and not form, with how the corporation operated and the
individual defendant's relationship to that operation." *Hoyt Props., Inc. v. Prod. Res. Group,
L.L.C.*, 736 N.W.2d 313, 318 (Minn. 2007). Relevant facts to the inquiry include: (1)
insufficient capitalization, (2) failure to observe corporate formalities, (3) nonpayment of
dividends, (4) insolvency of debtor corporation, (5) siphoning of funds, (6) nonfunctioning of
officers and directors, (7) absence of corporate records, and (8) existence of corporation as

merely facade for individual dealings. *Barzen*, 553 N.W.2d at 449-50 (citing *Victoria Elevator*, 283 N.W.2d at 512). If an entity is an alter-ego, then a court may impose liability if there is a finding of injustice or fundamental unfairness. *Id.* at 450.

To support their proposition that the Vikings are the NFL's alter ego, Plaintiffs cite to *Crest Tanker, Inc. et. al. v. Nat'l Maritime Union of Am.*, 796 F.2d 234, 237-38 (8th Cir. 1986). *Crest Tanker* employed the alter ego concept where a corporate entity sought to avoid the obligations of an "employer" under the CBA by utilizing another related corporate entity to lay blame for failure to meet those obligations. *Id.* There, the court found that "in some instances, an employer which has not signed a labor contract may be so closely tied to a signatory employer as to bind them both to the agreement." *Id.*

Plaintiffs do not make any claims that would satisfy the *Victoria Elevator* test. Plaintiffs do not allege that Defendants were insufficiently capitalized or insolvent, in any way disregarded the formalities of corporate existence, siphoned funds, or that the existence of the NFL is merely a facade for individual dealings. Rather, Plaintiffs assert that because the NFL exerts control over players' work conditions, schedules, rules, regulations, structure of compensation, drug testing, and discipline, it is responsible for its drug testing under DATWA. Plaintiffs' assertions, however, do not support a claim for alter ego liability. The Vikings are not the NFL's alter ego for employment purposes.

> d.    *The record is insufficient to determine whether the NFL may be a joint employer with the Vikings.*

DATWA is silent as to dual or joint employment and the obligations of such employers. DATWA requires that the employee receive compensation from an employer. Minn. Stat. § 181.950, subd. 6. Plaintiffs assert that the NFL provides pension plans and other types of consideration to players. Plaintiffs have not, however, provided this Court with evidence

regarding pension plans or other financial consideration. The record is insufficient to determine, based on this criteria alone, whether Defendants are a joint employer of Plaintiffs. Statutes and case law, however, have provided several frameworks which can be used to determine whether an entity is a joint employer.

Under the Family and Medical Leave Act, when two or more businesses exercise some control over the work or working conditions of an employee, they may be considered joint employers. 29 C.F.R. § 825.106. Whether more than one individual or company has the right to control or direct an employee in the performance of their work may also create a dual employment relationship. *Auto. Trade Ass'n of Maryland v. Harold Folk Enters., Inc.*, 484 A.2d 612 (1984).

In *Boire v Greyhound Corp.*, the Supreme Court indicated that a determination of joint employment under the National Labor Relations Act is essentially a factual one, based on the "indicia of control" exercised by an employer. 376 U.S. 473 (1964). There, the Court analyzed whether maintenance workers hired by an independent contractor to clean a bus terminal were jointly employed by the bus company which owned the terminal. *Id.* The Supreme Court remanded the case for a factual evaluation of the control the bus company exercised over the work of the maintenance employees. *Id.*

In this case, Defendants assert some degree of control over Plaintiffs' employment. The NFL, through the terms agreed upon in the CBA, does exercise control over and direct some aspects of Plaintiffs' work as professional football players. Plaintiffs state that NFL exerts control over players' work conditions, schedules, rules, regulations, structure of compensation, drug testing, and discipline. Using this analysis, it appears that the NFL could, perhaps, be a joint employer of Plaintiffs.

Minnesota courts have used other approaches to determine whether two entities may be liable as a single employer. "The first rests upon a finding that the two entities constitute a joint employer. The second rests on a finding that one entity is merely the agent or instrumentality of the other." *Johns v. Harboarge I, Ltd.*, 585 N.W.2d 853 (Minn. Ct. App. 1998). The Minnesota Supreme Court articulated a five part test to determine whether an employment relationship exists: (1) the right to control the means and manner of performance; (2) the mode of payment; (3) the furnishing of material or tools; (4) the control of the premises where the work is done; and (5) the right of the employer to discharge. *Guhlke v. Roberts Truck Lines*, 128 N.W.2d 324 (Minn. 1964).

In this case, it is unclear how much of an employment relationship exists. The NFL controls some means and manner of performance. It employs referees, sets the rules of the game, and determines the time and location of games. At present there are insufficient facts to determine what kind of control, if any, the NFL has over the mode of payment, furnishing materials or tools, and the mode of payment. The record lacks information about the control of fields, vendors, uniforms, equipment, control. Likewise, the record does not state who pays royalties, bonuses for participation in the ProBowl or SuperBowl, the structure or control over pensions, and other modes of payment.

At present, the record is insufficient to determine whether the NFL is a joint employer of Plaintiffs.

> e.     *The record is insufficient to determine whether the NFL may be Plaintiffs' employer under the single employer doctrine.*

The single-employer doctrine looks at whether the commonality of the employers' operations, management, labor relations, and ownership or financial control, is sufficient to indicate that they should be treated as one whole. *Radio & Tel. Broad. Technicians Local Union*

*1264 v. Broad. Service of Mobile, Inc.*, 380 U.S. 255, 256 (1965). In *Crest Tankers*, although the

District Court twice said that evidence would support either holding, it found that the companies

were not a single employer, despite their common ownership, because the interrelation among

their operations was not great; the daily managements were unconnected even though the

corporate management was identical; and labor relations were conducted separately, although the

same Apex official had the authority to deal with labor at both. *Crest Tankers*, 796 F.2d at

237 (8th Cir. 1986).

The NFL, which began operating in 1920, is an unincorporated association comprised of

member clubs which own and operate professional football teams. *Mackey v. Nat'l Football

League*, 543 F.2d 606, 610 (8th Cir. 1976). Each team in the NFL is separately owned, however,

there may be some commonality of operations, management, labor relations, and financial

control. The NFL assumes full responsibility for the national promotion of professional football,

granting of team franchises and controlling who may purchase teams, negotiation of network TV

contracts for broadcasting rights with respect to its members' games, employment of referees,

adoption of game rules, scheduling of season games between members, and many other matters

pertaining to the sport. *N. Am. Soccer League v. Nat'l Football League*, 670 F.2d 1249, 1251 (2d

Cir. 1982).

In *American Needle, Inc. v. Nat'l Football League*, a case currently before the United

States Supreme Court, the NFL argues that it should be regarded as a single entity in some, but

not all, aspects of its operations. Brief of Respondent National Football League, No. 08-661,

2009 WL 3865438 (2009). The NFL argued that "teams compete on the playing field, but in an

economic sense 'they combine in a single firm.'" *Am. Needle*, 2009 WL 3865438 at *22

(quoting Simon Rottenberg, *The Baseball Players' Labor Market*, 64 J. POLITICAL ECON. 242,

255 (Jun. 1956). The district court found that the member clubs' cooperative marketing serves to promote NFL football, and that the NFL and the teams act as a single entity in licensing their intellectual property. 2009 WL 3865438, at *11. The Seventh Circuit affirmed stating that it had "embraced the possibility that a professional sports league could be considered a single entity under *Copperweld*." *Am. Needle Inc. v. Nat'l Football League*, 538 F.3d 736 (7th Cir. 2008).

The Seventh Circuit, however, held that the single entity determination "should be addressed not only 'one league at a time,' but also 'one facet of a league at a time.'" *Id.* (quoting *Chicago Prof'l Sports Ltd. Partnership v. Nat'l Basketball Ass'n*, 95 F.3d 593 (7th Cir. 1996)). At oral argument before the United States Supreme Court in the *American Needle* case, the NFL's counsel stated that "the NFL clubs are not separate sources of independent power. As a result they are a unit. They are a single entity. . .." Respondents' original oral argument, *Am. Needle Inc. v. Nat'l Football League*, No. 08-661, 2010 WL 110134, at *47(Jan. 13, 2010). The NFL's position, that it is one entity for purposes of producing and marketing, is a factor for this Court to consider. It is not dispositive of whether the NFL is one entity for purposes of employment and drug testing.

Key to DATWA's definition of employee is that "the employee performs services for compensation, in whatever form, from an employer." Minn. Stat. 181.950, subd. 6. The record is incomplete to determine whether the NFL and the member clubs are one entity for the purposes of player compensation. It is unclear, for example, whether the NFL or the individual teams pay players' pensions or pay players who participate in the ProBowl and in the Super Bowl. Without a firmer understanding of the material facts, the Court cannot rule on the employment issue at this time. Both parties' motions for summary judgment are denied on the

employment issue, as there remains a material issue of fact regarding the identity of Plaintiffs' employer for DATWA purposes.

**C.    If the NFL is Plaintiffs' employer, then DATWA applies to Plaintiffs' drug tests.**

DATWA applies to employers who conduct drug or alcohol testing. Minn. Stat. § 181.951. Drug or alcohol testing is defined as an "analysis of a body component sample . . . for the purpose of measuring the presence or absence of drugs, alcohol, or their metabolites in the sample tested." Minn. Stat. § 181.950(5). DATWA defines "drug" as a controlled substance as defined by Minn. Stat. § 152.01(4). Minnesota's controlled substance statute specifically includes "anabolic steroids." Minn. Stat. § 152.01(4)(6). Minnesota law also states that a controlled substance includes drugs, which are defined as "all medicines and preparations recognized in the United State Pharmacopoeia or National Formulary and any substance or mixture of substances intended to be used for the cure, mitigation, or prevention of disease of either humans or other animals." Minn. Stat. § 152.01, subd. 2.

Defendants claim that because Bumetanide, rather than an illegal drug, was found in Plaintiffs' systems, that DATWA is inapplicable. This argument is flawed. DATWA is not an outcome determinative test. The NFL was testing Plaintiffs for anabolic steroids and other prohibited substances. Bumetanide is a banned substance under the Policy because it masks the presence of steroids. It is irrelevant, for this purpose, that the test results revealed Bumetanide rather than steroids. To apply DATWA's procedural safeguards based on the findings of the test, rather than on the testing itself, would strip DATWA of its intended purpose, as well as make it nearly impossible to enforce. DATWA applies to Plaintiffs' drug testing, and, if the NFL is Plaintiffs' employer, it must comport with DATWA's requirements.

24

**D.**   **Defendants complied with the testing notice requirements under DATWA.**

Plaintiffs claim that Defendants failed to provide Plaintiffs at least two weeks' written notice that they would be tested during their annual physical examination, as mandated by DATWA. DATWA requires that "the employee [be] given at least two weeks' written notice that a drug or alcohol test may be requested or required as part of the physical examination" where an employer conducts drug testing." Minn. Stat. § 181.951(3).

Each year, Plaintiffs received a copy of the Policy, advising them that they would be tested for prohibited substances at training camp, as part of the pre-season physical. Kevin Williams is a six-year veteran of the NFL and Pat Williams is a twelve-year veteran. Plaintiffs received a copy of the Policy every year. The Policy states that "[a]ll players will be tested for Prohibited Substances at least once per League Year. Such testing will occur at training camp, or whenever the player reports thereafter, and will be deemed a part of his preseason physical." (Def. Ex. 1 at 4.) Plaintiffs were notified year after year that they would be tested for banned substances and their annual pre-season physical.

Plaintiffs appear to argue that they were given insufficient notice because they were not given a separate notice of the exact date of their tests two weeks ahead of time. The statute, however, does not require this. DATWA merely requires that an employee must be given at least two weeks' notice that a drug test may be required as part of the physical examination. Notice that the test may be required as part of the physical exam, not the exact date of the test is mandated. In strict compliance with the statute, Plaintiffs were given more than two weeks' notice that a drug or alcohol test may be required as part of their physical examination at the start of training camp.

25

The record demonstrates that Defendants complied with DATWA's two week minimum written notice requirement. Defendants' Motion for Summary Judgment is granted on this count, and Plaintiffs cross-motion is denied.

### E.    Defendants did not comply with DATWA's three-day notice requirement for test results.

Minn. Stat. § 181.953(3), (7) provides that the "laboratory shall disclose to the employer a written test result report . . . within three working days after a confirmatory test" and that the employer "[w]ithin three working days after receipt of a test result report from the testing laboratory . . . shall inform in writing an employee . . . of a positive test result on a confirmatory test." Plaintiffs argue that the lab did not disclose the confirmatory "B" sample test results to the NFL within three days and that the NFL did not disclose the results to Plaintiffs three days later. Defendants do not dispute this fact. Rather, Defendants argue that taking additional time for Drs. Lombardo and Finkle to review the results before revealing them to Plaintiffs and their team provided Plaintiffs protection that exceeded, but did not conflict with, DATWA's requirements.

Plaintiffs were initially tested on July 26, 2008, but did not receive notice of the positive test results until September 26, 2008 and October 3, 2008. Dr. Lombardo stated that players generally receive notice of the initial test "anywhere from 14 days to 30 days, 35 days, sometimes longer." (Kiehl Aff., Ex. D at 211.) Regardless of whether Defendants desired to give Plaintiffs' test results an additional level of review, they violated DATWA by not disclosing the confirmatory test results to Plaintiffs within three working days.

Plaintiffs' Motion for Summary Judgment is granted on this count, and Defendants' cross-motion is denied, subject to a finding that the NFL is Plaintiffs' employer.

**F.    Defendants complied with DATWA's requirement to give Plaintiffs written notification of their right to explain the positive test results.**

DATWA requires that employees be given a right to explain a positive drug test.

> If an employee . . . tests positive for drug use, the employee must be given written notice of the right to explain the positive test and the employer may request that the employee . . . indicate any over-the-counter or prescription medication that the individual is currently taking or has recently taken and any other information relevant to the reliability of, or explanation for, a positive test result.

Minn. Stat. § 181.953(6)(b). Plaintiffs were given their results and asked to call Dr. Lombardo

to discuss them. Kevin Williams' agent called Dr. Lombardo to explain the results. Pat

Williams did not contact Dr. Lombardo. Before the appeal hearing, Plaintiffs were given a

chance to set forth the grounds for their appeal. In their written submissions, Plaintiffs explained

that they used the "banned diuretic" due to "clinical weight problems" and, thus, were protected

under the ADA. (Def. Ex. 12.) At the hearing, Plaintiffs had an additional opportunity to

explain their test results, which they did by testifying, calling witnesses, and submitting briefs.

Although Plaintiffs were given an opportunity to explain their test results, Plaintiffs

contend that when an "employee provides a sufficient explanation for the positive test result,

such as the intake of over-the-counter products, that explanation must excuse the violation."

(Def. Ex. 32 at 23-24, n.12.) DATWA gives employees the right to *explain* a positive test.

DATWA does not require an employer to *accept* the explanation. Had the Legislature intended

to force employers to accept a sufficient explanation, as Plaintiffs argue, it could have easily

done so. The Legislature did not intend such a result. Such a requirement could easily defeat the

purpose of a drug-testing program. The Court will not read such a provision into the statute. *See*

*Metro. Sports Facilities Com'n v. County of Hennepin*, 561 N.W.2d 513, 516 (Minn. 1997).

Defendants did not accept Plaintiffs' explanation because Plaintiffs had previously agreed to be strictly liable for what they put in their bodies. According to the CBA, a positive test result is not excused because a player was unaware that he took a prohibited substance. Had Plaintiffs provided a legitimate medical reason for taking StarCaps, Dr. Lombardo could have accepted their explanation and granted a therapeutic use exemption.

DATWA requires that Defendants give Plaintiffs the opportunity to explain their positive results, not that they accept Plaintiffs' explanation for their positive results. Plaintiffs' Motion for Summary Judgment is denied on this count, and Defendants' cross-motion is granted.

### G.      Defendants did not reject Plaintiffs' request for a confirmatory test.

Plaintiffs assert that Defendants denied their request for a confirmatory test in violation of DATWA. Minn. Stat. § 181.953(9) states that an employee "may request a confirmatory retest of the original sample [at his] own expense after notice of a positive test result on a confirmatory test." In this case, Plaintiffs never requested a "confirmatory retest of the original sample." Plaintiffs' counsel did not contest the accuracy of the positive Bumetanide test results. Plaintiffs, instead, wanted an alternative test, capable of detecting trace amounts of steroids to determine if Plaintiffs were using Bumetanide to mask steroid use. DATWA requires a retest to confirm a test result. It does not require an alternative test designed to detect an entirely different drug. *See* Minn. Stat. § 181.953(9).

Defendants rejected Plaintiffs request for an alternative type of test because Bumetanide itself is a banned substance in the Policy. Moreover, Defendants did perform a retest. Plaintiffs' "B" bottles were tested pursuant to the terms of the Policy and met or exceeded the requirements of DATWA. Plaintiffs' Motion for Summary Judgment is denied on this count, and Defendants' cross-motion is granted.

**H.      Defendants did not violate Plaintiffs' rights by using a lab that meets or exceeds DATWA requirements.**

Under DATWA, employers must use a licensed, accredited, or certified laboratory. Minn. Stat. § 181.953. The testing laboratory must meet one of the following criteria for drug testing: (1) is certified by the National Institute on Drug Abuse; (2) is accredited by the College of American Pathologists; or (3) is licensed to test for drugs by the New York Department of Health. *Id.* at subd. 1. An employer may also use a testing laboratory that exceeds the requirements of DATWA. "[P]arties to a collective bargaining agreement" may agree to "a drug or alcohol testing policy that meets or exceeds, and does not otherwise conflict with the minimum standards and requirements for employee protection." Minn. Stat. § 181.955(1).

The UCLA Lab that the NFLPA and NFL agreed to use was certified in accordance with criteria that surpass that used by the agencies listed in DATWA. Defendants' expert, Dr. Don Catlin, who has overseen drug testing at several Olympics and the World Cup, testified that the UCLA Lab is certified and accredited by WADA – a "sport testing system [] accepted and acknowledged to be the standard of excellence for all the major countries in the world." (Def. Ex. 21 at ¶ 9.) The UCLA Lab is viewed as a premier testing lab and meets the highest standards and requirements for drug testing. (Id.) It also "tests for approximately 200 substances that are subject to anti-doping policies in the world of sports" and is "designed to meet the needs of sport testing programs." (Id.)

Moreover, Defendants' expert explains that most workplace drug labs certified by the agencies listed in DATWA "are focused on testing for illegal drugs such as cocaine, marijuana, and . . . ordinarily do not test for anabolic steroids, masking agents used to disguise the use of anabolic steroids, or diuretics such as Bumetanide." (Id. at ¶ 10.) Dr. Catlin concludes that,

29

"[t]he procedures and standards of the [UCLA Lab] exceed the criteria for drug testing under programs" mentioned in DATWA.

Plaintiffs contend that the UCLA Lab fails to meet the statutory requirement because it was not certified by the agencies listed in DATWA. However, there are no laboratories that are certified by both those agencies and by WADA. (Def. Ex. 32 at 22.) DATWA clearly provides that an employer may use lab that exceeds the requirements of DATWA. Here, the parties, pursuant to a collective bargaining agreement, agreed to use the UCLA Lab – which utilizes standards that meet or exceed those enumerated in DATWA.

Because use of the UCLA Lab does not violate Plaintiffs' rights under DATWA, Defendants' Motion for Summary Judgment is granted on this count, and Plaintiffs' cross-motion is denied.

**I.      Whether the NFL breached DATWA's confidentiality requirement is a material issue of fact.**

Plaintiffs claim that Defendants breached the confidentiality requirement of DATWA. DATWA's confidentiality requirement states that "test result reports and other information acquired in the drug or alcohol testing process are . . . private and confidential information, and . . . may not be disclosed by an employer or laboratory to another employer or to a third-party individual, governmental agency, or private organization without the written consent of the employee or job applicant tested." Minn. Stat. § 181.954(2). There is no evidence or allegations that Plaintiffs ever gave written consent for the disclosure of their test results.

Plaintiffs claim that Defendants violated this confidentiality requirement because the press found out about the test results before Plaintiffs or their counsel did. Defendants assert that Plaintiffs' claim fails because they have produced no evidence that the NFL disclosed the test results to anyone else. The media leak is a question of fact. Only a very limited number of

people knew about Plaintiffs' test results. Dr. Lombardo testified that Plaintiffs received notice

of the test results before the media published those results. (Plf. Ex. D at 223.) He also testified

that he ensures the test results' confidentiality by "speak[ing] to no one but the player and people

that the player, with written permission, allows me to speak or asks me to speak to." (Def. Ex.

D. at 218.) Dr. Lombardo further stated that the media broadcast the test results after he sent the

results to the NFL. (Plfs' Ex. D at 224.)

Taking Dr. Lombardo's testimony as true, the leak occurred sometime after the results

were in the hands of the NFL. Both sides claim that the other is responsible for the leak.

Because there is a disputed issue of material fact as to the source of the leaked test results. Both

parties' motions for summary judgment are denied on this count.

### J.     **Plaintiffs exhausted administrative procedures as required by DATWA.**

Defendants claim that because Plaintiffs failed to raise their DATWA claim at arbitration,

they are barred from doing so now. DATWA states that employees may bring an action "only

after first exhausting all applicable grievance procedures and arbitration proceeding requirements

under a collective bargaining agreement . . .." Minn. Stat. § 181.956. Plaintiffs appealed their

suspensions to Pash, the NFL's chief legal officer. Plaintiffs were represented by counsel, and

representatives from the NFLPA and the Vikings appeared on their behalf. Plaintiffs admitted

that they used StarCaps, a weight loss supplement, the night before their scheduled weigh-ins so

that they could meet their weight targets. Plaintiffs further testified that Bumetanide was not

listed on the StarCaps label.

Plaintiffs' counsel argued that their Policy violations should be excused for a variety of

reasons. Plaintiffs did not specifically allege violations of DATWA and the CPA, at that time.

Following the hearing, Plaintiffs' counsel submitted a letter brief setting forth their arguments

under the Policy and New York state fiduciary law.  Plaintiffs exhausted all applicable grievance

procedures and arbitration requirements under the CBA.  With no other recourse within the NFL

structure, the day after Plaintiffs' appeals were denied, they filed for relief in state court.

Plaintiffs satisfied DATWA's exhaustion requirement and Defendants' Motion for Summary

Judgment is denied on this count.

### K.     Plaintiffs were not disciplined based on their initial screening test.

DATWA provides that "[a]n employer may not . . . discipline . . . an employee on the

basis of a positive test result from an initial screening test that has not been verified by a

confirmatory test."  Minn. Stat. § 181.853(10)(a).  Plaintiffs contend that Defendants

immediately imposed discipline before conducting a second confirmatory test by placing them

on reasonable cause testing.

Plaintiffs' argument is flawed for several reasons.  First, DATWA requires "a

confirmatory test," not a second confirmatory test.  "A 'confirmatory' test is simply a second test

done on the same specimen after a first 'initial screening' test has come back positive."  *Wehlage

v. ING Bank, FSB*, No. 07-CV-1952, 2008 WL 4838718, at *3 n.1 (D. Minn. Nov. 5, 2008)

(referring specifically to Minn. Stat. § 181.953(10)(a)).  Defendants took no disciplinary action

until after a confirmatory test was conducted on Plaintiffs' "A" and "B" samples.

The "A" sample confirmatory tests verified Plaintiffs' initial screening tests before

Defendants placed Plaintiffs on reasonable suspicion testing.  DATWA provides that

> An employer may request or require an employee to undergo drug
> and alcohol testing if the employer has a reasonable suspicion that
> the employee: (1) is under the influence of drugs or alcohol; (2)
> has violated the employer's written work rules prohibiting the use,
> possession, sale, or transfer of drugs or alcohol while the employee
> is working or while the employee is on the employer's premises . .
> . provided the work rules are in writing and contained in the
> employer's written drug and alcohol testing policy.

Minn. Stat. § 181.951, subd. 5.  After both Plaintiffs' "A" samples tested positive for

Bumetanide, Defendants had reasonable suspicion that Plaintiffs violated the Policy by using a

banned substance.  Defendants conducted a second test on Plaintiffs' "A" samples to verify the

test results.  Defendants then performed a confirmatory test on Plaintiffs' "B" bottle samples.

Plaintiffs' samples were tested three times before Plaintiffs were placed on suspension.

Defendants did not violate Plaintiffs' rights under DATWA because they did not discipline

Plaintiffs based on their initial test results.  Plaintiffs' Motion for Summary Judgment is denied

on this count, and Defendant's cross-motion is granted.

### L.    Defendants did not retaliate against Plaintiffs.

Plaintiffs claim that Defendants retaliated against them by placing them on reasonable

cause testing and suspending them for four games.  As discussed above, Defendants' imposition

of reasonable cause testing did not violate DATWA and does not constitute retaliation.  DATWA

states that "[a]n employer may not retaliate against an employee for asserting rights and remedies

provided in [DATWA]."  Minn. Stat. § 181.956(5).  Retaliation requires that Plaintiffs show "(1)

statutorily-protected conduct by the employee; (2) adverse employment action by the employer;

and (3) a causal connection between the two." *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d

428, 444 (Minn. 1983).

Plaintiffs fail to show that Defendants engaged in retaliatory action.  Plaintiffs claim that

the reasonable cause testing and four-game suspensions were retaliation.  However, Defendants

followed DATWA's reasonable cause and disciplinary guidelines before taking any action

against Plaintiffs.  Even if Defendants had violated Plaintiffs' rights under DATWA, there is no

causal connection between the reasonable cause testing, the suspensions, and Plaintiffs' assertion

of their statutory rights.  Plaintiffs were placed on reasonable cause testing on August 27, 2008,

before they even knew that they would be suspended. Their complaint was not filed until
December 3, 2009, more than three months after the NFL placed them on reasonable cause
testing.

Plaintiffs were notified of their suspensions on September 26, 2008, and October 3, 2008.
However, Plaintiffs' complaint was not filed until roughly two months after being notified of
their suspensions, and almost two weeks after the arbitration hearing. Defendants did not
retaliate against Plaintiffs because they asserted their statutory rights. Plaintiffs' Motion for
Summary Judgment is denied on this count, and Defendants' cross-motion is granted.

**M.     Plaintiffs' DATWA claims are not preempted.**

Defendants claim that the Labor Management Relations Board preempts Plaintiffs'
DATWA claims because their resolution is "substantially dependent upon analysis of the terms"
of the collectively bargained Policy. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985).
Defendants assert that because the Eighth Circuit was unclear as to which specific DATWA
violations Plaintiffs alleged and because it never conducted a preemption analysis with respect to
Plaintiffs' DATWA claims, that Plaintiffs' specific claims were preempted. In their appeal to the
Eighth Circuit, Defendants claimed that Plaintiffs' DATWA claims were preempted because
they would require the state court to analyze the Policy to determine if it met or exceeded
DATWA's testing requirements. *Williams v. Nat'l Football League*, 582 F.2d 863 (8th Cir.
2009). Defendants make the same claim again here.

"[T]he Court has established that section 301 does not preempt state law claims merely
because the parties involved are subject to a CBA and the events underlying the claim occurred
on the job." *Williams*, 582 F.3d at 874 (citing *Allis-Chalmers*, 471 U.S. at 211). Section 301
preemption applies where a state-law claim requires interpretation of a provision of the CBA.

*Trustees of the Twin City Bricklayers Fringe Benefit Funds v. Superior Waterproofing, Inc.*, 450
F.3d 324, 331 (8th Cir. 2006).

DATWA governs drug and alcohol testing in the Minnesota workplace by imposing
minimum standards and requirements for employee protection with regard to an employer's drug
and alcohol testing policy. Minn. Stat. § 181.955 subd. 1.DATWA expressly addresses CBAs
and states that it applies to all CBAs in effect after the passage of the law in 1987. Minn. Stat. §
181.955, subd. 2. DATWA "shall not be construed to limit the parties to a collective bargaining
agreement from bargaining and agreeing with respect to a drug and alcohol testing policy that
meets or exceeds, and does not otherwise conflict with, the minimum standards and requirements
for employee protection . . .." § 181.955 subd. 1.

The Eighth Circuit previously rejected Defendants' argument that Plaintiffs do not have a
DATWA claim because it would require a state court to analyze the Policy.

> Here, a court would have no need to consult the Policy in order to
> resolve the Players' DATWA claim. Rather, it would compare the
> facts and the procedure that the NFL actually followed with respect
> to its drug testing of the Players with DATWA's requirements for
> determining if the Players are entitled to prevail. Such a claim is
> not preempted.

*Williams*, 582 F.3d at 876. "An otherwise independent claim will not be preempted if the CBA
need only be consulted during its adjudication." *Id.* at 877 (citing *Trustees*, 450 F.3d at 330).
Both here, and in front of the Eighth Circuit, Defendants fail to point to a specific provision of
either the CBA or the Policy which must be interpreted. Plaintiffs' statutory claims exist
independently of the Policy because, even if the NFL was acting pursuant to the Policy, those
actions may still violate state laws. DATWA proscribes conduct or establishes rights and
obligations that exist independently of the Policy, and thus those claims are not preempted.

Finally, the NFL argues that denying preemption and subjecting the Policy to divergent state regulations would render the uniform enforcement of its drug testing policy nearly impossible. The Supreme Court has observed that, in adopting § 301, Congress did not wish

> to give the substantive provisions of private agreements the force of federal law, ousting any inconsistent state regulation. Such a rule of law would delegate to unions and unionized employers the power to exempt themselves from whatever state labor standards they disfavored. Clearly, § 301 does not grant the parties to a [CBA] the ability to contract for what is illegal under state law. In extending the pre-emptive effect of § 301 beyond suits for breach of contract, it would be inconsistent with congressional intent under that section to preempt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract.

*Allis-Chalmers*, 471 U.S. at 211-12 (footnote omitted); *see Livadas v. Bradshaw*, 512 U.S. 107, 123 (1994) (cautioning that section 301 "cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law").

Moreover, the Ninth Circuit rejected an argument similar to Defendants' in *Cramer v. Consol. Freightways, Inc.*, 255 F.3d 683, 695 n. 9 (9th Cir. 2001) (en banc). In *Cramer,* the employer, a large trucking company, "argue[d] that the terms of CBAs affecting employees in multiple states should supersede inconsistent state laws." *Id.* at 688, 695 n. 9. The Ninth Circuit observed, "[t]his contention overreaches, however, because the LMRA certainly did not give employers and unions the power to displace any state regulatory law they found inconvenient." *Id.* at 695 n. 9.

Plaintiffs' DATWA claim is predicated on Minnesota law, not the CBA, the Policy, or the interpretation of the CBA or the Policy. Players' DATWA claim is not preempted and Defendants' Motion for Summary Judgment is denied on this count.

**N.      Plaintiffs' claim under the Consumable Products Act fails because they were under the influence of StarCaps while at work.**

Plaintiffs argue that Defendants violated their rights under the CPA by suspending them for engaging in the use or enjoyment of StarCaps while off work premises during non-working hours. The CPA states, in part, that

> An employer may not refuse to hire a job applicant or discipline or discharge an employee because the applicant or employee engages in or has engaged in the use or enjoyment of lawful consumable products, if the use or enjoyment takes place off the premises of the employer during nonworking hours. For purposes of this section, "lawful consumable products" means products whose use or enjoyment is lawful and which are consumed during use or enjoyment, and includes food, alcoholic or nonalcoholic beverages, and tobacco.

Minn. Stat. § 181.938(2).

StarCaps is a lawful, over-the-counter product that was advertised as an all natural supplement. Plaintiffs admit that they ingested StarCaps the night before their scheduled weigh-in at training camp so that they could meet their assigned weight targets and earn their $400,000 weight bonuses. Even assuming that the NFL is Plaintiffs' employer, Plaintiffs' CPA claims fail.

*1.      Plaintiffs used and enjoyed StarCaps at work, during working hours.*

A CPA claim does not turn on where and when a lawful consumable product was actually ingested, but rather whether an employee came to work under its influence. In *Miners v. Cargill Commc'ns, Inc.*, the plaintiff claimed that she was terminated in violation of the CPA for consuming alcohol during non-working hours. No. C8-97-837, 1997 WL 757157, at *3 (Minn. Ct. App. Dec. 9, 1997), *rev. denied*, (Minn. Feb. 19, 1998). The Minnesota Court of Appeals stated that, while the plaintiff may have consumed alcohol during non-working hours, she was still intoxicated while driving the company van during working hours. *Id.* The *Miners* Court affirmed the trial court's dismissal of the plaintiff's CPA claim and concluded that the statute

"contains no prohibition against an employer terminating an employee for driving a company vehicle after consuming alcohol." *Id.*

The CPA focuses on where "the use or enjoyment takes place." Minn. Stat. § 181.938. Here, Plaintiffs came to work under the influence of Bumetanide. Plaintiffs were using StarCaps when they arrived at work with a detectable quantity of Bumetanide in their systems. Plaintiffs were enjoying the effects of StarCaps when they weighed in, at training camp, at their assigned weight targets. The NFL did not violate Plaintiffs' rights under the CPA by suspending them for arriving for work after consuming a weight-loss supplement containing Bumetanide.

> **2.    *The Policy's ban on Bumetanide relates to a bona fide occupational requirement.***

Defendants are exempt from liability under the CPA because the prohibition against Bumetanide "relates to a bona fide occupational requirement." Minn. Stat. § 181.938(2), (3)(a)(1).  The CPA states,

> Subd. 3.  (a) It is not a violation of subdivision 2 for an employer to restrict the use of lawful consumable products by employees during nonworking hours if the employer's restriction:
> (1) relates to a bona fide occupational requirement and is reasonably related to employment activities or responsibilities of a particular employee or group of employees;

*Id.*

Maintaining optimal physical health and fitness is a bona fide occupational requirement for professional football players.  Plaintiffs agreed in their contracts to "maintain [themselves] in excellent physical condition," and to refrain from engaging in activities that "may involve a significant risk of personal injury."  To ensure players' top physical health and well-being, the collective bargaining agreement outlines standard minimum pre-season physical examination criteria, regulates pre-season training sessions, and establishes off-season workout rules.  As Plaintiffs recognize in their Complaint, Bumetanide presents "a potentially 'acute' medical

threat" and exposes users to "potential acute physical suffering." The Policy's prohibition of Bumetanide relates to the bona fide requirement that professional football players stay in peak physical condition.

The Bumetanide prohibition is also necessary because it masks the presence of steroids. Steroid use "has been linked to a number of physiological, psychological, orthopedic, reproductive, and other serious health problems." (Def. Ex. 1 at 1-2.) Moreover, steroid use "threaten[s] the fairness and integrity of the athletic competition on the playing field." (Id.)

Bumetanide is an inherently harmful substance that also masks the use of harmful steroids. The NFL's prohibition against it falls within the bona fide occupational requirement exception to the CPA. Defendants did not violate Plaintiffs' rights under the CPA. Plaintiffs' Motion for Summary Judgment is denied on this count, and Defendants' cross-motion is granted.

### O.   Requiring Defendants' to comply with DATWA does not violate the Commerce Clause.

Defendants claim that requiring the NFL to comply with Plaintiffs' understanding of DATWA would impose an impermissible burden on interstate commerce. Requiring the NFL to abide by Minnesota state law when conducting drug tests on Minnesota employees, within the state of Minnesota, does not violate the Commerce Clause. "[The Congress shall have power] To regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes;" U.S. Const. art. I, § 9, cl.3.

The NFL is engaged in interstate commerce. *Radovich v. NFL*, 352 U.S. 445, 452 (1957). The first step in analyzing a Commerce Clause claim is to see if a state statute is discriminatory on its face. Here, DATWA and the CPA are not facially discriminatory. If a state statute in not facially discriminatory, a court must determine the effects of the statute. *Oregon Waste Sys. Inc. v. Dep't of Envtl. Quality of Oregon*, 511 U.S. 93, 99 (1994) (holding that a

statute imposing a surcharge on out-of-state waste disposal services unconstitutional under the Commerce Clause).

Nondiscriminatory statutes that have only incidental effects on interstate commerce are upheld unless they impose a "clearly excessive" burden in relation to the putative in-state benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). The extent of the burden allowed depends on (1) the nature of the in-state interest and (2) whether that interest could be promoted with less impact on interstate activities. *Id.* State laws frequently survive scrutiny under *Pike*. *Dep't of Revenue of Ky. v. Davis*, 128 S. Ct. 1801, 1808-09 (2008). *See e.g. Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 810 (1976)( a state law authorizing state payments to processors of automobile hulks validly burdened out-of-state processors with more onerous documentation requirements than their in-state counterparts); *Reeves, Inc. v. Stake*, 447 U.S. 429, 436 (1980) (upholding South Dakota's policy of giving in-state customers first dibs on cement produced by a state-owned plant); *White v. Massachusetts Council of Constr. Employers, Inc.*, 460 U.S. 204, 208 (1983)(holding that a Boston executive order requiring half the workers on city-financed construction projects to be city residents passed muster). The analysis in this case favors Plaintiffs.

A statute is unduly burdensome under the Commerce Clause only if it unfairly causes an out of state business to perform inefficiently in the home state or at an unfairly increased cost. *Pike*, 397 U.S. at 145. Nothing in DATWA or the CPA causes such a result. Under both statutes, the NFL, like all other multi-state corporations, is free to operate in the State of Minnesota as long as it comports with minimum procedural requirements.

Both DATWA and the CPA offer significant benefits to Minnesota residents by protecting employees' rights. Where state statutes protect the public's health and safety, it will

be upheld "despite the incidental burden they may impose on interstate commerce." *R & M Oil & Supply, Inc. v. Saunders*, 307 F.3d 731, 737 (8th Cir. 2002). Here, the in-state interest is significant and the burden on the NFL is minimal. Imposing the same standards on all employers, whether local or international, does not unfairly cause an employer to perform inefficiently in Minnesota or at an unfair increased cost. To require the NFL to meet the minimum statutory requirements would not force it to operate inefficiently or at an unfair increased cost.

The NFL relies on several distinguishable cases to support its argument that DATWA and the CPA are unconstitutional. In *Partee v. San Diego Chargers Football Co.*, the Chargers contended that professional football is a unique activity of interstate commerce which requires nationally uniform governance, that only federal antitrust laws apply, and that interstate commerce would be unreasonably burdened if state antitrust laws were applied to professional football's interstate activities. 668 P.2d 674, 677 (Cal. 1983). There, the court analogized professional football with professional baseball's antitrust exemption and held that "the Commerce Clause precludes the application of state antitrust law" to baseball to promote fair economic competition." *Id.* at 679 (quoting *Flood v. Kuhn*, 407 U.S. 258, 284 (1972)).

The NFL also cites *NCAA v. Miller* for the proposition that a state's imposition of procedural protections in NCAA proceedings violate the Commerce Clause. 10 F.3d 633 (9th Cir. 1993). However, *Miller* invalidated the Nevada statute as illegal per se because "the Statute is directed at interstate commerce and only interstate commerce." *Id.* at 638. There, the court did not reach the Pike balancing test because the statute was facially discriminatory.

The NFL claims, without explanation, that it cannot abide by its national CBA if it complies with Minnesota state law. Neither the validity nor the enforcement of the CBA has

been challenged. An employer cannot contract for what is illegal under state law and then seek to have that state law invalidated. *Allis-Chalmers*, 471 U.S. at 212. Defendants claim that abiding by Minnesota state law would require the NFL to use inferior labs that would not know how to test for steroids or masking agents, to excuse a positive test result whenever it resulted from a player's use of over-the-counter products, and to allow the consumption of steroids or masking agents on the way to a game. Defendants claim misses the mark.

DATWA, the CPA, and the CBA are not mutually exclusive. DATWA's standards provide a floor for protecting employees' rights, not a ceiling. DATWA does not prevent the NFL from using a lab with higher accreditation. Nor does DATWA require the NFL to excuse use of banned over-the-counter products or consumption of steroids. As explained in this order, the NFL did not violate DATWA by testing Plaintiffs for anabolic steroids or Bumetanide and did not violate DATWA by refusing to excuse Plaintiffs' violation of the Policy. Complying with Minnesota law does not hinder the NFL's ability to combat steroid use throughout the league.

Defendants urge the Court to consider the effect "if several jurisdictions were to adopt similar [statutes]." *Saunders*, 307 F.3d at 735. The Court finds this argument wholly unsupportive of Defendants' position. Many states have adopted legislation pertaining to employee drug and alcohol testing. Despite varying state laws, corporations that participate in employee drug testing conduct business across state lines everyday in this country. Defendants fail to demonstrate why it would be more onerous for the NFL to comply with state laws, than for any other business engaged in interstate commerce.

DATWA and the CPA provide minimum, rather than maximum standards for employers. The adoption of similar laws by other states does not place an excessive burden on professional

sports. The NFL, pursuant to its CBA, is free to establish a more rigorous drug testing program that exceeds the minimum standards delineated in DATWA. DATWA does not have a detrimental extraterritorial effect, and does not implicate the Commerce Clause. Therefore, Defendant's Motion for Summary Judgment is denied on this count, and Plaintiffs' cross-motion is granted.

### P.    Plaintiffs' request for a permanent injunction is reserved.

Plaintiffs seek an injunction, permanently enjoining the NFL from disciplining Plaintiffs as a result of the drug testing and resultant discipline. DATWA provides that "[a]n employee . . . has standing to bring an action for injunctive relief requesting the district court to enjoin an employer or laboratory that commits or proposes to commit an act in violation of sections 181.950 to 181.954." Minn. Stat. § 181.956 (3).

This Court has discretion to issue an injunction if Plaintiffs have proven their case on the merits. *Bio-Line, Inc. v. Burman*, 404 N.W.2d 318, 320 (Minn. Ct. App. 1987). "In determining whether permanent injunctive relief is warranted, the district court must first determine whether the plaintiff has proven its case." *Thomas & Betts Corp. v. Leger*, No. A04-260, 2004 WL 2711391, at *25 (Minn. Ct. App. Nov. 24, 2004) (citing *Minn. Pub. Interest Research Group v. Butz*, 358 F. Supp 584, 625 (D. Minn. 1973), *aff'd*, 498 F.2d 1314 (8th Cir. 1974)). If the court finds that a plaintiff has succeeded on the merits, it must then balance the likelihood of irreparable harm to the plaintiff against the possibility of injury to the defendant and other interested parties, as well as any public policy considerations. *Id.*

Plaintiffs have not established success on the merits. The Court grants in part and denies in part both Plaintiffs' and Defendants' Motions for Summary Judgment. This case will proceed

to trial on several remaining issues of material fact.  Plaintiffs' request for a permanent injunction is reserved until the outstanding issues in this case have been resolved.

## III.   CONCLUSION

The record is incomplete at this stage, preventing the Court from making the required legal conclusions to dispose of this case on summary judgment.  Material issues of fact remain regarding whether the NFL is Plaintiffs' employer under DATWA, whether the NFL's Policy meets or exceeds DATWA's requirements, and whether the NFL breached DATWA's confidentiality requirement.  This case will proceed to trial on March 8, 2010.