# EXHIBIT D

Dockets.Justia.com

STATE OF MINNESOTA                            DISTRICT COURT

COUNTY OF HENNEPIN                      FOURTH JUDICIAL DISTRICT

---

Kevin Williams and Pat Williams,          Court File No. _____

        Plaintiffs,

    v.                                            **SUMMONS**

The National Football League, John
Lombardo, M.D., Brian Finkle, and Adolpho
Birch,

        Defendants.

---

**THE STATE OF MINNESOTA TO THE ABOVE-NAMED DEFENDANTS:**

      YOU ARE HEREBY SUMMONED and required to file with the Clerk of this Court and

serve upon plaintiffs' attorney, Pat Williams, Briggs and Morgan, 2200 IDS Center, 80 South

Eighth Street, Minneapolis, Minnesota 55402, an answer to the Verified Complaint which is

herewith served upon you, within twenty (20) days after service of this Summons upon you,

exclusive of the day of service. If you fail to do so, judgment by default will be taken against

you for the relief demanded in the Complaint.

Dated: _12/3_, 2008

BRIGGS AND MORGAN, P.A.

By: _____

Patrick S. Williams (#196502)
Scott Knudson (# 141987)
Kent Schoen (# 387981)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 977-8400

**ATTORNEYS FOR PLAINTIFFS KEVIN
WILLIAMS AND PAT WILLIAMS**

STATE OF MINNESOTA                    DISTRICT COURT

COUNTY OF HENNEPIN                FOURTH JUDICIAL DISTRICT

---

Kevin Williams and Pat Williams,                    Court File No.

             Plaintiffs,              **VERIFIED COMPLAINT**

    v.

National Football League, John Lombardo,
M.D., Brian Finkle, and Aldopho Birch,

           Defendants

---

Kevin Williams and Pat Williams ("Players"), by their attorneys, Crowell & Moring LLP and Briggs and Morgan, P.A., as and for their Verified Complaint in the above-referenced action, state and allege as follows:

## NATURE OF THE ACTION

1.    This is an action seeking damages for the harm suffered as a result of the negligence, breach of fiduciary duty, fraud, constructive fraud, constructive fraud, negligent misrepresentation, and vicarious liability perpetrated on them by the National Football League ("NFL"). Plaintiffs seek injunctive relief, compensatory, and punitive damages.

## THE PARTIES

2.    Defendant NFL an unincorporated association headquartered in New York, New York.

3.    Plaintiff Kevin Williams is a 6-year veteran of the NFL, a husband and a father of 2 children, and a pillar of his community of Minneapolis, Minnesota, where he resides.

4.    Plaintiff Pat Williams is a 12-year veteran of the NFL, a husband and a father of 3 children, and a pillar of his community of Monroe, Lousiana, where he resides in the off-season, as well as of Minneapolis, Minnesota, where he resides during the NFL season.

5.      Defendant John Lombardo, M.D. is designated as the Independent Administrator of the NFL Policy on Anabolic Steroids and Related Substances (Program). Dr. Lombardo assumed a position of trust with all parties involved with the Program, creating fiduciary duties and obligations. In fact, Dr. Lombardo answers to, and is controlled by, the NFL and, as alleged below, as a matter of course provides information about the Program to the NFL while excluding the National Football League Players Association ("NFLPA") from receipt of such information, even when the information relates to the health and safety of the players and the integrity of the Program.

6.      Defendant Brian Finkle is the Consulting Forensic Toxicologist to the Program and, upon information and belief, is a resident of the State of Utah. Mr. Finkle assumed a position of trust with all parties involved with the Program, creating fiduciary duties and obligations.

7.      Defendant Adolpho Birch is Vice President of Law and Labor Policy at the NFL, is a resident, upon information and belief, of the State of New York, and works, literally, within several yards of Jeff Pash, the Hearing Officer who rendered the suspension of the Plaintiffs and within the same proximity to Roger Goodell, the Commissioner of the NFL. Mr. Birch owed to all parties to the Program a level of fair dealing, creating certain fiduciary duties and obligations.

**FACTUAL BACKGROUND**

8.      The National Football League Policy and Procedure on Anabolic Steroids and Related Substances (the "Program") was designed to protect the integrity of the game of football and to protect the health and safety of its players.

9.      The NFL and individual Defendants have wantonly ignored the two basic tenets of the Program and, as a result, the Plaintiffs have suffered irreparable injury to their reputations and livelihood, and are threatened with continuing and future injury if the Defendants are not enjoined from taking the threatened actions described below.

10.     The NFL, on December 2, 2008, suspended at least two of its players, Plaintiffs Kevin Williams and Pat Williams, despite its acknowledgment that neither Player testified

2

positive for anabolic steroids, knowingly ingested any substance banned by the Program, or ever tested positive for anabolic steroids during their long and productive years in the NFL despite frequent and random drug testing. The NFL rationalized the decision by stating that it is enforcing a strict liability standard imposed by the terms of the Program.

11.    The NFL suspended innocent Plaintiffs for four games, compromising their reputations, their place in the community, the compensation they have spent years building towards the opportunity for their Team to be successful during the 2008 NFL season, based upon a series of circumstances that included an unexplained and irrational cover-up by top NFL executives that was certain to entrap and otherwise compromise NFL players, as well as to jeopardize the players' health and welfare.

12.    Actions by top NFL officials included as follows:

a. As early as 2006, the "Independent Administrator" in charge of the Program, Defendant John Lombardo, learned that (a) several NFL players were using a product called StarCaps as a weight-loss aid; (b) StarCaps advertised as having only "natural ingredients"; (c) StarCaps in fact contained a controlled substance, Bumetanide; and (d) detection of Bumetanide in a player being tested under the Program would yield a positive result for a banned substance, thereby subjecting the Player to suspension.

b. By sometime in late 2006, the NFL had confirmed that (a) StarCaps contained Bumetanide; (b) Bumetanide presented a potentially "acute" medical threat to any person unwittingly ingesting the substance; and (c) the issue was sufficiently dangerous that the NFL encouraged a more thorough scientific

3

review of the situation, which confirmed the presence of Bumetanide in StarCaps and resulted in a top NFL lawyer, Defendant Adolpho Birch, undertaking the responsibility to warn the Food & Drug Administration ("FDA") of the presence of Bumetanide in StarCaps while overtly discouraging a scientist involved in the scientific review from making the disclosure.

c. Notwithstanding the above, the NFL did not (a) warn NFL players, Teams, the National Football League Players Association or anyone else associated with the NFL, with the possible exception of other top ranking NFL executives, and perhaps Commissioner Goodell (although Mr. Birch has refused to disclose whether he did or did not inform Commissioner Goodell) of the presence of Bumetanide in StarCaps; or (b) alert the FDA of the presence of Bumetanide in StarCaps despite Mr. Birch undertaking the responsibility to do so.

d. More concerned about the commercial aspect of the NFL than the health and safety of the players and the integrity of the Program, the NFL, in December 2006, barred NFL personnel from endorsing products manufactured by Balanced Health Products, the manufacturer of StarCaps, but did not warn players – or anyone else – that StarCaps contained Bumetanide nor did the NFL release a specific advisory, as it does from time to time, warning players not to use StarCaps.

      e. Upon information and belief, although the December 2006 memorandum about Balanced Health Products may have been forwarded to the NFLPA, it was not distributed to the Teams, or at least Team trainers, and was not directly distributed to any NFL players.

13.    The NFL, as with all sports organizations, has been increasingly scrutinized by, among others, public officials regarding the use of banned substances, and most especially anabolic steroids. The failure to warn players of the content of StarCaps can only rationally be explained in this context. The instant suspensions provide the NFL with a politically palatable solution to convincing public officials that the League is seriously policing the use of steroids.

14.    The NFL, in a very public way, has now shown public officials that the NFL will not make any exceptions for violations of the Program. This political message was accomplished at the expense of exposing Plaintiffs, among others, as being "violators" of the Program. But the "violators" were not users of anabolic steroids, and thus the NFL has been able to deliver its political message without providing any evidence to public officials who are warning the NFL of greater outside regulation and scrutiny that football players in fact "cheat" to enhance performance.

15.    Neither Plaintiff has ever taken anabolic steroids. Neither Plaintiff has ever masked or otherwise diluted a urine sample taken as part of the administration of the Program in order to disguise the use of any substance. Neither Plaintiff has ever violated the Program.

16.    Neither Plaintiff would have used StarCaps had the NFL disclosed to players that the product contained a banned substance or that its label and advertising was erroneous.

17.    Both Plaintiffs suffer from medical conditions that could have been exacerbated by the ingestion of Bumetanide.

18.     Each Plaintiff made good faith efforts to abide by the Program's rules and regulations and each Plaintiff knew or had reason to know that the NFL outlets for information, including its Supplement "hotline" line, were essentially useless.

19.     NFL officials have stated that, without Bumetanide, the use of StarCaps would not violate the Program.

### NEED FOR EXIGENT INJUNCTIVE RELIEF

20.     The Program's random testing disclosed that, on July 26, 2008, both Plaintiffs had in their system a banned substance, Bumetanide.  The testing also revealed that neither Plaintiff had any trace of an anabolic steroid or showed any sign of diluting their urine samples or masking any other substance.

21.     Over four months later, the NFL has now upheld a suspension barring each Plaintiff from participating in four NFL games, from practicing, or from collecting their salaries. Moreover, suspension under the Program precludes inclusion on the NFL Pro Bowl team and each Plaintiff's contract contains bonus clauses triggered by being selected to the Pro Bowl team.

22.     The NFL actions, moreover, severely compromise the Plaintiffs' reputations and standing in the community.  Despite the fact that the administration of the Program is supposed to remain confidential, the NFL proposed the four-game suspension in late September and early October, and, within hours of that recommendation, news of the NFL's proposed action was broadcast throughout the world on sports channels such as NFL Network and ESPN.

23.     Now, with only four regular season games remaining and in the middle of a battle to make the playoffs for the first time since the 2004 season, the NFL, notwithstanding its own complicity in the current situation, has threatened the success of the Minnesota Vikings Football Team, the financial success of the City of Minneapolis as well as surrounding cities and towns, and the general enjoyment of Vikings' fans throughout this region and the country.

## COUNT I
### (Injunctive Relief)

24.    Paragraphs 1 through 23 are incorporated herein and made a part of this claim.

25.    The Players have demonstrated a likelihood of ultimate success on the merits based on the allegations set forth herein.

26.    The Players will suffer irreparable injury if the injunctive relief sought is withheld.

27.    The sanctions that will be imposed on the Players by the NFL's December 2, 2008 decision, which is to take effect immediately, will cause the Players substantial irreparable injury that cannot be remedied with monetary compensation.  The NFL's decision to bar the Players from participating in four NFL games, from practicing, attending team and individual meetings, training at the Minnesota Vikings' practice facility, spending anytime at the Minnesota Vikings' practice facility, communicating with teammates or members of the coaching staff, attending team functions, attending Minnesota Vikings' games as a spectator and from collecting their salaries will cause the Players to not only lose their weekly wages but to also miss one of the most competitive seasons of their short professional careers.  This will impact the Player's sports records and impact their eventual ability to be inducted into the Professional Football Hall of Fame.

28.    Suspension under the Program will preclude the Players from being included in the NFL Pro Bowl team, an all-star football team that is a prestigious honor.  The opportunity to "make-up" the time lost is not an option.  The Players will simply never have the ability to participate in these loss games and practices again.

29.    The Players' contracts also contain bonus clauses that will necessarily be affected by punishment wielded by the Defendants.  The monetary losses due to compromising of the acceleration and bonus clauses cannot be appropriately calculated for purposes of a preliminary injunction because of the snowball effect the NFL's suspension will have on the reputations,

7

earning potential, and NFL standing of the Players. The games, including the Pro Bowl, forgone can never be recovered.

30.     The NFL's actions severely compromise the Plaintiffs' reputations and standing in their community, among their fellow athletes, and in the public.

31.     Despite the fact that the administration of the Program is supposed to remain confidential, the NFL proposed the four-game suspension in late September and early October, and, within hours of that recommendation, news of the NFL's proposed action was broadcast throughout the country. Moreover, the NFL's own press release, as well as the hundreds of spin-off reports by the mass media, makes clear that the Players were suspended for violating the NFL's "anti-doping policy" without any substantive provision to assure that it is clear and undisputed that the Players did not use steroids or otherwise try to ingest banned substances. The Player's reputations are irreparably being smeared.

32.     The Players' playoff season is also in jeopardy, since the suspensions will threaten the success of the Minnesota Vikings Football Team's chances to qualify for the 2008 playoffs.

33.     The financial success of the City of Minneapolis as well as surrounding cities and towns, and the general enjoyment of Vikings' fans throughout the country is at jeopardy.

34.     The balance of the equities tips in favor of the Players rather than the Defendants.

35.     The Players are the only parties who have and will continue to suffer from the NFL's proposed suspension. Their reputations are forever tainted and their career paths may be irreparably altered.

36.     The relief herein sought would cause minimal hardship to the NFL because it receives no benefit from the suspension. Moreover, even if the NFL were to prevail on the merits in this action, which they will not, they can always move forward and institute the suspension at the resolution of this case. The relief sought herein only seeks to maintain the *status quo*, and provide the Players with the opportunity to defend their good names and expose the bad acts of the NFL.

8

## COUNT II
### (Breach of Fiduciary Duty)

37.     Paragraphs 1 through 36 are incorporated herein and made a part of this claim.

38.     Individual Defendants, as professionals with a heightened knowledge and expertise, and a relationship of trust with Plaintiffs who relied on the Doctors' and the lawyer's and the NFL's expertise in establishing, maintaining and administering the Program, have a fiduciary duty to Plaintiffs, which encompasses a duty to act honestly, openly, fairly, and in the best interests of the Plaintiffs.

39.     By failing to disclose the fact that StarCaps contains Bumetanide, needlessly exposing the Plaintiffs to the harsh sanctions of the Program and potential acute physical suffering, and continuing to withhold the true information about the ingredients in StarCaps, Defendants intentionally, knowingly, and in bad faith breached their fiduciary duties to the Plaintiffs.

40.     In committing their breach of fiduciary duty as alleged herein, Defendants acted with reckless disregard for the truth, in conscious disregard for the Plaintiff's interests, and with malice and oppression so as to justify an award of punitive damages.

41.     As a result of the bad faith breach of their fiduciary duties, the Plaintiffs will suffer compensatory damages in excess of $10,000,000.

42.     As a result of the bad faith breach of their fiduciary duties, the Plaintiffs have suffered and will suffer continuing damage to their reputation and ability to make a living.

## COUNT III
### (Aiding and Abetting Breach of Fiduciary Duty)

43.     Paragraphs 1 through 42 are incorporated herein and made a part of this claim.

44.     Lombardo, Finkle and Birch owed a fiduciary duty to the Players as alleged above. By failing to inform the Plaintiffs of the known risks associated with StarCaps, failing to

9

exercise proper management and control over medical information released to the Plaintiffs, and deliberately misleading the Players as to the NFL's goal to protect the Player's health, Lombardo, Finkle and Birch breached their fiduciary duties to the Players.

45.     By knowingly endorsing the misrepresentations and omissions of Lombardo, Finkle and Birch and knowingly failing to protect against potential harm to the Players, the NFL actively participated in, assisted in, and also had actual knowledge of the other Defendants' breaches of their fiduciary duties to the Players.

46.     By knowingly failing to protect against these misdeeds, the NFL actively participated in, assisted in, and also had actual knowledge of the breaches of fiduciary duties to the Plaintiffs by Lombardo, Finkle and Birch.

47.     As a result of the other Defendants' bad faith breaches of their fiduciary duties as alleged herein, and the NFL's acts and omissions in aiding and abetting these breaches, the Plaintiffs have suffered compensatory damages in an exact amount to be determined at trial.

48.     In aiding and abetting the other Defendants' breaches of their fiduciary duties to the Plaintiffs as alleged herein, the NFL acted in reckless disregard for the truth, in conscious disregard for the Plaintiffs' rights, and with malice and oppression so as to justify an award of punitive damages.

## COUNT IV
### (Violation of Public Policy)
### (Against the NFL)

49.     Paragraphs 1 through 48 are incorporated herein and made a part of this claim.

50.     Defendant NFL's recent decision to punish the Players for violations of the Program, where the Players were only in violation of the Program as a direct result of the Defendants' breach of their fiduciary duties to the Players, has the effect of sanctioning Defendants' breach of fiduciary duty. Defendant NFL's sanction of the breach of fiduciary duty owed by the individual Defendants to Players is in direct violation of the public policy of Minnesota.

10

51.     In fact, Defendant NFL's sanction of the Defendants' breach of fiduciary duty operates to grant the individual Defendants and to create an opportunity for fiduciaries to operate in a duty-free zone.  Such sanctioning by the NFL is in direct contravention of the longstanding public policy of Minnesota.

52.     As a result, the Players have suffered compensatory damages in excess of $10,000,000, in an exact amount to be determined at trial and reputation damage in an amount to be determined at trial.

## COUNT V
### (Fraud)

53.     Paragraphs 1 through 52 are incorporated herein and made a part of this claim.

54.     In making public statements during the period of 2006-2007 to players, agents, teams in the NFL – and the general public – the NFL stated that the goal of the NFL's Program was to "protect the health and well being of the NFL players."  These false statements were knowingly and intentionally made to actually cause harm to NFL players – including Plaintiffs.

55.     When making these false misrepresentations, the Defendants knowingly and intentionally pursued and attempted to solidify a public appearance of non-tolerance for use of anabolic steroids.  This unstated goal to set an example of unwitting NFL players for public appearance purposes resulted in a draconian and inflexible enforcement of the Program.  The Defendants had actual and certain knowledge that NFL players were in fact using StarCaps and that that use could result in a violation of the Program – or serious physical harm.  The Defendants omitted to make that crucial knowledge available to the Players.

56.     The resulting inflexible enforcement of the Program caused the Players' harm.

57.     The NFL and other defendants knowingly omitted relevant and necessary health information from the Players in order to continue the appearance of a "strict liability policy" irrespective of actual steroid use.

58.     The Players reasonably relied upon the statements referenced herein in determining take StarCaps.

59.     The Players reasonably relied on these misrepresentations and omissions when they reviewed and assessed the information available to them to make the decision to take StarCaps.

60.     The Players have suffered compensatory damages in excess of $10,000,000, in an exact amount to be determined at trial and reputation damage in an amount to be determined at trial.

61.     In committing their fraud as alleged, Defendants acted in reckless disregard for the truth, in conscious disregard for Player's rights, and with malice and oppression so as to justify an award of punitive damages.

## COUNT VI
### (Constructive Fraud)

62.     Paragraphs 1 through 61 are incorporated herein and made a part of this claim.

63.     As a result of their duties and responsibilities to Plaintiffs, among others, the individual Defendants had a duty to convey to the Plaintiffs the information about the hidden contents of the product StarCaps.

64.     The individual Defendants knowingly failed to reveal the true contents of StarCaps, and, notwithstanding, continued to make the false statement that the Program was designed and being administered to protect the health and safety of all NFL Players.

65.     Specifically, the Defendants had a duty to disclose the information it learned about the secret inclusion of Bumetanide in StarCaps to both Plaintiffs because the NFL had superior knowledge of the inclusion of that banned substance in a product that the NFL was aware many of the players were taking.

66.     All NFL players, including the Plaintiffs, relied upon the representation of the NFL and its executives, including the individual Defendants, about the Program and its administration, by making material misrepresentation of an existing fact with knowledge of the falsity of their statements and material omissions, with intent to deceive the Players which will

result in irreparable damages if the Players' justifiable reliance on Defendants is allowed to form the basis for the extreme and harsh punishment being pursued by the NFL..

67. By upholding the punishment against the Plaintiffs, despite breach of its own duties and obligations, and despite the NFL being in possession of material information that could have prevented the Plaintiffs from ingesting a substance that not only resulted in Plaintiffs non-compliance with the Program, but put their health and welfare in danger, the NFL has sanctioned the breach of duties by the individual Defendants, violated its own duties and obligations, and acted in a manner inconsistent with public policy of the State of Minnesota.

68. The Defendants' failure to disclose the fact that StarCaps contains Bumetanide for two years after it became aware of the information materially affected the Plaintiff's actions. Disclosure would have prevented the Plaintiff's from taking StarCaps altogether.

## COUNT VII
### (Negligent Misrepresentation)

69. Paragraphs 1 through 69 are incorporated herein and made a part of this claim.

70. The NFL was in a unique position in its relationship with the Plaintiffs. The NFL had material information that could have helped the Plaintiffs to comply with the terms of the contract all parties had agreed to. The NFL had knowledge and independent scientific confirmation of the material information for nearly two years without disclosing it to the football community or to the American public.

71. In its Memorandum dated December 2006, the NFL advised players that they were prohibited from endorsing products manufactured by Balanced Health Products, the manufacturer of StarCaps.

72. The NFL continued to advise players of banned substances and alert players when products joined the banned substances list as it had done in the past during the two years between the time the NFL learned that StarCaps contains Bumetanide and the present.

13

73.     The NFL never advised the Plaintiffs or anyone in the football community who might have alerted the Plaintiffs, that StarCaps contains Bumetanide and that taking the product could result in non-compliance with the Program.

74.     The NFL was aware that the Plaintiffs needed the secret information about the true ingredients of StarCaps in order to both maintain compliance with the Program, and to avoid serious health risks. The NFL was aware that Plaintiffs would not and did not have access to the information that Starcaps contains Bumetanide through any other source.

75.     Had the NFL disclosed the fact that StarCaps contains a banned substance that could result in non-compliance with the Program at any time during the past two years, or had the Plaintiffs become aware of that information independently, the Plaintiffs would have stopped taking StarCaps immediately.

76.     The Players reasonably relied on the information disclosed by Balanced Health Products, the manufacturer of StarCaps, about the ingredients in StarCaps.

77.     The Players reasonably relied on the NFL to share and disseminate information that would have a material impact on the Players' ability to comply with the Program.

## COUNT VIII

### (Negligence)

78.     Paragraphs 1 through 77 are incorporated herein and made a part of this claim.

79.     Defendants had duties and obligations to Plaintiffs.

80.     Defendants breached their duties and obligations to Plaintiffs.

81.     As a proximate cause of Defendants' breach, Plaintiffs suffered damages as alleged herein.

## COUNT IV
### (For Gross Negligence)

82.     Paragraphs 1 through 81 are incorporated herein and made a part of this claim.

14

83.     By the Defendants' failure and/or refusal to release critical medical information to the Players regarding StarCaps, despite knowledge of that StarCaps could result in an unwitting violation of the Program and could cause potential physical harm to the Players, Defendants acted with reckless and deliberate disregard of Players' rights as members of the NFL.

84.     Defendants' gross negligence caused the Players to suffer compensatory damages in an exact amount to be determined at trial.

**COUNT X**
**(Vicarious Liability Upon the Doctrine of Respondeat Superior)**
**(Against the NFL and Birch)**

85.     Paragraphs 1 through 84 are incorporated herein and made a part of this claim.

86.     At all times relevant to this litigation, Defendants Dr. Lombardo, Birch and Finkle were agents or employees of the NFL acting within the scope of their employment by Defendant NFL and in the furtherance of Defendants' business.  As Defendants Lombardo, Birch and Finkle's employer or nominal employer, Defendant NFL is responsible for the doctors' actions and responsibilities within the scope of their employment.

87.     As a result of Defendants Lombardo, Birch and Finkle's torts within the scope of their employment with Defendants NFL and Mr. Birch as alleged above, Plaintiffs have suffered and will continue to suffer compensatory damages in excess of $10,000,000.

**PRAYER FOR RELIEF**

WHEREFORE, the Players respectfully pray the Court to grant them judgment for the following relief:

1.     Compensatory damages;

2.     Punitive damages;

3.     Injunctive relief; and

4.     Such other relief as the Court deems just and proper.

15

Dated: December 3, 2008

**BRIGGS AND MORGAN, P.A.**

By: _____

    Patrick S. Williams (#196502)
    Scott G. Knudson (#141987)
    Kent T. Schoen (#0387981)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2157
(612) 977-8400

**ATTORNEYS FOR PLAINTIFFS KEVIN
WILLIAMS AND PAT WILLIAMS**

16

## VERIFICATION

STATE OF MINNESOTA  )

                    )        **ss.:**

COUNTY OF HENNEPIN )

      Patrick Williams, being duly sworn, deposes and says:

      I am a Plaintiff in the above action.  I have read the foregoing Summons and Verified

Complaint and know the contents thereof and the same are true to my own knowledge, except as

to the matters therein stated to be alleged upon information and belief, and as for those matters, I

believe them to be true.

      I verify that the foregoing statements are true under penalties of perjury.

                                       _____

                                       Patrick Williams

Sworn to before me this
3rd day of December, 2008.



_____
     NOTARY PUBLIC



SCOTT G. KNUDSON
Notary Public
Minnesota
My Commission Expires January 31, 2010

18

**VERIFICATION**

**STATE OF MINNESOTA )**
**)**    **ss.:**
**COUNTY OF HENNEPIN )**

    Kevin Williams, being duly sworn, deposes and says:

    I am a Plaintiff in the above action.  I have read the foregoing Summons and Verified

Complaint and know the contents thereof and the same are true to my own knowledge, except as

to the matters therein stated to be alleged upon information and belief, and as for those matters, I

believe them to be true.

    I verify that the foregoing statements are true under penalties of perjury.

                                       _____
                                       Kevin Williams

Sworn to before me this
3rd day of December, 2008.



_____
  NOTARY PUBLIC

SCOTT G. KNUDSON
Notary Public
Minnesota
My Commission Expires January 31, 2010

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| KEVIN WILLIAMS and PAT WILLIAMS, | ) | Case No. 08-CV-6255-PAM-JJG |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | **AMENDED COMPLAINT** |
| THE NATIONAL FOOTBALL LEAGUE, | ) | |
| JOHN LOMBARDO, M.D., BRIAN FINKLE, | ) | **JURY TRIAL DEMANDED** |
| and ALDOPHO BIRCH, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Kevin Williams and Pat Williams ("Players"), by their attorneys, Crowell & Moring LLP and Fulbright & Jaworski LLP, as and for their Amended Complaint in the above-referenced action, state and allege as follows:

## NATURE OF THE ACTION

1.     This is an action seeking damages for the harm suffered as a result of the negligence, breach of fiduciary duty, fraud, constructive fraud, negligent misrepresentation, and vicarious liability perpetrated on the Players by the National Football League ("NFL") and the individual Defendants, all of whom acted, at all relevant times, as representatives and agents of the NFL. The Players seek injunctive relief, compensatory and punitive damages.

## THE PARTIES

2.     Plaintiff Kevin Williams is a 6-year veteran of the NFL, a husband and a father of two children, and a pillar of his community of Minneapolis, Minnesota, where he resides.

3.     Plaintiff Pat Williams is a 12-year veteran of the NFL, a husband and a father of three children, and a pillar of his community of Monroe, Louisiana, where he resides in the off-season, as well as of Minneapolis, Minnesota, where he resides during the NFL season.

4.     Defendant NFL is an unincorporated association comprised of the employer member clubs of the NFL, one of which is the Minnesota Vikings, which is located in this district.  The NFL derives revenue from the State of Minnesota through, among other things, advertising, ticket sales, merchandizing and broadcasting revenue.

5.     Defendant John Lombardo, M.D. is designated as the Independent Administrator of the NFL Policy on Anabolic Steroids and Related Substances (the "Program").  Dr. Lombardo assumed a position of trust with all parties involved with the Program, creating fiduciary duties and obligations.  In fact, Dr. Lombardo was selected by, answers to and is controlled by, the NFL and, as alleged below, as a matter of course provides information about the Program to the NFL while excluding the National Football League Players Association ("NFLPA") from receipt of such information, even when the information relates to the health and safety of the players and the integrity of the Program.  Dr. Lombardo owed to all parties to the Program fiduciary duties and obligations, including duties of fair dealing, fair disclosure and avoidance of conflicts of interest.

6.     Defendant Brian Finkle is the Consulting Forensic Toxicologist to the Program and, upon information and belief, is a resident of the State of Utah.  Defendant Finkle assumed a position of trust with all parties involved with the Program, creating fiduciary duties and obligations.  Like Dr. Lombardo, the NFL selected Defendant Finkle for his position in the Program and his position depends upon the continuing approval of the NFL.  Defendant Finkle owed to all parties to the Program fiduciary duties and obligations, including duties of fair dealing, fair disclosure and avoidance of conflicts of interest.

7.     Defendant Adolpho Birch is the Vice President of Law and Labor Policy at the NFL, is a resident, upon information and belief, of the State of New York, and works, literally,

2

within several yards of Jeff Pash, the Hearing Officer who rendered the suspension of the Players and within the same proximity to Roger Goodell, the Commissioner of the NFL. Defendant Birch owed to all parties to the Program fiduciary duties and obligations, including duties of fair dealing, fair disclosure and avoidance of conflicts of interest.

## **FACTUAL BACKGROUND**

8.      The Program was designed to protect the integrity of the game of football and to protect the health and safety of its players.

9.      The NFL and individual Defendants have wantonly ignored the two basic tenets of the Program and, as a result, the Players have suffered irreparable injury to their reputations and livelihood, and are threatened with continuing and future injury if the Defendants are not enjoined from taking the threatened actions described below.

10.     The NFL, on December 2, 2008, suspended at least two of its players, Plaintiffs Kevin Williams and Pat Williams, despite its acknowledgment that neither Player testified positive for anabolic steroids, knowingly ingested any substance banned by the Program, or ever tested positive for anabolic steroids during their long and productive years in the NFL despite frequent and random drug testing. The NFL rationalized the decision by stating that it is enforcing a strict liability standard imposed by the terms of the Program.

11.     The NFL has unfairly and wrongfully compromised the Players' reputations, their place in the community, the compensation they have spent years building towards and the opportunity for their Team to be successful during the 2008 NFL season, based upon a series of circumstances that included an unexplained and irrational cover-up by top NFL executives that was certain to entrap and otherwise compromise NFL players, as well as to jeopardize the Players' health and welfare.

3

12.    Actions by top NFL officials included as follows:

(a)    As early as 2006, the "Independent Administrator" in charge of the Program, Defendant Lombardo, learned that: (1) several NFL players were using a product called StarCaps as a weight-loss aid; (2) StarCaps was advertised as having only "natural ingredients"; (3) StarCaps in fact contained a controlled substance, Bumetanide; and (4) detection of Bumetanide in a player being tested under the Program would yield a positive result for a banned substance, thereby subjecting the Player to suspension.

(b)    By sometime in late 2006, the NFL had confirmed that: (1) StarCaps contained Bumetanide; (2) Bumetanide presented a potentially "acute" medical threat to any person unwittingly ingesting the substance; and (3) the issue was sufficiently dangerous that the NFL encouraged a more thorough scientific review of the situation, which confirmed the presence of Bumetanide in StarCaps and resulted in a top NFL lawyer, Defendant Birch, undertaking the responsibility to warn the Food & Drug Administration ("FDA") of the presence of Bumetanide in StarCaps while overtly discouraging a scientist involved in the scientific review from making the disclosure.

(c)    Notwithstanding the above, the NFL did not (1) warn NFL players, Teams, the NFLPA or anyone else associated with the NFL, with the possible exception of other top ranking NFL executives, and perhaps Commissioner Goodell (although Defendant Birch has refused to disclose whether he did or did not inform Commissioner Goodell) of the presence of Bumetanide in StarCaps; or

4

(2) alert the FDA of the presence of Bumetanide in StarCaps despite Defendant Birch undertaking the responsibility to do so.

(d)     More concerned about the commercial aspect of the NFL than the health and safety of the players and the integrity of the Program, the NFL, in December 2006, circulated a memorandum barring NFL personnel from endorsing products manufactured by Balanced Health Products, the manufacturer of StarCaps, but did not warn players – or anyone else – that StarCaps contained Bumetanide, nor did the NFL release a specific advisory, as it does from time to time, warning players not to use StarCaps.

(e)     Upon information and belief, although the December 2006 memorandum about Balanced Health Products may have been forwarded to the NFLPA, it was not distributed to the Teams, or at least Team trainers, and was not directly distributed to any NFL players.

13.     The NFL, as with all sports organizations, has been increasingly scrutinized by, among others, public officials regarding the use of banned substances, and most especially anabolic steroids.  The failure to warn players of the content of StarCaps can only rationally be explained in this context.  The instant suspensions provide the NFL with a politically palatable solution to convincing public officials that the League is seriously policing the use of steroids.

14.     The NFL, in a very public way, has now shown public officials that the NFL will not make any exceptions for violations of the Program.   This political message was accomplished at the expense of brandishing the Players, among others, as being "violators" of the Program. But the "violators" were not users of anabolic steroids, and thus the NFL has been able to deliver its political message without providing any evidence that football players in fact

"cheat" to enhance performance to public officials who are warning the NFL of greater outside regulation and scrutiny.

15.   Neither Plaintiff has ever taken anabolic steroids.   Neither Plaintiff has ever masked or otherwise diluted a urine sample taken as part of the administration of the Program in order to disguise the use of any substance. Neither Plaintiff has ever violated the Program.

16.   Neither Plaintiff would have used StarCaps had the NFL disclosed to players that the product contained a banned substance or that its label and advertising was erroneous.

17.   Both Players suffer from medical conditions that could have been exacerbated by the ingestion of Bumetanide.

18.   Each Plaintiff made good faith efforts to abide by the Program's rules and regulations and each Plaintiff knew or had reason to know that the NFL outlets for information, including its Supplement "hotline" telephone line, were essentially useless.

19.   NFL officials have stated that, without Bumetanide, the use of StarCaps would not violate the Program.

## NEED FOR EXIGENT INJUNCTIVE RELIEF

20.   The Program's random testing disclosed that, on July 26, 2008, both Plaintiffs had in their system a banned substance, Bumetanide. The testing also revealed that neither Plaintiff had any trace of an anabolic steroid or showed any sign of diluting their urine samples or masking any other substance.

21.   Over four months later, the NFL upheld a suspension barring each Plaintiff from participating in four NFL games, from practicing, or from collecting their salaries.   Moreover, suspension under the Program would have precluded inclusion on the NFL Pro Bowl team and each Plaintiff's contract contains bonus clauses triggered by being selected to the Pro Bowl team.

22.    The NFL actions, moreover, severely compromise the Players' reputations and standing in the community.  Despite the fact that the administration of the Program is supposed to remain confidential, the NFL proposed the four-game suspension in late September and early October, and, within hours of that recommendation, news of the NFL's proposed action was broadcast throughout the world on sports channels such as NFL Network and ESPN.

23.    With only four regular season games remaining and in the middle of a battle to make the playoffs for the first time since the 2004 season, the NFL, notwithstanding its own complicity in the current situation, threatened the success of the Minnesota Vikings Football Team, the financial success of the City of Minneapolis as well as surrounding cities and towns, and the general enjoyment of Vikings' fans throughout this region and the country.

## COUNT 1

### (Injunctive Relief)

24.    Paragraphs 1 through 23 are incorporated herein and made a part of this claim.

25.    The Players have demonstrated a likelihood of ultimate success on the merits based on the allegations set forth herein.

26.    The Players will suffer irreparable injury if the injunctive relief sought is withheld or lifted.

27.    The sanctions that would be imposed on the Players by the NFL's December 2, 2008 decision, which was to take effect immediately, would cause the Players substantial irreparable injury that could not be remedied with monetary compensation.  The NFL's decision to bar the Players from participating in four NFL games, from practicing, attending team and individual meetings, training at the Minnesota Vikings' practice facility, spending anytime at the Minnesota Vikings' practice facility, communicating with teammates or members of the coaching staff, attending team functions, attending Minnesota Vikings' games as a spectator and

7

from collecting their salaries would cause the Players not only to lose their weekly wages but also to miss one of the most competitive seasons of their short professional careers. This would impact the Player's sports records and impact their eventual ability to be inducted into the Professional Football Hall of Fame.

28.     Suspension under the Program would have precluded the Players from being included in the NFL Pro Bowl team, an all-star football team that is a prestigious honor. The opportunity to "make-up" the time lost is not an option. The Players would simply never have the ability to participate in these lost games and practices again. Moreover, being selected for the NFL Pro Bowl has significant implications for Kevin Williams' compensation under his current contract that could not be recuperated.

29.     The Players' contracts also contain bonus clauses that would necessarily be affected by punishment wielded by the Defendants. The monetary losses due to compromising the acceleration and bonus clauses cannot be accurately calculated for purposes of an injunction because of the snowball effect the NFL's suspension would have on the reputations, earning potential, and NFL standing of the Players. The games, including the Pro Bowl, once forgone can never be recovered.

30.     The NFL's actions severely compromise the Plaintiffs' reputations and standing in their community, among their fellow athletes, and in the public.

31.     Despite the fact that the administration of the Program is supposed to remain confidential, the NFL proposed the four-game suspension in late September and early October, and, within hours of that recommendation, news of the NFL's proposed action was broadcast throughout the country. Moreover, the NFL's own press release, as well as the hundreds of spin-off reports by the mass media, makes clear that the Players were suspended for violating the

NFL's "anti-doping policy" without any substantive provision to assure that it is clear and undisputed that the Players did not use steroids or otherwise try to ingest banned substances. The Player's reputations are irreparably being smeared.

33.    The Players' playoff season was also placed in jeopardy, since the suspensions threatened the success of the Minnesota Vikings Football Team's chances to qualify for the 2008 playoffs.

33.    The financial success of the City of Minneapolis as well as surrounding cities and towns, and the general enjoyment of Vikings' fans throughout the country is at jeopardy.

34.    The balance of the equities tips in favor of the Players rather than the Defendants.

35.    The Players are the only parties who have and will continue to suffer from the NFL's proposed suspension. Their reputations are forever tainted and their career paths may be irreparably altered.

36.    The relief herein sought would cause minimal hardship to the NFL because it receives no benefit from the suspension. Moreover, even if the NFL were to prevail on the merits in this action, which it will not, it can always move forward and institute the suspension at the resolution of this case. The relief sought herein only seeks to maintain the *status quo*, and provide the Players with the opportunity to defend their good names and expose the bad acts of the NFL.

### COUNT II

**(Breach of Fiduciary Duty)**
**(Against the NFL, Lombardo, Finkle and Birch)**

37.    Paragraphs 1 through 36 are incorporated herein and made a part of this claim.

38.    Individual Defendants, as professionals with a heightened knowledge and expertise, and a relationship of trust with the Players who relied on the doctors' and the lawyer's

and the NFL's expertise in establishing, maintaining and administering the Program, have a fiduciary duty to the Players, which encompasses a duty to act honestly, openly, fairly, and in the best interests of the Players.

39.     By failing to disclose the fact that StarCaps contains Bumetanide, needlessly exposing the Players to the harsh sanctions of the Program and potential acute physical suffering, and continuing to withhold the true information about the ingredients in StarCaps, Defendants intentionally, knowingly and in bad faith breached their fiduciary duties to the Players.

40.     In committing their breach of fiduciary duty as alleged herein, Defendants acted with reckless disregard for their duties and responsibilities, in conscious disregard for the Player's interests, and with malice and oppression so as to justify an award of punitive damages.

41.     As a result of the bad faith breach of the Defendants' fiduciary duties, the Players will suffer compensatory damages in excess of $10,000,000.

42.     As a result of the bad faith breach of the Defendants' fiduciary duties, the Players have suffered and will suffer continuing damage to their reputation and ability to make a living.

## COUNT III

### (Aiding and Abetting Breach of Fiduciary Duty)
### (Against the NFL)

43.     Paragraphs 1 through 42 are incorporated herein and made a part of this claim.

44.     Defendants Lombardo, Finkle and Birch owed a fiduciary duty to the Players as alleged above. By failing to inform the Players of the known risks associated with StarCaps, failing to exercise proper management and control over medical information released to the Players, and deliberately misleading the Players as to the NFL's goal to protect NFL players' health, Defendants Lombardo, Finkle and Birch breached their fiduciary duties to the Players.

10

45.     By knowingly endorsing the misrepresentations and omissions of Defendants Lombardo, Finkle and Birch and knowingly failing to protect against potential harm to Players, the NFL actively participated in, assisted in, and also had actual knowledge of, the other Defendants' breaches of their fiduciary duties to the Players.

46.     By knowingly failing to protect against these misdeeds, the NFL actively participated in, assisted in, and also had actual knowledge of the breaches of fiduciary duties to the Plaintiffs by Lombardo, Finkle and Birch.

47.     As a result of the other Defendants' breaches of their fiduciary duties as alleged herein, and the NFL's acts and omissions in aiding and abetting these breaches, the Players have suffered damages in an exact amount to be determined at trial.

48.     In aiding and abetting the other Defendants' breaches of their fiduciary duties to the Plaintiffs as alleged herein, the NFL acted in reckless disregard for the truth, in conscious disregard for the Players' rights and with malice and oppression so as to justify an award of punitive damages.

<u>**COUNT IV**</u>

**(Violation of Public Policy)**
**(Against the NFL)**

49.     Paragraphs 1 through 48 are incorporated herein and made a part of this claim.

50.     Defendant NFL's recent decision to punish the Players for violations of the Program, where the Players were only in violation of the Program as a direct result of the Defendants' breach of their fiduciary duties to the Players, has the effect of sanctioning Defendants' breach of fiduciary duty. Defendant NFL's sanction of the breach of fiduciary duty owed by the individual Defendants to Players is in direct violation of the public policy of Minnesota.

11

51.     In fact, Defendant NFL's sanctioning of the individual Defendants' breach of fiduciary duty operates to grant the individual Defendants unwarranted protection for their actions and to create an opportunity for fiduciaries to operate in a duty-free zone.   Such sanctioning by the NFL is in direct contravention of the longstanding public policy of the State of Minnesota.

52.     As a result, the Players have suffered compensatory damages in excess of $10,000,000, in an exact amount to be determined at trial and damage to their reputation in an amount to be determined at trial.

**COUNT V**

**(Fraud)**
**(Against the NFL, Lombardo, Finkle and Birch)**

53.     Paragraphs 1 through 52 are incorporated herein and made a part of this claim.

54.     In making public statements during the period of 2006-2008 to players, agents, teams in the NFL – and the general public – the NFL stated that the goal of the NFL's Program was to "protect the health and well being of the NFL players." These statements were knowingly and intentionally false.

55.     When making these misrepresentations, the Defendants knowingly and intentionally pursued and attempted to solidify a public appearance of non-tolerance for use of anabolic steroids.   This unstated goal to set an example of unwitting NFL players for public appearance purposes resulted in draconian and inflexible enforcement of the Program.   The Defendants had actual and certain knowledge that NFL players were in fact using StarCaps and that such use could result in a violation of the Program, as well as serious physical harm.   The Defendants omitted to make that crucial knowledge available to the Players.

56.     The resulting inflexible enforcement of the Program caused the Players harm.

12

57.   The NFL and the individual Defendants knowingly omitted relevant and necessary health information from the Players while continuing the appearance of a "strict liability policy" irrespective of actual steroid use.

58.   The Players reasonably relied upon the statements referenced herein as well as the purported integrity of the Defendants.

59.   The Players reasonably relied on these misrepresentations and omissions when they reviewed and assessed the information available to them before making the decision to take StarCaps.

60.   The Players have suffered compensatory damages in excess of $10,000,000, in an exact amount to be determined at trial, and damage to their reputation in an amount to be determined at trial.

61.   In committing their fraud as alleged, Defendants acted in reckless disregard for the truth, in conscious disregard for the Players' rights, and with malice and oppression so as to justify an award of punitive damages.

## COUNT VI

### (Constructive Fraud)
### (Against the NFL, Lombardo, Finkle and Birch)

62.   Paragraphs 1 through 61 are incorporated herein and made a part of this claim.

63.   As a result of their duties and responsibilities to the Players, among others, the individual Defendants had a duty to convey to the Players the information about the hidden contents of the product StarCaps.

64.   The individual Defendants knowingly failed to reveal the true contents of StarCaps, and, notwithstanding, continued to make the false statement that the Program was designed and being administered to protect the health and safety of all NFL players.

13

65.     Specifically, the Defendants had a duty to disclose the information it learned about the secret inclusion of Bumetanide in StarCaps to the Players because the NFL had superior knowledge of the inclusion of that banned substance in a product that the NFL was aware a significant number of the players were taking.

66.     All NFL players, including the Players, relied upon the representations and purported goals of the NFL and its executives, including the individual Defendants, about the Program and its administration.  The Defendants made material misrepresentations of an existing fact with knowledge of the falsity of their statements and material omissions.

67.     By upholding the punishment against the Players, despite the breach of the NFL's own duties and obligations, and despite the NFL being in possession of material information that could have prevented the Players from ingesting a substance that not only resulted in Players' alleged non-compliance with the Program but put their health and welfare in danger, the NFL has sanctioned the breach of duties by the individual Defendants, violated its own duties and obligations, and acted in a manner inconsistent with public policy of the State of Minnesota.

68.     The Defendants' failure to disclose the fact that StarCaps contains Bumetanide for two years after it became aware of the information materially affected the Players' actions. Disclosure would have prevented the Players from taking StarCaps altogether.

69.     In committing their fraud as alleged, Defendants acted in reckless disregard for the truth, in conscious disregard for Plaintiffs' rights, and with malice and oppression.

## COUNT VII

**(Negligent Misrepresentation)**
**(Against the NFL, Lombardo, Finkle and Birch)**

70.     Paragraphs 1 through 69 are incorporated herein and made a part of this claim.

14

71.    The NFL was in a unique position in its relationship with the Players. The NFL had material information that could have helped the Players to comply with the terms of the contract all parties had agreed to. The NFL had knowledge and independent scientific confirmation of the material information for nearly two years without disclosing it to the football community or to the American public.

72.    In its Memorandum dated December 2006, the NFL advised players that they were prohibited from endorsing products manufactured by Balanced Health Products, the manufacturer of StarCaps.

73.    The NFL continued to advise players of banned substances and alert players when products joined the banned substances list as it had done in the past during the two years between the time the NFL learned that StarCaps contains Bumetanide and the present.

74.    The NFL never advised the Players, or anyone in the football community who might have alerted the Players, that StarCaps contains Bumetanide and that taking the product could result in non-compliance with the Program.

75.    The NFL was aware that the Players needed the secret information about the true ingredients of StarCaps in order to maintain compliance with the Program and to avoid serious health risks. The NFL was aware that Players would not and did not have access to the information that StarCaps contains Bumetanide through any other source.

76.    Had the NFL disclosed the fact that StarCaps contains a banned substance that could result in non-compliance with the Program at any time during the past two years, or had the Players become aware of that information independently, the Players would have stopped taking StarCaps immediately.

15

77.    The Players reasonably relied on the information disclosed by Balanced Health Products, the manufacturer of StarCaps, about the ingredients in StarCaps.

78.    The Players reasonably relied on the NFL to share and disseminate information that would have a material impact on the Players' ability to comply with the Program.

79.    As a result, the Players have suffered compensatory damages in excess of $10,000,000, in an exact amount to be determined at trial and damage to their reputation in an amount to be determined at trial.

## COUNT VIII

### (Negligence)
### (Against the NFL, Lombardo, Finkle and Birch)

80.    Paragraphs 1 through 79 are incorporated herein and made a part of this claim.

81.    Defendants had duties and obligations to the Players.

82.    Defendants by their negligence breached their duties and obligations to the Players.

83.    As a result, the Players have suffered compensatory damages in excess of $10,000,000, in an exact amount to be determined at trial and damage to their reputation in an amount to be determined at trial.

## COUNT IV

### (For Gross Negligence)
### (Against the NFL, Lombardo, Finkle and Birch)

84.    Paragraphs 1 through 83 are incorporated herein and made a part of this claim.

85.    By the Defendants' failure and/or refusal to release critical medical information to the Players regarding StarCaps, despite knowledge that StarCaps could result in an unwitting violation of the Program and could cause potential physical harm to the Players, Defendants

acted with reckless and deliberate disregard constituting gross negligence of Players' rights as members of the NFL.

86.   As a result, the Players have suffered compensatory damages in excess of $10,000,000, in an exact amount to be determined at trial and damage to their reputation in an amount to be determined at trial.

## COUNT X
### (Intentional Inflict of Emotion Distress)
### (Against the NFL, Lombardo, Finkle and Birch)

87.   Paragraphs 1 through 86 are incorporated herein and made a part of this claim.

88.   At all times relevant to this litigation, Defendants NFL, Lombardo, Finkle and Birch engaged in conduct that was extreme and outrageous.

89.   The conduct in which Defendants NFL, Lombardo, Finkle and Birch engaged was intentional or reckless.

90.   The conduct of Defendants NFL, Lombardo, Finkle and Birch caused the Players severe emotional distress.

91.   As a result, the Players have suffered compensatory damages in excess of $10,000,000, in an exact amount to be determined at trial and damage to their reputation in an amount to be determined at trial.

## COUNT XI

### (Vicarious Liability/Respondeat Superior)
### (Against the NFL)

92.   Paragraphs 1 through 91 are incorporated herein and made a part of this claim.

93.   At all times relevant to this litigation, Defendants Lombardo, Finkle and Birch were agents or employees of the NFL acting within the scope of their employment by, or responsibilities to, Defendant NFL and in the furtherance of Defendants' business.   As

17

Defendants Lombardo, Finkle and Birch's employer or nominal employer, Defendant NFL is responsible for the individual Defendants' actions and responsibilities within the scope of their employment and/or responsibilities.

94.     As a result of Defendants Lombardo, Finkle and Birch's torts within the scope of their employment with, or responsibilities to, Defendant NFL as alleged above, Players have suffered and will continue to suffer compensatory damages in excess of $10,000,000.

## COUNT XII

### (Violation of Minnesota Drug and Alcohol Testing in the Workplace Act)
### (Against the NFL, Lombardo, Finkle and Birch)

95. Paragraphs 1 through 94 are incorporated herein and made a part of this claim.

96. The Defendants have violated the Minnesota Drug and Alcohol Testing in the Workplace Act.

97. The Players have certain rights and remedies pursuant to the Minnesota Drug and Alcohol Testing in the Workplace Act.

98. Defendants have violated the Players' substantive and procedural rights under the Minnesota Drug and Alcohol Testing in the Workplace Act.

99. Defendants' violations of the Minnesota Drug and Alcohol Testing in the Workplace Act were knowing and reckless.

100.    As a result, the Players have suffered compensatory damages in excess of $10,000,000, in an exact amount to be determined at trial, reputation damage in an exact amount to be determined at trial, and attorneys' fees in this matter.

## COUNT XIII

### (Violation of Minn.Stat. § 181.938)
### (Against the NFL, Lombardo, Finkle and Birch)

101.    Paragraphs 1 through 100 are incorporated herein and made a part of this claim.

102.   For purposes of Minn.Stat. § 181.938, the Players are employees of the NFL.

103.   The Players consumed StarCaps, which the Players justifiably believed to be a lawful consumable product, during non-work hours.

104.   The Defendants have attempted to take disciplinary action against the Players for the Players' consumption of StarCaps, in violation of Minn.Stat. § 181.938.

105.   As a result, the Players have suffered compensatory damages in excess of $10,000,000, in an exact amount to be determined at trial, and reputation damage in an exact amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, the Players respectfully pray the Court to grant them judgment for the following relief:

1.   Compensatory damages;

2.   Punitive damages;

3.   Injunctive relief; and

4.   Such other relief as the Court deems just and proper.

Dated: January 2, 2009

**CROWELL & MORING LLP**

By: _____/s/ Peter R. Ginsberg_____
      Peter R. Ginsberg (PG6712)
      Admitted *Pro Hac Vice*
      153 East 53rd Street, 31st Floor
      New York, New York 10022
      Telephone: (212) 223-4000
      Facsimile: (212) 223-4134

      Ronn B. Kreps (#151142)
      Andre Hanson (#0258234)
      Fulbright and Jaworski, LLP
      2100 IDS Center
      80 South Eighth Street
      Minneapolis, Minnesota 55402-2112

**ATTORNEYS FOR PLAINTIFFS KEVIN
WILLIAMS AND PAT WILLIAMS**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA


National Football League Players
Association,                                           CIVIL 08-6254 (PAM/JJG)

                    Plaintiff,

vs.

National Football League, et al

                    Defendants.

----------------------------------------              CIVIL 08-6255 (DSD/JJK)
Kevin Williams, et al,

                    Plaintiffs,

vs.

The National Football League,
et al.

                    Defendants.

-------------------------------------------------------------------------------------------

ORDER OF DIRECTION TO THE CLERK OF COURT
FOR REASSIGNMENT OF RELATED CASE


        Case No. 08-6254  PAM/JJG  having been assigned to Judge Paul A. Magnuson, and Case
No. 08-6255 DSD/JSM  having later been assigned to Judge David S. Doty,  said  matters being
related cases,


        IT IS HEREBY ORDERED That Case No. 08-6255 DSD/JJK be assigned to Judge Paul A.
Magnuson and Magistrate Judge Jeanne J. Graham, nunc pro tunc, by use of a card on the Master list
of the automated case assignment system, and the Clerk of court is directed to void and reuse a card
on the same list pursuant to this Court's Assignment of Cases Order dated June 29, 2006.

    IT IS FINALLY ORDERED That a copy of this order shall be placed in each of the above respective files.

Dated: December   __4__ , 2008         s/Paul A. Magnuson
                                                    Judge Paul A. Magnuson
                                                    United States District Court

Dated: December   __4__ , 2008         s/David S. Doty
                                                    Judge David S. Doty
                                                    United States District Court

**Full docket text:**
TEXT ONLY ENTRY - ORDER granting [8] Motion for Admission Pro Hac Vice of Attorney Daniel L
Nash for John Lombardo, M.D., Brian Finkle, Adolpho Birch and The National Football League. Fee
paid; receipt number 3-005084. Approved by Clerk Richard D Sletten on 12/4/08. (MMC)

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/03/2010 13:59:17 | | |
| **PACER Login:** | hl0164 | **Client Code:** | |
| **Description:** | History/Documents | **Search Criteria:** | |
| **Billable Pages:** | 1 | **Cost:** | 0.08 |

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

National Football League
Players Association,

                                                    Civil No. 08-6254 (PAM/JJG)

                    Plaintiff,

v.

National Football League, and
National Football League
Management Council

                    Defendants.

_____                         **ORDER**

Kevin Williams and Pat Williams,                  Civil No. 08-6255 (PAM/JJG)

                    Plaintiffs,

v.

National Football League, John
Lombardo, M.D., Brian Finkle,
and Adolpho Birch,

                    Defendants.

_____

        This matter is before the Court on the Motion for Preliminary Injunction filed in case

08-6254 by the National Football League Players Association ("NFLPA") and the Motion

to Dissolve the temporary restraining order ("TRO") in case 08-6255.

        The issues in this case are complex and contentious, and the parties have raised

questions that deserve careful consideration.  Moreover, due process requires that the Court

fully and fairly review all of the submissions and the legal arguments of the parties.  That

consideration is not possible in the two days that remain before the players at issue are next

scheduled to take the field. Thus, due process mandates the entry of an injunction preserving the status quo to allow for the Court's review of the issues.

Accordingly, pending further Order of the Court, **IT IS HEREBY ORDERED that**:

1.  Plaintiff's Motion for a Preliminary Injunction in case 08-6254 (Docket No. 3) is **GRANTED**;

2.  Defendants are **ENJOINED** from enforcing the arbitration awards issued on December 2, 2008, concerning Charles Grant, Deuce McAllister, Will Smith, Kevin Williams, and Pat Williams;

3.  Defendants are **ENJOINED** from preventing those players listed above from participating in National Football League practices and games and otherwise participating in the National Football League as players; and

4.  Defendants' Motion to Vacate and Dissolve TRO in case 08-6255 (Docket No. 3) is **DENIED**.

Dated: Friday, December 5, 2008

s/ *Paul A. Magnuson*
Paul A. Magnuson
United States District Court Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

National Football League                              Civil No. 08-6254 (PAM/JJG)
Players Association,

                Plaintiff,

v.

National Football League, and
National Football League
Management Council

                Defendants.

_____                      **MEMORANDUM AND ORDER**

Kevin Williams and Pat Williams,                     Civil No. 08-6255 (PAM/JJG)

                Plaintiffs,

v.

National Football League, John
Lombardo, M.D., Brian Finkle,
and Adolpho Birch,

                Defendants.

_____

     This matter is before the Court on the Motion for Preliminary Injunction filed in case

08-6254 by the National Football League Players Association, and Defendants' Motion to

Dissolve the temporary restraining order ("TRO") in case 08-6255.  On December 5, 2008,

after hearing the oral arguments of the parties, the Court temporarily granted the Motion for

Preliminary Injunction and denied the Motion to Vacate, finding that the complexity of the

case demanded preservation of the status quo to allow the Court to give full consideration

to the issues involved.  The Court has now carefully reviewed the parties' submissions.
Based on those submissions and the arguments of counsel, the Court determines that
extension of the preliminary injunction is warranted.

## BACKGROUND

### A.    Facts

On Tuesday, December 2, 2008, a Hearing Officer upheld two labor arbitration
awards that suspended for the remaining four weeks of the season five players in the National
Football League ("NFL"): Kevin Williams and Pat Williams of the Minnesota Vikings and
Charles Grant, Deuce McAllister, and Will Smith of the New Orleans Saints.  The players
all tested positive for the diuretic bumetanide and were suspended pursuant to the NFL's
Policy on Anabolic Steroids and Related Substances (the "Policy").  The Policy lists
bumetanide as a banned substance and provides that "[t]he <u>first</u> time a player violates this
Policy by testing positive [for a banned substance] . . . he will be suspended without pay for
a minimum of four regular and/or postseason games." (Jacobson Decl. Ex. A (hereinafter
"Policy") at ¶ 6 (emphasis in original).)  The Policy imposes strict liability on players — in
other words, "a positive test result will not be excused because a player was unaware that he
was taking a [banned substance]." (<u>Id.</u> at ¶ 3.E.)

Defendant Dr. John Lombardo is the "Independent Administrator" of the Policy. (<u>Id.</u>
at Appx. B.)  Defendant Dr. Bryan Finkle is the "Consulting Toxicologist." (<u>Id.</u>)  As the
Independent Administrator, Lombardo is solely responsible for administering the testing
regimen, analyzing test results (in consultation with Finkle), and certifying violations of the

Policy.  (Id. at ¶ 2.)  In addition, Lombardo is responsible for consulting with players and team physicians and for developing educational materials.  (Id.)  The Policy directs players with questions about a specific supplement to call either Lombardo or the NFL Supplement Hotline (the "Hotline").  (Id. at ¶ 3.E.)

The facts show that the players tested positive after they took an over-the-counter weight-loss supplement called StarCaps.  Bumetanide is not listed on the label as an ingredient in StarCaps, but there is no dispute that StarCaps contains bumetanide.  The National Football League Players Association ("NFLPA" or "union") contends, and the NFL[1] does not dispute, that the players unknowingly ingested bumetanide.  Bumetanide is banned under the Policy because it can mask the presence of steroids, but there is no allegation that the players' use of StarCaps was intended to mask steroid use.  There is also no allegation that the players took any anabolic steroid.  The NFLPA contends that Lombardo, Finkle, and Defendant Adolpho Birch (the NFL's Vice President of Law and Labor Policy) knew as early as 2006 that StarCaps contained bumetanide but deliberately failed to communicate this information to players or the union.

The NFL does not deny that Lombardo, Finkle, and Birch knew that StarCaps contained bumetanide.  Indeed, the NFL concedes that Lombardo and Finkle directed a laboratory to perform tests on StarCaps and that those tests determined that StarCaps contained bumetanide.  The results of the tests were published in the November/December

---

[1] "NFL" as used here refers to both the NFL and the NFL Management Council, in addition to the individually named Defendants in Civ. No. 08-6255.

3

2007 <u>Journal of Analytical Toxicology</u>.  (Jacobson Decl. Ex. C at 5.)  Despite this knowledge, the NFL contends that they had no duty to warn players specifically about StarCaps, because the Policy provides that players are responsible for what is in their own bodies, and also warns players about using over-the-counter supplements.  (<u>See</u> Policy at ¶ 3.E and Appx. F.)  Indeed, the Policy notes that over-the-counter supplements may not "contain the ingredients listed on the packaging." (<u>Id.</u> Appx. F.)

After the players were notified about their positive tests, each requested a hearing under the Policy. (<u>Id.</u> at ¶ 10.) The Policy provides that "the Commissioner or his designee will preside as Hearing Officer." (<u>Id.</u>)  The Commissioner designated Jeffrey Pash, the NFL's chief legal officer, to act as the Hearing Officer.  Mr. Pash held two hearings, one on the Williamses' appeal and one on the appeal of Grant, McAllister, and Smith.  As noted by the substantively identical arbitration awards Mr. Pash issued in each matter, the players argued that their violations of the Policy "should be excused because the NFL and Dr. Lombardo were aware that StarCaps contained an undisclosed banned substance, bumetanide, but did not specifically advise NFL players of this fact." (Jacobson Decl. Ex. C at 7.) Although the players did not contend that either the NFL or Lombardo had a duty to test specific supplements for banned substances, they argued that "where, as here, the testing process leads to specific information about a specific product, . . . the league and Dr. Lombardo have a duty to inform NFL players . . . ." (<u>Id.</u>)

The testimony at the hearing showed that none of the players contacted Lombardo about StarCaps, although at least one player did ask a team trainer to call the Hotline to ask

4

about StarCaps. According to the player, the Hotline told the trainer that StarCaps did not

contain any banned substances. Others testified that the Hotline did not offer information

about specific supplements, but rather warned callers to avoid supplements altogether. In

addition, Lombardo himself testified that, had any player asked him specifically about

StarCaps, he would "strongly urge [the player] not to take the product" because "weight

reduction products historically have either a diuretic or a stimulant." (Id. at 6 (quoting Tr. at

100, 105-106).) Notably, Lombardo did not testify that he would have told the player that

StarCaps contained a banned substance.

Ultimately, Mr. Pash upheld the players' suspensions:

> The rule puts the burden on players to be responsible and accountable
> for what is in their bodies. It avoids complex issues of intent and ensures that
> all players will be treated equally under the Policy. It establishes a simple and
> straightforward – if admittedly inflexible – rule to guide player conduct and
> administration of the Policy. Based on this record, there is no question that
> each of these players have [sic] heard and understood those warnings and
> know that they are responsible for what is in their bodies.

(Id.) He found that the Policy did not impose a burden on the NFL or Lombardo to warn

players about specific supplements, determining that the general warnings about supplements

should have served as notice to the players that any use of supplements could lead to a

positive test result. (See, e.g., id. at 8.)

**B.    Procedural Posture**

After receiving Mr. Pash's decision, Kevin Williams and Pat Williams brought suit

in Minnesota state court, alleging that their impending suspensions violated Minnesota law.

Judge Gary Larson of the Hennepin County District Court entered a TRO on Thursday,

December 3, 2008, against the Williamses' suspensions. The NFLPA filed its lawsuit in federal court the next day, alleging that the suspensions of all five players violated federal law. That same day, the NFL removed the Williamses' case to this Court.

The NFLPA asks for an injunction against the suspensions in order to preserve the status quo. It contends that, absent an injunction, the players and their teams will suffer irreparable harm. The NFL opposes the entry of a preliminary injunction and seeks to vacate the state-court TRO. The NFL contends that the players and the NFLPA cannot challenge the arbitrator's decision because the Collective Bargaining Agreement ("CBA") provides that such decisions are final and binding on the parties. The NFL also argues that the Williamses' state-law claims are preempted by federal law.

## DISCUSSION

### A.     Preemption

In its Motion to Vacate the TRO, the NFL argues that the Williamses' state-law claims are preempted by section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). The NFL does not, however, move to dismiss those claims on preemption grounds, instead arguing that because the claims are preempted, the Williamses cannot show a likelihood that they will succeed on the merits of the claims.

The LMRA preempts state-law tort claims that "are 'substantially dependent' upon an analysis of the terms or provisions of a collective bargaining agreement or are 'inextricably intertwined' with consideration of the terms or provisions of a collective bargaining agreement . . . ." Oberkramer v. IBEW-NECA Serv. Ctr., Inc., 151 F.3d 752, 756

6

(8th Cir. 1998) (quoting Allis-Chalmers Corp v. Lueck, 471 U.S. 202, 213, 220 (1985)).

There is no question that the Williamses' claims, as currently framed, depend on the Policy.[2]

Thus, it is likely that those claims are preempted by the LMRA.  For the purposes of these

Motions, the Court will consider the Williamses' claims as arising under § 301 of the LMRA.

See Allis-Chalmers, 471 U.S. at 220 (holding that where state-law claim requires analysis

of terms of labor agreement, court may either treat claim as a § 301 claim or dismiss claim

as preempted).  Therefore, and for the purposes of these Motions only, the Court will treat

the Williamses' claims as substantially identical to the NFLPA's claims, and will evaluate

simultaneously all Plaintiffs' claims of entitlement to equitable relief.  The Court will refer

to Plaintiffs collectively as the NFLPA, except where only the Williamses' claims are at

issue.

**B.      Preliminary Injunction**

A preliminary injunction may be granted only if the moving party can demonstrate:

(1) a likelihood of success on the merits, (2) that the movant will suffer irreparable harm

absent the injunction, (3) that the balance of harms favors the movant, and (4) that the public

---

[2]  At the oral argument on these Motions, counsel for the Williamses indicated that the
Williamses intended to file an Amended Complaint, raising claims that the Policy conflicts
with various Minnesota statutes.  Such claims may not be preempted. "Clearly, § 301 does
not grant the parties to a collective-bargaining agreement the ability to contract for what is
illegal under state law. . . . [Therefore] it would be inconsistent with congressional
intent . . . to preempt state rules that proscribe conduct, or establish rights and obligations,
independent of a labor contract." Allis-Chalmers, 471 U.S. at 212.  However, given that the
TRO was entered on the Williamses' claims in their initial Complaint, the Court will examine
only those allegations in resolving the preemption question.

interest favors the movant. Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981). Injunctive relief is considered to be a "drastic and extraordinary remedy that is not to be routinely granted." Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993).

The NFL contends that the Norris-LaGuardia Act, 29 U.S.C. § 101 et seq., prohibits the Court from entering any injunctive relief in a labor case such as this. Courts have invoked the Act to deny injunctive relief when the movant seeks to enjoin a broad policy or rule. See, e.g., Powell v. Nat'l Football League, 690 F. Supp. 812 (D. Minn. 1988) (Doty, J.) (denying request for injunction against free agency policy); Nat'l Football League Players Ass'n v. Nat'l Football League, 724 F. Supp. 1027 (D.D.C. 1989) (denying request for injunction against steroid policy). The Act, however, is not a blanket prohibition on any injunction in a labor case. See, e.g., Jackson v. Nat'l Football League, 802 F. Supp. 226, 233 (D. Minn. 1992) (Doty, J.) (finding that the Act did not bar a TRO because "such relief will not undermine any labor policy set forth in the Act"); Int'l Bhd. of Elec. Workers v. Potomac Elec. Power Co., 634 F. Supp. 642, 643 (D.D.C. 1986) (court may enter injunction "where the integrity of the arbitration process would be threatened absent interim relief"). Here, the NFLPA does not seek an injunction against the Policy as a whole but rather only against the suspensions of particular players whose arbitration awards, according to the NFLPA, are tainted by the NFL's conduct.

The Act provides that "[n]o court of the United States . . . shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or

growing out of a labor dispute, except in a strict conformity with the provisions of this

chapter . . . ." 29 U.S.C. § 101. Under the Act, an injunction may issue only if the Court

finds (1) that illegal acts either have been committed or are threatened to be committed; (2)

that the movant will suffer irreparable harm; (3) that the balance of harms weighs in favor

of the movant; (4) that there is no adequate remedy at law; and (5) that "the public officers

charged with the duty to protect [movant's] property are unable or unwilling to furnish

adequate protection." 29 U.S.C. § 107; see also Jackson, 802 F. Supp. at 234 ("Even if the

court were to apply the Act to the present case, injunctive relief may still issue based on the

evaluation of the traditional factors underlying such relief . . . ."). The Act echoes the

Dataphase factors listed above, with the addition of a fifth factor that has no relevance to this

case. Thus, the Court finds that, should the NFLPA succeed in establishing the Dataphase

factors listed above, preliminary injunctive relief is appropriate. See, e.g., Boys Markets, Inc.

v. Retail Clerks Union, Local 770, 398 U.S. 235, 254 (1970) ("A district court entertaining

an action under § 301 may not grant injunctive relief . . . unless and until it decides that the

case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act.").

### 1.    Likelihood of Success on the Merits

The NFLPA seeks to vacate the arbitration awards that suspended the players. (See

Compl. in Civ. No. 08-6254, at ¶¶ 43-49.) They contend that the suspensions violate public

policy, are contrary to the essence of the CBA, and that the partiality of the arbitrator

warrants setting those suspensions aside. (Id. at ¶ 45.)

The NFLPA acknowledges that a party seeking to set aside an arbitration award bears

9

a very high burden. However, on a motion for preliminary relief, the NFLPA need not show

a greater than fifty percent likelihood that it will prevail on the merits of its claims. Rather,

> the question is whether the balance of equities so favors the movant that justice
> requires the court to intervene to preserve the status quo until the merits are
> determined. . . .
>
> In balancing the equities no single factor is determinative. The
> likelihood that plaintiff ultimately will prevail is meaningless in isolation. In
> every case, it must be examined in the context of the relative injuries to the
> parties and the public. If the chance of irreparable injury to the movant should
> relief be denied is outweighed by the likely injury to other parties litigant
> should the injunction be granted, the moving party faces a heavy burden of
> demonstrating that he is likely to prevail on the merits. Conversely, where the
> movant has raised a substantial question and the equities are otherwise strongly
> in his favor, the showing of success on the merits can be less. . . .
>
> [W]here the balance of other factors tips decidedly toward plaintiff a
> preliminary injunction may issue if movant has raised questions so serious and
> difficult as to call for more deliberate investigation.

Dataphase, 640 F.2d at 113. Because the Court finds that the balance of the equities strongly

favors the NFLPA, as discussed below, the Court will examine whether the NFLPA has

raised a "substantial question" on the merits of its claim that the Hearing Officer's decision

should be set aside.

      a.    Partiality of hearing officer

An arbitration award may be set aside if the Court determines that the arbitrator was

biased. See, e.g., Apperson v. Fleet Carrier Corp., 879 F.2d 1344, 1358-59 (6th Cir. 1989)

(applying Federal Arbitration Act's "evident partiality" standard to arbitration award

involving collective bargaining agreement); Morelite Constr. Corp. v. New York City Dist.

Council Carpenters Benefit Funds, 748 F.2d 49 (2d Cir. 1984) (same). Section 10 of the

Federal Arbitration Act provides that a court may vacate an arbitration award "where there was evident partiality or corruption in the arbitrator[]." 9 U.S.C. § 10(a)(2).

The NFLPA argues that Mr. Pash was biased because his office was directly implicated in the NFL's failure to inform players that StarCaps contained a banned substance. The NFL responds that because the Policy specifically provides that the Commissioner or his designee will preside over any arbitration, the NFLPA agreed to Mr. Pash presiding over the hearing and therefore waived any challenge to Mr. Pash.

In agreeing that the Commissioner or his designee would preside over hearings under the Policy, the NFLPA agreed to a certain amount of partiality in the arbitrator.[3] Thus, "the award should be confirmed unless the objecting party proves that the arbitrator's partiality prejudicially affected the award." Winfrey v. Simmons Foods, Inc., 495 F.3d 549, 551 (8th Cir. 2007).

It is plain that the involvement of Mr. Pash's office and Birch, Mr. Pash's subordinate, in the alleged conduct rendered Mr. Pash a partial arbitrator. At the oral arguments on the pending Motions, counsel for the NFLPA discussed Birch's arbitration hearing testimony. Birch was asked whether he reported the information about StarCaps to either Mr. Pash or the Commissioner. He refused to answer the question, and Mr. Pash upheld his refusal to

---

[3] The Court does not determine at this time that the NFLPA agreed to the specific bias alleged here. It is for another day to determine whether in fact the parties anticipated that the arbitrator would be implicated in the wrongdoing alleged. For the moment, the Court will assume without deciding that the NFLPA waived any challenge to Mr. Pash's partiality as a basis for vacating the award ab initio.

11

answer. This exchange alone casts substantial doubt on Mr. Pash's neutrality.

The NFLPA has succeeded in establishing that a substantial question exists as to whether Mr. Pash's connection to the allegations in this case prejudicially affected the award. Although Mr. Pash's decisions are well reasoned, he glossed over the rather shocking allegations the NFLPA makes. Moreover, he did not take into account Lombardo's testimony that, even if asked about StarCaps in particular, he would merely warn the player away from supplements in general. Such testimony calls into question the very basis of the NFL's position on banned substances. The NFL maintains that its strict liability policy is fair in part because players may contact either Lombardo or the Hotline with questions about specific supplements. If players cannot get answers to their questions, however, they cannot determine which supplements are permissible and which are not. While it is true that the NFL discourages the use of all weight-loss supplements, such supplements are not forbidden and the players reasonably expect to rely on the advice of Lombardo and the Hotline with respect to such substances. Mr. Pash's failure to take Lombardo's testimony into account is substantial evidence that the arbitration award was prejudiced by Mr. Pash's partiality. The NFLPA is entitled to a preliminary injunction to preserve the status quo until a full hearing can be held on the issue of Mr. Pash's partiality and the effect of any partiality on the arbitration awards at issue.

        b.    Essence of the CBA

An arbitration award that fails to "draw[] its essence from the collective bargaining agreement" is not entitled to deference from the reviewing Court. United Paperworkers Int'l

Union v. Misco, Inc., 484 U.S. 29, 36 (1987). The NFLPA argues that the arbitration awards here should be vacated because they are contrary to one of the stated goals of the Policy: the "concern[] with the adverse health effects of using Prohibited Substances." (Policy at ¶ 1.) The NFLPA contends that "the Arbitration Awards undeniably put the health of NFL players at serious risk by depriving them of critical information about the ingredients in StarCaps — the exact opposite of the Policy's stated goal." (Pl.'s Supp. Mem. at 26.)

The Court's authority to reverse an arbitration award for failure to comply with the Policy is "exceptionally narrow." Coca-Cola Bottling Co. of St. Louis v. Teamsters Local Union No. 688, 959 F.2d 1438, 1440 (8th Cir. 1992). "[A]s long as the arbitrator is even arguably construing or applying the [Policy] and acting within the scope of his authority," the Court's determination that the arbitrator "committed serious error does not suffice to overturn his decision." Misco, 484 U.S. at 38.

Mr. Pash's decisions on the players' appeals are thorough and, as noted above, well reasoned. He discussed the aims of the Policy, which include protecting the health of players, but determined that the overriding goal of the Policy is one of strict liability: players must be responsible for what is in their bodies. He determined that the Policy imposes no obligation on either the NFL or Lombardo to warn players about specific supplements. While the NFLPA may disagree with these conclusions, it has not established that Mr. Pash ignored the plain language of the Policy or misapplied the Policy. See Iowa Mold Tooling Co. v. Teamsters Local Union No. 828, 16 F.3d 311, 312 (8th Cir. 1994) (noting that arbitrator may not ignore plain language of contract). Rather, the NFLPA's argument is that

13

Mr. Pash's decisions do not further the goals of the Policy. That argument is not sufficient to vacate the awards for failure to draw their essence from the Policy. Thus, the NFLPA has not raised a substantial question as to whether the awards should be vacated on this basis.

      c.    Public policy

"If the [Policy] as interpreted by [Mr. Pash] violates some explicit public policy, [the Court is] obliged to refrain from enforcing it." W.R. Grace & Co. v. Local Union 759, 461 U.S. 757, 766 (1983). It is not enough, however, for the party challenging the arbitration award to argue that the award violates a general public policy. Rather, the relevant public policy "is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" Id. (quoting Muschany v. United States, 324 U.S. 49, 66 (1945)).

The NFLPA asserts that the arbitration awards violate public policy "because they sanction Defendants' knowing and intentional breach of fiduciary duty" and thereby sanction behavior that threatens the players' health and safety. (Pl.'s Supp. Mem. at 17.) To succeed in establishing that a substantial question exists as to the claim that the awards should be vacated as against public policy, the NFLPA must raise a substantial question as to whether (1) a fiduciary duty exists, (2) fiduciary duties are an explicit public policy interest, and (3) the arbitration awards violated that public policy interest.

The NFLPA contends that the NFL, Lombardo, and Birch owed the players a

14

fiduciary duty under New York law[4] because the Policy provided that players could contact Lombardo or the NFL-administered Hotline with questions about supplements, and because Lombardo had the duty under the Policy to consult with players and to educate players about banned substances. The NFL does not respond to this argument and thus appears to concede for the purposes of this Motion that the NFLPA has at least raised a substantial question as to whether the NFL, Lombardo, and Birch owed the players a fiduciary duty with respect to communicating information about banned substances under the Policy.

Under New York law, fiduciary duties are a matter of public policy. See, e.g., Tzolis v. Wolff, 884 N.E.2d 1005, 1009 (N.Y. 2008) (noting that the New York legislature has declared it the public policy of New York to allow lawsuits that serve to deter breaches of fiduciary duties); see also Kinney v. Glenny, 240 N.Y.S. 713, 717 (N.Y. Sup. Ct. 1930) ("[A]ll acts of an agent which tend to violate his fiduciary duty are regarded as frauds upon the confidence bestowed and are not only invalid as to the principal, but are also against public policy."), rev'd on other grounds, 247 N.Y.S. 119 (N.Y. App. Div. 1931). New York's public policy in enforcing fiduciary duties is an explicit public policy, and as such may serve as the basis for vacating an arbitration award.

As discussed above in Section B.1.a. in the context of evaluating Mr. Pash's alleged bias, the Policy's strict liability stance takes its authority in part from its assurances that players may seek advice from Lombardo and from the Hotline. Yet Lombardo testified that

---

[4] There appears to be no dispute that New York law governs the fiduciary duty issue.

15

he would have only offered general warnings about supplements even if questioned about StarCaps in particular, and one player testified that the Hotline told his representative that there were no banned substances in StarCaps. The arbitration awards do not acknowledge these serious apparent breaches of fiduciary duties, nor do the awards discuss the effect of these breaches on the merits of the players' appeals. Thus, the awards do appear to sanction the apparent breaches of fiduciary duties. As such, the awards may violate the public policy of the state of New York.

The NFLPA has established that a substantial question exists as to whether the awards violate public policy.[5] Thus, for the purposes of preliminary relief, the NFLPA has demonstrated a likelihood that it will succeed on the merits of its claims that the awards should be vacated because they violate public policy.

## 2.    Irreparable Harm

The NFL argues that, even if the NFLPA can show a likelihood of success on the merits of its claims, it cannot establish that the players will suffer any irreparable harm and therefore injunctive relief is inappropriate. See Modern Computer Sys., Inc. v. Modern Banking Sys., Inc., 871 F.2d 734, 738 (8th Cir. 1989) (en banc) (injunction may not issue without a showing of irreparable harm). According to the NFL, each player's "lost playing

---

[5] The NFLPA also contends that the awards violate public policy because they endanger players' health. Because the Court has determined that the NFLPA has raised a substantial question as to whether the awards violate the public policy of enforcing fiduciary duties, the Court will leave to another day the determination whether arbitration awards that may endanger the health of a small group of people, such as professional football players, can be vacated as violating public policy.

time, prestige, and the impact of his suspension on his team's playoff chances" are merely "an inherent result of the suspension process" and do not constitute irreparable harm. (Defs.' Opp'n Mem. at 19.)  The NFL's position, however, begs the question.  If the players' suspensions were proper, then those suspensions cannot constitute irreparable harm. Improper suspensions, however, can undoubtedly result in irreparable harm.  See Jackson, 802 F. Supp. at 230-31 (finding that the players made "a sufficient showing of irreparable harm because they suffer irreparable injury each week that they remain restricted under an illegal system of player restraints.").

The players are certainly harmed by the impending suspensions.  As the NFLPA argues, a player who has been suspended under the Policy is ineligible for post-season awards such as the Pro-Bowl.  Those honors carry significant economic and non-economic benefits.  Moreover, at least some of the players are central to their team's chances of making the playoffs.  The failure to make the playoffs and the effect of that failure on the players, teams, and fans is not compensable monetarily and is therefore an irreparable harm.

Suspending a player for testing positive for a banned substance when there are such substantial questions about the facts and circumstances surrounding the specific supplement at issue irreparably harms the player.  "The existence of irreparable injury is underscored by the undisputed brevity and precariousness of the players' careers in professional sports, particularly in the NFL."  Id. at 231; see also Linseman v. World Hockey Ass'n, 439 F. Supp. 1315, 1319 (D. Conn. 1977) ("[T]he career of a professional athlete is more limited than that of persons engaged in almost any other occupation.").  Not only does the player lose playing

time, but his reputation may be irretrievably tarnished. Banned substances "threaten the fairness and integrity of the athletic competition on the playing field." (Policy at ¶ 1.) Thus, being accused of using such substances is akin to being accused of cheating. Where, as here, there are substantial questions about the process used to suspend these players for their inadvertent use of a banned substance, the harm to the players from such suspensions is clearly irreparable.

### 3.    Balance of Harms

Both the NFL and the NFLPA have an interest in the enforcement of the Policy. The NFL contends that this interest will be harmed by an injunction against the suspensions at issue because such an injunction will encourage players to challenge their suspensions in court and render meaningless the Policy's imposition of strict liability. The Court disagrees. The facts of this case are unusual, and it is only because of those unusual facts that this Court has entertained the Motion for Preliminary Injunction. The Court's analysis applies only to the factual situation present here and does not provide any authority that other suspensions under the Policy are in any way improper or challengeable. Moreover, the parties' interest in the enforcement of the Policy can only be an interest in the proper enforcement of that Policy. Thus, both the NFLPA and the NFL have an interest in ensuring that the suspensions meted out under the Policy are not tainted by alleged bias and wrongdoing.

Given that the NFLPA has established the threat of irreparable harm absent the issuance of an injunction and the NFL has not established that it will suffer any harm if an injunction issues, the balance of harm weighs decidedly in favor of granting an injunction.

18

### 4.     Public Interest

In Section B.1.c. above, the Court discussed the public policy implications of the fiduciary duty allegations the NFLPA makes.  Because of the strong public policy of deterring breaches of fiduciary duty, the public interest weighs in favor of an injunction here.  Similarly, as courts have recognized for more than a century, the public interest lies in ensuring that innocent people are not subject to unjust punishment.  See, e.g., Shephard v. Whetstone, 1 N.W. 753, 754 (Iowa 1879) ("The punishment of an innocent person . . . has no tendency to subserve the public interest . . . ."); see also United States v. Keegan, 71 F. Supp. 623, 626 (S.D.N.Y. 1947) ("[I]t is distasteful to the public generally . . . to think that an entirely innocent person is ever punished for a crime.").  If the suspensions at issue are improper, then allowing those suspensions to go forward violates the public interest.

The NFLPA has succeeded in establishing that the public interest weighs in favor of a preliminary injunction.

### 5.     Conclusion

All of the Dataphase factors weigh in favor of granting the preliminary injunction the NFLPA seeks.  The Court will therefore extend the previously granted Preliminary Injunction.

## C.     Proceedings Going Forward

The Court encourages the parties to continue to work toward a non-judicial solution to this matter.  If the parties are unable to do so, it is the Court's intention to hold a full evidentiary hearing on the merits as soon as practicable.  The parties must first have an

opportunity, however, to complete the pleading process to ensure that the Court has all claims before it prior to ruling on the merits.

It is the Court's preference that the parties, in consultation with the Court, agree on a schedule for filing pleadings and for briefing with respect to the evidentiary hearing. To that end, the parties shall provide the Court with a joint proposed scheduling order on or before Monday, December 22, 2008. Should the parties be unable to reach agreement on a schedule, the Court will determine the appropriate schedule for this matter.

## CONCLUSION

The NFLPA has demonstrated that it is entitled to preliminary injunctive relief to preserve the status quo so that the Court can entertain a hearing on the merits of this complicated and contentious matter. The Court will therefore extend the preliminary injunction entered on December 5, 2008, until a full hearing on the parties' claims can be held.

Accordingly, **IT IS HEREBY ORDERED that** the Preliminary Injunction entered on December 5, 2008 (Docket No. 21 in 08-6254) shall remain in full force and effect until terminated or altered by further Order of this Court.


Dated: Thursday, December 11, 2008

s/ *Paul A. Magnuson*

Paul A. Magnuson
United States District Court Judge


20

**Full docket text:**
TEXT ONLY ENTRY - ORDER granting [16] Amended Motion for Admission Pro Hac Vice of
Attorney Peter R Ginsberg for Kevin Williams and Pat Williams. Fee paid; receipt number 4-028951.
Approved by Magistrate Judge Jeanne J. Graham on 12/19/08. (MMC)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/03/2010 14:00:07 | | | |
| **PACER Login:** | hl0164 | **Client Code:** | |
| **Description:** | History/Documents | **Search Criteria:** | |
| **Billable Pages:** | 1 | **Cost:** | 0.08 |

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

National Football League
Players Association,                                Civil No. 08-6254 (PAM/JJG)

             Plaintiff,

v.

National Football League, and
National Football League
Management Council

             Defendants.

                                       **ORDER**

Kevin Williams and Pat Williams,                   Civil No. 08-6255 (PAM/JJG)

             Plaintiffs,

v.

National Football League, John
Lombardo, M.D., Brian Finkle,
and Adolpho Birch,

             Defendants.

This matter is before the Court on a Motion to Stay filed by Defendants in both of the above-captioned cases. Defendants seek a stay pending a ruling on their Motions to Dismiss. Because Plaintiffs in 08-6255 have amended their Complaint, the Motion to Dismiss in that case is moot. Moreover, it remains the Court's view that discovery should proceed expeditiously regardless of the pendency of dispositive motions. Thus, the Motion to Stay is denied.

**IT IS HEREBY ORDERED that**:

1.   Defendants' Motion to Stay in case 08-6254 (Docket No. 30) is **DENIED**;

2.   Defendants' Motion to Stay in case 08-6255 (Docket No. 19) is **DENIED**;

3.   Defendants' Motion to Dismiss in case 08-6255 (Docket No. 17) is **DENIED as moot**; and

4.   The Court will hold a pretrial conference in these matters at 2:00 p.m. on Tuesday, February 24, 2009, in order to set a discovery and dispositive motion schedule. The Court will issue a Notice of Pretrial Conference to counsel with further information.


Dated:   January 27, 2009

                                                  s/Paul A. Magnuson
                                                  Paul A. Magnuson
                                                  United States District Court Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION,                               CIVIL NO. 08-6254 (PAM/JJG)

        Plaintiff,

v.                                                          **ORDER**

NATIONAL FOOTBALL LEAGUE and
NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL,

        Defendants.


KEVIN WILLIAMS and PAT WILLIAMS,
                                                   Civil No. 08-6255 (PAM/JJG)
        Plaintiffs,

v.

THE NATIONAL FOOTBALL LEAGUE,
JOHN LOMBARDO, M.D.,
BRIAN FINKLE, and ADOLPHO BIRCH,

        Defendants.


Pursuant to the order issued by Senior Judge Paul A. Magnuson on January 27, 2009,

denying the Motion to Stay Discovery (Doc. Nos. 50 and 41, respectively), the motion

hearing scheduled for February 10, 2009 at 9:30 AM before the undersigned has been

stricken from this Court's calendar.


Dated:  January 28, 2009              _s/ Jeanne J. Graham_____
                                       JEANNE J. GRAHAM
                                       U.S. Magistrate Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

National Football League                          Civil No. 08-6254 (PAM/JJG)
Players Association,

                    Plaintiff,

v.

National Football League, and
National Football League
Management Council

                    Defendants.

_____                          **ORDER**

Kevin Williams and Pat Williams,                  Civil No. 08-6255 (PAM/JJG)

                    Plaintiffs,

v.

National Football League, John
Lombardo, M.D., Brian Finkle,
and Adolpho Birch,

                    Defendants.

_____

On Tuesday, January 27, 2009, this Court denied Defendants' Motions to Stay in the

above-captioned cases.   At the same time, Defendants filed amended Motions and

memoranda in support, contending that the Court should stay discovery pending resolution

of the appeals.   However, as stated in the previous Order, discovery should proceed

regardless of the pendency of appeals or dispositive motions.  Thus, the Amended Motions

to Stay are denied.

**IT IS HEREBY ORDERED that**:

1.   Defendants' Amended Motion to Stay in case 08-6254 (Docket No. 45) is

**DENIED**; and

2.   Defendants' Amended Motion to Stay in case 08-6255 (Docket No. 36) is

**DENIED**.

Dated: <u>Wednesday, January 28, 2009</u>

<u>s/ Paul A. Magnuson</u>
Paul A. Magnuson
United States District Court Judge

2

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION,

              Plaintiff,

      vs.

NATIONAL FOOTBALL LEAGUE and
NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL,

              Defendants.

Civil No. 08-6254 (PAM/JJG)

**ORDER ON JOINT
STIPULATION REGARDING
ELECTRONIC SERVICE**

KEVIN WILLIAMS and PAT
WILLIAMS,

              Plaintiffs,

      vs.

NATIONAL FOOTBALL LEAGUE,
JOHN LOMBARDO, M.D., BRIAN
FINKLE, M.D. and ADOLPHO BIRCH,

              Defendants.

Civil No. 08-6255 (PAM/JJG)

Based on the Joint Stipulation Regarding Electronic Service, dated February 19,

2009 (Doc. Nos. 60 and 53, respectively), entered into by the parties,

**IT IS HEREBY ORDERED** that:

(1)    With respect to all documents that are electronically filed in the above-
captioned matters pursuant to the District of Minnesota's Electronic Case
File program, electronic filing will constitute service upon the parties, and
the additional time provisions of Federal Rule of Civil Procedure 6(d) shall
not apply;

(2)    With respect to the service of all other documents, the parties will effectuate service via electronic mail and next-day hard copy mail as follows:

       a.    Defendants will serve by electronic mail Jeffrey Kessler, David Feher, David Greenspan, Molly Donovan, Ian Papendick and Christopher Clark (Dewey & LeBoeuf LLP), Mark Jacobson (Lindquist & Vennum), and Peter Ginsberg and Christina Burgos (Crowell & Moring);

       b.    With respect to the service of documents via next-day hard copy mail, Plaintiffs agree to serve one attorney of record at the New York offices of Dewey & LeBoeuf, and one attorney of record at the New York offices of Crowell & Moring;

       c.    Plaintiffs agree to serve by electronic mail Daniel Nash and Marla Axelrod (Akin Gump Strauss Hauer & Feld LLP), and Joseph Schmitt and Peter Gray (Halleland Lewis Nilan & Johnson);

       d.    With respect to the service of documents via next-day hard copy mail, Plaintiffs will serve one attorney of record at the Washington, D.C. offices of Akin Gump;

       e.    To the extent that a particular document contains exhibits too voluminous to send via electronic mail, the serving party may elect to send such exhibits via overnight hard copy mail rather than electronic mail;

       f.    Service will be deemed effective on the date the electronic mail is sent, and no additional days for mailing will be added to any applicable response date, and the additional time provisions of Federal Rule of Civil Procedure 6(d) shall not apply;

(3)    The parties shall send all correspondence by electronic mail.

Dated: February 20, 2009               _s/ Jeanne J. Graham_____
                                    JEANNE J. GRAHAM
                                    United States Magistrate Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

National Football League                          CIVIL NO. 08-6254 PAM/JJG
Players Association,

      Plaintiff,

v.                                                **PRETRIAL SCHEDULING ORDER**

National Football League, and
National Football League
Management Council,

      Defendants.

---

Kevin Williams and Pat Williams,                  CIVIL NO. 08-6255 PAM/JJG

      Plaintiffs,

v.                                                **PRETRIAL SCHEDULING ORDER**

National Football League, John
Lombardo, M.D., Brian Finkle, M.D.
and Adolpho Birch,

      Defendants.

      Pursuant to Rule 16 of the Federal Rules of Civil Procedure and the Local Rules of this Court, and in order to secure the just, speedy, and inexpensive determination of this action, the following schedule shall govern these proceedings. The schedule may be modified only upon formal motion and a showing of good cause as required by Local Rule 16.3.

**Pleadings and Disclosures**
    **February 27, 2009**     - All pre-discovery disclosures required by Rule 26(a)(1), including production of documents, shall be completed on or before this date. Any disputes regarding pre-discovery disclosures shall be called immediately to the Court's attention by making an appropriate motion, and shall not be relied upon by any party as justification for not adhering to this Pretrial Scheduling Order.

1

**April 1, 2009**       -   All motions which seek to amend the pleadings or add parties must be served and filed on or before this date, and shall include a redlined version reflecting the changes contained in the proposed amended pleading. This deadline does not apply to motions which seek to amend the complaint to add a claim for punitive damages. Such motions must be brought on or before the non-dispositive motion deadline.

## Discovery and Non-dispositive Motions

No more than **25** interrogatories (counted in accordance with Rule 33) shall be served by any party. Each party shall take no more than **ten (10)** depositions, including any expert depositions.

Disclosure of the identity of expert witnesses under Rule 26(a)(2)(A) and the full disclosures required by Rule 26(a)(2)(B), accompanied by the written report prepared and signed by the expert witness, shall be made by **April 1, 2009**. Any expert rebuttal reports will be disclosed by **April 15, 2009**.

**April 29, 2009**       -   All discovery of any kind, including expert depositions, shall be commenced in time to be completed by this date. Each party shall fully supplement all discovery responses quarterly in accordance with Fed. R. Civ. P. 26(a). Any evidence responsive to a discovery request that has not been disclosed before the trial date, except for good cause shown, shall be excluded from evidence at trial.

**April 15, 2009**       -   All non-dispositive motions and supporting documents, including those which relate to discovery and any request for extension of this Pretrial Scheduling Order, shall be served, filed, and HEARD by this date. Prior to scheduling any non-dispositive motion, the parties are encouraged to consider whether the motion, including motions relating to discovery and scheduling, can be informally resolved through a telephone conference with Magistrate Judge Jeanne J. Graham. To the extent that formal discovery motions will be filed, non-dispositive motions may be scheduled for hearing by calling Judith Kirby, Calendar Clerk to Magistrate Judge Graham, at 651- 848-1890. A reply memorandum not exceeding 1750 words (including footnotes) may

be delivered to opposing counsel and the chambers of Magistrate Judge Graham no later than 9 a.m. on the business day preceding the hearing, so long as the total word count for the original and reply memorandum does not exceed 12,000 words. All non-dispositive motions shall be scheduled, filed, and served in compliance with the Electronic Case Filing Procedures for the District of Minnesota and in compliance with Local Rules 7.1, 37.1 and 37.2. When a motion, response, or reply brief is filed on ECF, one paper courtesy copy of the pleading and all supporting documents shall be mailed or delivered to Calendar Clerk, Judith Kirby, contemporaneously with the documents being posted on ECF.

**Settlement Conference, Dispositive Motions and Trial**

**April 27, 2009**     -   All dispositive motions shall be served, filed, and fully briefed by this date. Counsel for the moving party shall call Suzanne Ruiz, Calendar Clerk to Judge Paul A. Magnuson, at 651-848-1156 to schedule the hearing. All dispositive motions shall be scheduled, filed and served in compliance with the Electronic Case Filing Procedures for the District of Minnesota and in compliance with Local Rule 7.1. When a motion, response, or reply brief is filed on ECF, two paper courtesy copies of the pleading and one paper courtesy copy of all supporting documents shall be mailed or delivered to Calendar Clerk, Suzanne Ruiz, contemporaneously with the documents being posted on ECF. Counsel are forewarned that six to eight weeks advance notice is necessary to place a dispositive motion on the calendar.

Opposition to dispositive motions shall be filed by **May 4, 2009**. Replies in support of dispositive motions shall be filed by **May 11, 2009**. A hearing date for dispositive motions is set by the court for **May 14, 2009 at 10:30 a.m.**

Dated: <u>Wednesday, February 25, 2009</u>

*s/ Paul A. Magnuson*
Paul A. Magnuson
United States District Court Judge

| Discovery Cut-Off |
|---|
| **April 29, 2009** |
| |
| Non-Disp. Motions |
| **April 15, 2009** |
| |
| Disp. Motion Ends |
| **April 27, 2009** |
| |
| Trial Date |
| **June 15, 2009** |

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| NATIONAL FOOTBALL LEAGUE<br>PLAYERS ASSOCIATION, | Civil No. 08-6254 (PAM/JJG) |
| Plaintiff, | |
| v. | **NOTICE OF SETTLEMENT**<br>**CONFERENCE** |
| NATIONAL FOOTBALL LEAGUE, and<br>NATIONAL FOOTBALL LEAGUE<br>MANAGEMENT COUNCIL, | |
| Defendants. | |

| | |
|---|---|
| KEVIN WILLIAMS and PAT WILLIAMS, | Civil No. 08-6255 (PAM/JJG) |
| Plaintiffs, | |
| v. | |
| THE NATIONAL FOOTBALL LEAGUE,<br>JOHN LOMBARDO, M.D., BRIAN FINKLE,<br>and ADOLPHO BIRCH, | |
| Defendant*. | |

A settlement conference will be held on **Tuesday, June 2, 2009, at 9:30 a.m., in Courtroom 3B**, Warren E. Burger Federal Building and U.S. Courthouse, 316 North Robert Street, **SAINT PAUL,** Minnesota before the undersigned United States Magistrate Judge.

Counsel who will actually try the case and each party, armed with full settlement discretion, shall be present. If individuals are parties to this case, they shall be present. If a corporation or other collective entity is a party, a duly authorized officer or managing agent of that party shall be present. This means that each party must attend through a person who has the power to change that party's settlement posture during the course of

the conference. If the party representative has a limit, or "cap" on his or her authority, this requirement is not satisfied. If an insurance company is involved, the responsible agent must be present. Appearances by telephone are not permitted except in extraordinary circumstances, which must be brought to the attention of the Court and all parties no later than one week prior to the settlement conference by first contacting the Court by telephone to receive permission to electronically file a letter setting forth a full explanation of the circumstances. Any responses to such a letter shall be electronically filed no later than one business day following the filing of the letter request.

In order to encourage the parties to address the issue of settlement on their own, counsel must confer in person at least ten (10) days prior to the date of the settlement conference, to engage in a full and frank discussion of settlement. If the case does not settle, each attorney shall submit to the undersigned **at least one week before the date of the settlement conference** a confidential letter (not to exceed ten (10) pages, including exhibits) setting forth the parties' respective settlement positions before the meeting, their respective positions following the meeting and a reasoned, itemized analysis justifying their client's last stated settlement position. **This letter shall be submitted to the undersigned by e-mail to the following address: graham_chambers@mnd.uscourts.gov.**

Failure of any lawyer to submit this letter will result in the settlement conference being rescheduled and the imposition of an appropriate sanction on the attorney whose failure caused the conference to be postponed. Additional sanctions may be imposed for failure to comply with any of the other foregoing instructions.


Dated: May 6, 2009                        s/ Jeanne J. Graham
                                          JEANNE J. GRAHAM
                                          U.S. Magistrate Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

National Football League                          Civil No. 08-6254 (PAM/JJG)
Players Association,

                      Plaintiff,

v.

National Football League, and
National Football League
Management Council

                   Defendants.

                                         **ORDER**

Kevin Williams and Pat Williams,                  Civil No. 08-6255 (PAM/JJG)

                    Plaintiffs,

v.

National Football League, John
Lombardo, M.D., Brian Finkle,
and Adolpho Birch,

                   Defendants.

    As indicated at the status conference, the Court denies Defendants' Motions for a

Protective Order.   Should a party file discovery requests or notice depositions that another

party believes are improper, the parties may bring that specific dispute before Magistrate

Judge Graham.  It is the Court's expectation that such disputes will be briefed and submitted

on an expedited basis, given the short discovery deadlines in this matter.

Accordingly **IT IS HEREBY ORDERED that**:

1.   Defendants' Motion for Protective Order in case 08-6254 (Docket No. 55) is

     **DENIED**; and

2.   Defendants' Motion for Protective Order in case 08-6255 (Docket No. 48) is

     **DENIED**.


Dated: Thursday, February 26, 2009

                                        *s/ Paul A. Magnuson*
                                        Paul A. Magnuson
                                        United States District Court Judge

2

**Full docket text:**
TEXT ONLY ENTRY - ORDER granting [91] Motion for Admission Pro Hac Vice of Attorney
Christina N Burgos for Kevin Williams and Pat Williams. Fee paid; receipt number 4-033409. Approved
by Magistrate Judge Jeanne J. Graham on 4/6/09. (MMC)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/03/2010 14:13:14 | | | |
| **PACER Login:** | h10164 | **Client Code:** | |
| **Description:** | History/Documents | **Search Criteria:** | |
| **Billable Pages:** | 1 | **Cost:** | 0.08 |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

## TELEPHONE AND IN COURT STATUS CONFERENCE

National Football League Players
Association,

               Plaintiff,

v.

National Football League,

               Defendant.

_____

Kevin Williams and Pat Williams,

               Plaintiffs,

v.

The National Football League,
John Lombardo, M.D., Brian Finkle,
and Adolpho Birch,

               Defendants.

**COURT MINUTES**
BEFORE: Jeffrey J. Keyes
U.S. Magistrate Judge

| | |
|---|---|
| Case Nos: | 08-6254, 08-6255   (PAM/JJG) |
| Date: | March 4, 2009 |
| Court Reporter: | n/a |
| Tape Number: | 3/4/09 (12:59 – 13:27) |
| Time Commenced: | 1:10 p.m. |
| Time Concluded: | 1:40 p.m. |
| Time in Court: | 0 Hours & 30 Minutes |

APPEARANCES:

    For Plaintiff NFL Players Assocation: Mark Jacobson Esq. (in person), Lindquist & Vennum
             PLLP; and David Feher, Esq. (via phone), Dewey & LeBoeuf, LLP

    For Plaintiffs Kevin Williams and Pat Williams:  Ronn Kreps Esq. (in person), Fulbright &
             Jaworski; and Christina Burgos Esq. (via phone)

    For Defendant NFL:  Joseph Schmitt, Esq. (in person), Halleland Lewis Nilan & Johnson; and
             Daniel Nash, Esq. (via phone), Akin Gump Strauss Hauer & Feld

Interpreter / Language:   N/A

Hearing on: Telephone conference regarding status of discovery

IF MOTION IS RULED ON PLEASE INCLUDE DOCUMENT NUMBER AND TITLE APPEARING IN CM/ECF:  N/A

**ORDER TO BE SUBMITTED BY:**     ☐ **COURT**   ☐ **PLAINTIFF** ☐ **DEFENDANT**

Motions taken under advisement as of:  N/A

☐ ORDER TO BE ISSUED     <u>X</u> NO ORDER TO BE ISSUED     ☐ R&R TO BE ISSUED

☐ NO R&R TO BE ISSUED

☐ Exhibits retained by the Court     ☐ Exhibits returned to counsel

s/Danielle M. Mair    
Signature of Law Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

### CIVIL HEARING

National Football League Players Association,

        Plaintiff,

v.

National Football League and National Football
League Management Council,

        Defendants.

Kevin Williams and Pat Williams,

        Plaintiffs,

v.

National Football League, John Lombardo, Brian
Finkle, and Adolpho Birch,

        Defendants.

**COURT MINUTES**
BEFORE: Jeanne J. Graham
U.S. Magistrate Judge

| | |
|---|---|
| Case Nos: | Civ. No. 08-6254 (PAM/JJG) |
| | Civ. No. 08-6255 (PAM/JJG) |
| Date: | March 10, 2009 |
| Court Reporter: | n/a |
| Courtroom: | 3B |
| Time Commenced: | 11:00 a.m. |
| Time Concluded: | 12:40 p.m. |
| Time in Court: | 1 hour and 40 minutes |

**APPEARANCES:**

For National Football League Players Association: David Feher, Mark Jacobson

For Kevin Williams and Pat Williams: Peter Ginsberg, Ronn Kreps

For National Football League, John Lombardo, Brian Finkle, and Adolpho Birch: Joseph Schmitt, Daniel Nash,
Marla Axelrod

**PROCEEDINGS:**

The Court held a hearing on numerous discovery disputes. A written order will issue.

                                       s/Adrienne Meyers
                                       Signature of Law Clerk

### UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

| | |
|---|---|
| National Football League Players Association, | Civ. No. 08-6254 (PAM/JJG) |
| Plaintiff, | |
| v. | O R D E R |
| National Football League and National Football League Management Council, | |
| Defendants. | |
| Kevin Williams and Pat Williams, | Civ. No. 08-6255 (PAM/JJG) |
| Plaintiffs, | |
| v. | O R D E R |
| National Football League, John Lombardo, Brian Finkle, and Adolpho Birch, | |
| Defendants. | |

JEANNE J. GRAHAM, United States Magistrate Judge

This matter came before the Court on March 10, 2009, for a hearing on numerous discovery issues concerning interrogatories, document requests, depositions, and pretrial scheduling. The Court ruled orally on the disputes and stated its reasons on the record. The purpose of this Order is simply to provide those rulings in a written format.

### I.      Background

In the spirit of the expedited nature of this case, this introductory section is limited to a few noteworthy events precipitating the March 10th hearing.

The hearing was originally noticed on a renewed motion for a protective order filed on February 13, 2009, by Defendants National Football League (NFL), National Football League Management Council (NFLMC), John Lombardo, Brian Finkle, and Adolpho Birch. (Doc. No. 55 in Civ. No. 08-6254; Doc. No. 48 in Civ. No. 08-6255.) At that time, however, none of the Defendants had yet responded to the interrogatories and document requests of Plaintiff National Football League Players Association (NFLPA); no depositions had been noticed; and Plaintiffs Kevin Williams and Pat Williams had not even served any discovery requests. At the Rule 16 pretrial conference on February 24, 2009, the Honorable Paul A. Magnuson, United States District Judge, denied the renewed motion for a protective order and instructed the parties to bring any actual, specific discovery disputes before this Court.

A briefing schedule was subsequently set, and all parties filed memoranda in support of their positions on Monday, March 9, 2009. The Court considered all of the relevant submissions, including the briefing associated with the renewed motion for a protective order, before the hearing on March 10th. In keeping with the procedural history of how the disputes were originally presented, the Court worded its rulings in the framework of the motion for a protective order, that is, granting or denying Defendants' objections to discovery. This Order is similarly worded.

## II.    Interrogatories

The Court denied the NFL and NFLMC's objections to NFLPA's Interrogatories No. 1 and No. 2. The NFL and NFLMC must answer the interrogatories fully, which includes supplementing their responses to identify individuals and information prior to the suspension hearings, not just prior to the positive tests.

The Court sustained the NFL and NFLMC's objections to Interrogatories No. 3 and No. 4, based on the particular wording of the interrogatories. The NFLPA proposed an alternative wording at the hearing, which the Court approved, and the NFLPA will provide the revised interrogatories to the NFL and NFLMC.

The dispute pertaining to Interrogatory No. 5 was denied as moot based on the NFL and NFLMC's agreement to supplement their response.

The Court sustained the NFL and NFLMC's objection to further responding to Interrogatory No. 6 because the information requested is best obtained from Jeffrey Pash. The Court reminded the NFL and NFLMC of their continuing obligation to supplement this response, however, should they obtain any additional, responsive information.

The Court sustained the NFL and NFLMC's objection to further answering Interrogatory No. 7 because the information requested is cumulative of that sought in Interrogatories No. 3 and No. 4.

As to Interrogatory No. 8, the Court ordered the NFL and NFLMC to supplement its response after examining materials outside the arbitration record and proceedings.

## III.   Document Requests

The Court denied the NFL and NFLMC's objections to the discovery sought in Document Requests 1-6, given the agreed-upon limits as to scope. The parties will continue to engage in additional discussions regarding the scope of searches.

## IV.   Depositions

The NFLPA may depose Jeffrey Pash and Adolpho Birch on the issues of arbitrator bias and public policy violations. Questions to Pash regarding his general thought processes as an arbitrator are not permitted. Questions to Birch must be limited to *his* involvement or role in the

failure to disclose the fact that StarCaps contained bumetanide. The Court did not rule whether Dennis Curran or Roger Goodell may be deposed, as their depositions have not been noticed. The Court also reserved ruling on whether the Williams Plaintiffs may depose Pash. The Williams Plaintiffs may depose Drs. John Lombardo and Brian Finkle because those individuals are named defendants and because the claims in that case cast a broad net for discovery. Finally, the parties must schedule depositions so that each deponent is examined only once.

## V.   General Discovery Matters

The NFL and NFLMC must respond to the discovery requests served by the Williams Plaintiffs by Monday, March 16, 2009.

Any discovery requested for, or relevant to, a scheduled deposition must be provided as soon as practicable, and in any case, no later than three days prior to the deposition.

## VI.   Scheduling

The Court set dates and guidelines for informal dispute resolution conferences, which will be reiterated in a separate order. Any disputes that are not resolved informally, or that a party wants to reserve for formal disposition, will be heard by the undersigned on Wednesday, April 15, 2009, at 10:00 a.m. Moving papers must be filed by 12:00 p.m. on Wednesday, April 8, 2009, and opposition papers must be filed by 12:00 p.m. on Monday, April 13, 2009. No replies will be permitted.

Any objections or appeals to this Court's orders must be filed no later than two days after the date of the written order, if there is one, or the date of the hearing, if there is not. Responses to objections or appeals must be filed within two days of the objection or appeal.

4

Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY**

**ORDERED** that discovery shall proceed as ordered at the March 10, 2009 hearing and repeated

herein.

Dated this 11th day of March, 2009          *s/ Jeanne J. Graham*_____
                                             JEANNE J. GRAHAM
                                             United States Magistrate Judge

5

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION,

          Plaintiff,

v.

NATIONAL FOOTBALL LEAGUE and
NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL,

          Defendants.

CIVIL NO. 08-6254 (PAM/JJG)

**ORDER FOR INFORMAL DISPUTE
RESOLUTION CONFERENCES**

KEVIN WILLIAMS and PAT WILLIAMS,

          Plaintiffs,

v.

THE NATIONAL FOOTBALL LEAGUE,
JOHN LOMBARDO, M.D.,
BRIAN FINKLE, and ADOLPHO BIRCH,

          Defendants.

Civil No. 08-6255 (PAM/JJG)

      The parties appeared before the undersigned Magistrate Judge on a discovery

motion.  Parties discussed discovery issues and the progress of discovery given the

February 26, 2009 Pretrial Scheduling Order of District Judge Paul A. Magnuson

(Doc. Nos. 68 and 60, respectively).  The parties agreed to engage in regular informal

discovery telephone conferences with the undersigned to resolve issues as they arise, if necessary.

Accordingly, the Court orders the following procedures for this Informal Dispute Resolution ("IDR") process:

1.    IDR conferences with the Court shall occur on the following schedule:

**Conference No. 1:**

| | |
|---|---|
| March 17, 2009 | Agendas exchanged between parties |
| March 18, 2009 | Parties meet and confer |
| March 19, 2009 | Position letters submitted by 12:00 Noon |
| March 20, 2009 | IDR Meeting at 1:00 PM |

**Conference No. 2:**

| | |
|---|---|
| March 24, 2009 | Agendas exchanged between parties |
| March 25, 2009 | Parties meet and confer |
| March 26, 2009 | Position letters submitted by 12:00 Noon |
| March 27, 2009 | IDR Meeting at 10:00 AM |

**Conference No. 3:**

| | |
|---|---|
| March 27, 2009 | Topics will be discussed during IDR Meeting |
| March 30, 2009 | Parties meet and confer |
| March 31, 2009 | Position letters submitted by 4:00 PM |
| April 1, 2009 | IDR Meeting at 3:00 PM |

2.    The Court contemplates that these conferences will average 30-45 minutes, as necessary.  The Court shall set up a conference call using the Court's Conference Bridge.  All parties will call at the designated time.  To access the conference/hearing, dial **800-516-9896.  You will receive prompts and when appropriate, enter the following access code:  1099783283#**.  Once you enter the conference call, you will hear music until Magistrate Judge Graham joins the call.

3.    The Court will notify the parties if there is any change in the Court's schedule, the telephone number or access code for the conference call.

4.    At least one attorney knowledgeable about each disputed issue shall be present.

5. Each side shall submit to the Court proposed agendas for the upcoming IDR conference according to the schedule set forth in paragraph 1 above. The proposed agendas shall be limited to four (4) topics.

6. Subsequently, according to the schedule set forth in paragraph 1 above, the parties must meet and confer, either in person or via telephone, in a good faith effort to resolve the issues presented.

7. Finally, the parties shall submit position letters for the remaining disputes, according to the schedule set forth in paragraph 1 above. The parties shall submit the letters by e-mail to *graham_chambers@mnd.uscourts.gov*. The letters shall not be submitted through the CM/ECF system. The parties may include authorities or rule citations, but the court will not review lengthy briefs or voluminous exhibits for the IDR conference, as the purpose is to reduce litigation costs. Accordingly, each side shall limit its letter submission to no longer than ten (10) double-spaced pages, including exhibits. The Court may revisit the scope and permissible length of these submissions as the case moves forward.

8. The parties have a continuing obligation to inform the Court, no later than the end of the day one (1) calendar prior to the IDR conference, if the issues to be discussed are resolved.

9. The parties may request a motion hearing pursuant to the Local Rules and the Federal Rules of Civil Procedure on any issue presented or other issues they wish to bring to the attention of the Court via formal motion practice.

10. The parties understand and agree that there will be no record of the IDR conference(s) or its filings, until or unless formal motion practice is requested.

11. Parties must continue to meet their discovery obligations between the IDR conferences.

12. The Court may cease IDR conferences if the parties do not, in good faith, use the process to move the case forward.

Dated: March 11, 2009

       *s/ Jeanne J. Graham*
       JEANNE J. GRAHAM
       United States Magistrate Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

National Football League                                    Civil No. 08-6254 (PAM/JJG)
Players Association,

                    Plaintiff,

v.

National Football League and
National Football League
Management Council,

                    Defendants.
_____                                    **ORDER**

Kevin Williams and Pat Williams,                            Civil No. 08-6255 (PAM/JJG)

                    Plaintiffs,

v.

National Football League, John
Lombardo, M.D., Brian Finkle,
and Adolpho Birch,

                    Defendants.
_____

        This matter is before the Court on Defendants' appeal of the March 11, 2009, Order

of Magistrate Judge Jeanne J. Graham.

        Defendants take issue with Magistrate Judge Graham's determination that Defendants

are bound to comply with Plaintiffs' discovery requests in these proceedings. At bottom,

Defendants do not believe that they should have to engage in discovery. The Court has

considered this argument on several occasions and rejected it. It is not well taken here.

Defendants' specific objections are similarly without merit. The Court has previously determined that Plaintiffs' claims of breach of fiduciary duty and arbitrator bias can go forward. Plaintiffs are entitled to discovery on those claims. Indeed, even the caselaw on which Defendants rely recognizes that discovery can be had on a claim of arbitrator bias if there is "clear evidence of impropriety." (Defs.' Mem. at 7 (quoting Lucent Techs., Inc. v. Tatung Co., 379 F.3d 24, 32 (2d Cir. 2004).) Plaintiffs' success on their request for a preliminary injunction shows that they have at least raised a question as to whether there is such "clear evidence." They must be allowed discovery on this point.

The remainder of Defendants' objections are mere restatements of their firmly held belief that discovery is not appropriate because the Court's review is limited to the record before the arbitrator. Defendants may ultimately be correct on this issue, but at this stage of the litigation the Court is unwilling to place such restrictive limits on discovery. Indeed, Defendants' arguments are premature: the Court cannot and will not determine potentially dispositive legal issues in the context of a discovery dispute.

The issues presented by this case are complex, personal, and inflammatory. To present those issues clearly to the Court, the parties must engage in discovery in good faith. The Court encourages the parties to consider the Court's previous Orders carefully before bringing further appeals, objections, or Motions.

2

Accordingly, **IT IS HEREBY ORDERED that**:

1.   Defendants' Objections and Appeal in case 08-6254 (Docket No. 80) are

     **DENIED**;

2.   Defendants' Objections and Appeal in case 08-6255 (Docket No. 67) are

     **DENIED**; and

3.   The Order of Magistrate Judge Jeanne J. Graham (08-6254 Docket No. 78; 08-

     6255 Docket No. 65) is **AFFIRMED**.


Dated:   March 17, 2009

                                   *s/Paul A. Magnuson*
                                   Paul A. Magnuson
                                   United States District Court Judge

3

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION,

        Plaintiff,

v.

NATIONAL FOOTBALL LEAGUE, and
NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL,

        Defendants.

KEVIN WILLIAMS and PAT WILLIAMS,

        Plaintiffs,

v.

THE NATIONAL FOOTBALL LEAGUE,
JOHN LOMBARDO, M.D., BRIAN
FINKLE, and ADOLPHO BIRCH,

        Defendants.

COURT MINUTES – CIVIL
BEFORE:  JEANNE J. GRAHAM
U.S. MAGISTRATE JUDGE

| | |
|---|---|
| Case No: | CV 08-6254 (PAM/JJG) |
| | CV 08-6255 (PAM/JJG) |
| Date: | March 20, 2009 |
| Tape: | N/A |
| Time Commenced: | 1:00 PM |
| Time Concluded: | 2:30 PM |
| Time in Court: | 1 Hour & 30 Minutes |

Hearing on: **IDR CONFERENCE**

## APPEARANCES:

Plaintiffs:    David L. Greenspan and Mark Jacobson for plaintiff National Football League
               Players Association
               Peter R. Ginsberg and Ronn B. Kreps for plaintiffs Kevin and Pat Williams

Defendants:    Daniel L. Nash and Joseph G. Schmitt

## PROCEEDINGS:

✔    By telephone (dial-in teleconference by Conference Bridge)

IDR conference on discovery issues

## Other Remarks:

As to the Williams' and NFLPA's discovery requests, the NFL shall serve Amended and Supplemental answers and documents by **March 23, 2009**, pursuant to Judge Magnuson's ruling of March 17, 2009, affirming this Court's previous order.  The NFL shall give the Williamses and the NFLPA their own sets of responsive documents.

The NFL's preemption objection to the Williams' discovery is overruled.

To address the dispute about whether the Williamses already have some of the requested documents in their possession, the NFL will identify which pages in the arbitration record are responsive.  If there are responsive records not found in the arbitration record, they will be produced.

The scope of discovery has already been ruled upon for the NFLPA.  The Williams' scope is broader, given their state law claims, but the defense argues, the underlying matter is still about StarCaps and what the NFL knew, if anything, and what they did or did not tell the players.  Plaintiffs argue that their claims extend to a broader fiduciary duty of the NFL to disclose everything they knew about StarCaps and other substances to the players, which may not limited to the banned substance policy.

In balancing these interests, the court determined, for example, as to Williams' Interrogatory No. 1, the NFL's response may be the same as their answer to the NFPLA's similar Interrogatory:  namely, to those people who knew that StarCaps contained a substance banned under the policy.  Document Request Nos. 17 and 18 were also discussed in terms of what the request asks for – the arguably too broad category of any matter regarding the health, safety and well-being of the players – to  communications related only to StarCaps.  Plaintiffs explained that in asking for all communications in the broad request, they sought information as to why tests were done on StarCaps in 2006, the scope of the information gathered about StarCaps, and the communications which show the delegation of any responsibility to tell federal and state agencies and the players.  The Court ordered the NFL to respond accordingly in the first wave of responses due March 23, 2009.  Then, the court may allow the scope to expand to communications regarding all substances banned by the policy, depending on the showing of relevance and other factors.

For Document Request No. 20, the NFL is to provide responsive documents as to the duties, responsibilities and professional connection between the persons mentioned.

Document Request No. 21 is a narrower request than all communications, and, therefore, the NFL's response shall include complaints and grievances received by the NFL, as to any banned substance under the Policy.

The NFL will disclose their personnel files as requested in Document Request No. 14, but Request No. 23 and Interrogatory No. 18 should be re-written. The parties discussed what they were looking for in those questions, including information about weight approval provisions in the contracts and other contract provisions over which the NFL claims control or supervision. These requests are based upon the Williamses state law claims, and the statutory grounds for seeking information on the NFL's relationship with its players.

With regard to the depositions schedule, Dr. Lombardo will be deposed on March 30, 2009 or, if not, on April 1, 2009. Dr. Finkle will be deposed on March 31, 2009. The Williamses will indicate topics of testimony they expect to ask Mr. Pash in deposition and what, if any, topics are different than the Rule 30(b)(6) topics already listed and they will do so by *March 24, 2009*. Plaintiffs offered to limit their questions to Mr. Pash to the Rule 30(b)(6) topics, but it is unclear who the NFL will designate for the Rule 30(b)(6) deposition noticed by both the Williamses and the NFPLA. The parties will meet and confer regarding the depositions for the next IDR on March 27, 2009. By Tuesday, March 24, 2009, the NFL shall designate the Rule 30(b)(6) deponent(s). Then, the parties and the court will have more specific information as to whom will be deposed and upon which topics the parties hope to question the deponents. The Court will decide any disputes on this issue and if someone other than Dr. Lombardo needs to be deposed on March 30, 2009, the court will consider the dispute before the IDR conference. Further deposition dates will be set at the next IDR conference. The parties must be prepared to have the Rule 30(b)(6) deposition as early as either March 30, 2009 or April 1, 2009. The depositions of Mr. Pash and Mr. Birch will occur sometime between April 13, 2009 and April 30, 2009. Any supplemental documents discovered for the depositions shall be provided within 2 days of the deposition, regardless of the discovery deadline.

With regard to the NFPLA requests, the NFL was committed to providing all requests and disclosures previously withheld pursuant to their objections to the USMJ order, no later than March 23, 2009. This will include the identity of the custodians of the records produced. There will then be a rolling production of all other supplemental documents, and in any case, documents will be produced no later than 3 days before the scheduled depositions. In addition, privilege logs will be produced.

The next IDR Conference will take place on **Friday, March 27, 2009, beginning at 10:00 AM**. The Court shall set up a conference call using the Court's Conference Bridge. All parties will call at the designated time. To access the conference/hearing, dial **800-516-9896. You will receive prompts and when appropriate, enter the following access code: 1099783283#**. You will then be asked to state your name, followed by the # sign. Once you enter the conference call, you will hear music until Magistrate Judge Graham joins the call.

 s/ Judith M. Kirby
Judicial Assistant

### UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, | ) ) ) | CIVIL NO. 08-6254 (PAM/JJG) |
| Plaintiff, | ) ) | |
| v. | ) ) | **PROTECTIVE ORDER** |
| THE NATIONAL FOOTBALL LEAGUE, and THE NATIONAL FOOTBALL LEAGUE MANAGEMENT COUNCIL, | ) ) ) ) ) | |
| Defendants. | ) ) | |
| | ) ) | CIVIL NO. 08-6255 (PAM/JJG) |
| KEVIN WILLIAMS and PAT WILLIAMS, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| THE NATIONAL FOOTBALL LEAGUE, JOHN LOMBARDO, M.D., BRIAN FINKLE, and ADOLPHO BIRCH, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

Based upon the Stipulation for Protective Order (Doc. Nos. 92 and 79,

respectively), entered into by the parties for an order pursuant to Fed. R. Civ. P.

26(c) that trade secret or other confidential information be disclosed only in

designated ways:

1.      As used in the Protective Order, these terms have the following meanings:

"Attorneys" means counsel of record in either case captioned above;

"Confidential" documents are documents designated pursuant to paragraph 2;

"Confidential - Attorneys' Eyes Only" documents are the subset of Confidential documents designated pursuant to paragraph 5;

"Documents" are all materials within the scope of Fed. R. Civ. P. 34;

"Written Assurance" means an executed document in the form attached as Exhibit A.

2.      By identifying a document "Confidential", a party may designate any document, including interrogatory responses, other discovery responses, or transcripts, which the party in good faith contends to constitute or contain trade secret or other confidential information.

3.      All Confidential documents, along with the information contained in the documents, shall be used solely for the purpose of these actions and for no other purpose, and no person receiving such documents shall, directly or indirectly, transfer, disclose, or communicate in any way the contents of the documents to any person other than those specified in paragraph 4.  All discovery responses will be served upon counsel of record in both of these actions.

4.      Access to any Confidential document shall be limited to:

(a) the Court and its officers;

(b)  the named parties to these cases;

(c)  Attorneys and their office associates, legal assistants, and stenographic and clerical employees;

(d)  persons shown on the face of the document to have authored or received it;

(e)  court reporters retained to transcribe testimony;

(f)  the parties' inside counsel;

(g)  employees of the parties;

(h)  outside independent persons (i.e., persons not currently or formerly employed by, consulting with, or otherwise associated with any party) who are retained by a party or its attorneys to furnish technical or expert services, or to provide assistance as mock jurors or focus group members or the like, and/or to give testimony in this action.

5.      The parties shall have the right to further designate Confidential documents or portions of documents as "Confidential - Attorneys' Eyes Only". Disclosure of such information shall be limited to the persons designated in paragraphs 4(a), (c), (d), (e), (f), and (h).

6.      Third parties producing documents in the course of this action may also designate documents as "Confidential" or "Confidential - Attorneys' Eyes Only", subject to the same protections and constraints as the parties to these actions. A copy of the Protective Order shall be served along with any subpoena served in connection with these actions. All documents produced by such third

parties shall be treated as "Confidential - Attorneys' Eyes Only" for a period of 10 business days from the date of their production, and during that period any party may designate such documents as "Confidential" or "Confidential - Attorneys' Eyes Only" pursuant to the terms of the Protective Order.

7.    Each person appropriately designated pursuant to paragraph 4(g) to receive Confidential information shall execute a "Written Assurance" in the form attached as Exhibit A.  Opposing counsel shall be notified at least 3 business days prior to disclosure to any such person who is known to be an employee or agent of, or consultant to, any competitor of the party whose designated documents are sought to be disclosed.  Such notice shall provide a reasonable description of the outside independent person to whom disclosure is sought sufficient to permit objection to be made.  If a party objects in writing to such disclosure within 3 business days after receipt of notice, no disclosure shall be made until the party seeking disclosure obtains the prior approval of the Court or the objecting party.

8.    All depositions or portions of depositions taken in these actions that contain trade secret or other confidential information may be designated "Confidential" or "Confidential - Attorneys' Eyes Only" and thereby obtain the protections accorded other "Confidential" or "Confidential - Attorneys' Eyes Only" documents.  Confidentiality designations for depositions shall be made either on the record or by written notice to the other parties within 5 business days of receipt of the transcript.  Unless otherwise agreed, depositions shall be treated as "Confidential - Attorneys' Eyes Only" during the 5-day period following

receipt of the transcript.  The deposition of any witness (or any portion of such

deposition) that encompasses Confidential information shall be taken only in the

presence of persons who are qualified to have access to such information.

9.     Any party who inadvertently fails to identify documents as

"Confidential" or "Confidential - Attorneys' Eyes Only" shall have 5 business

days from the discovery of its oversight to correct its failure.  Such failure shall be

corrected by providing written notice of the error and substituted copies of the

inadvertently produced documents.  Any party receiving such inadvertently

unmarked documents shall make reasonable efforts to retrieve documents

distributed to persons not entitled to receive documents with the corrected

designation.

10.     Any party who inadvertently discloses documents that are privileged

or otherwise immune from discovery shall, promptly upon discovery of such

inadvertent disclosure, so advise the receiving parties and request that the

documents be returned.  The receiving parties shall return such inadvertently

produced documents, including all copies, within 10 days of receiving such a

written request.  Any party returning such inadvertently produced documents may

thereafter seek re-production of any such documents pursuant to applicable law.

11.     If a party files a document containing Confidential information with

the Court, it shall do so in compliance with the Electronic Case Filing Procedures

for the District of Minnesota.  Materials or information designated "Confidential"

or "Confidential - Attorneys' Eyes Only" may be disclosed at a hearing or trial